# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

RONIT D. APPEL,

                        Plaintiff,

                -against-

SCHOEMAN UPDIKE KAUFMAN STERN &
ASCHER LLP, MINDY H. STERN, BETH L.
KAUFMAN, CHARLES B. UPDIKE, ANDREA D.
ASCHER, SUSAN S. CASERO, CINDY NYGAARD,
VERONICA LAW, LAURIE ZELIGSON,
THE ZELIGSON FIRM, PAUL E. BREENE,
REED SMITH LLP, MADISON 96 ASSOCIATES, LLC,
STUART J. BOESKY, JAMISON WEINER,
FRENCH PARTNERS, LLC, THE FEIL
ORGANIZATION, INC., JEFFREY MANAGEMENT
CORP., JEFFREY FEIL, JOHN FRANCIS BORRELLI
ARCHITECT, P.C., JOHN FRANCIS BORRELLI,
INTERIOR CONSTRUCTION CORP., JOSEPH
BRUZZESE, CREATIVE ENVIRONMENT SOLUTIONS
CORP., H & B CONSTRUCTION SERVICES, INC.,
M & B CONSTRUCTION, and M & B
CONSTRUCTION SERVICES,

                        Defendants.

------------------------------------------------------------------x

**SUMMONS**

Index No. _____

**DOCUMENT
ELECTRONICALLY
FILED**

To the above named Defendants:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff at the address indicated below within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: February 20, 2014
        New York, New York

                              RONIT D. APPEL

                              322 West 78th Street
                              New York, NY 10024
                              (347) 387-6100
                              ronitdappel@gmail.com
                              *Plaintiff and Attorney for Plaintiff*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

RONIT D. APPEL,

                     Plaintiff,

                -against-

SCHOEMAN UPDIKE KAUFMAN STERN &
ASCHER LLP, MINDY H. STERN, BETH L.
KAUFMAN, CHARLES B. UPDIKE, ANDREA D.
ASCHER, SUSAN S. CASERO, CINDY NYGAARD,
VERONICA LAW, LAURIE ZELIGSON,
THE ZELIGSON FIRM, PAUL E. BREENE,
REED SMITH LLP, MADISON 96 ASSOCIATES, LLC,
STUART J. BOESKY, JAMISON WEINER,
FRENCH PARTNERS, LLC, THE FEIL
ORGANIZATION, INC., JEFFREY MANAGEMENT
CORP., JEFFREY FEIL, JOHN FRANCIS BORRELLI
ARCHITECT, P.C., JOHN FRANCIS BORRELLI,
INTERIOR CONSTRUCTION CORP., JOSEPH
BRUZZESE, CREATIVE ENVIRONMENT SOLUTIONS
CORP., H & B CONSTRUCTION SERVICES, INC.,
M & B CONSTRUCTION, and M & B
CONSTRUCTION SERVICES,

                    Defendants.

-------------------------------------------------------------------x

**VERIFIED COMPLAINT**

Index No. _____

**JURY TRIAL
DEMANDED**

**DOCUMENT
ELECTRONICALLY
FILED**

       Plaintiff Ronit D. Appel, representing herself, complaining of

defendants Schoeman Updike Kaufman Stern & Ascher LLP, Mindy H. Stern, Beth

L. Kaufman, Charles B. Updike, Andrea D. Ascher, Susan S. Casero, Cindy

Nygaard, Veronica Law, Laurie Zeligson, The Zeligson Firm, Paul E. Breene, Reed

Smith LLP, Madison 96 Associates, LLC, Stuart J. Boesky, Jamison Weiner, French

Partners, LLC, The Feil Organization, Jeffrey Management Corp., Jeffrey Feil,

John Francis Borrelli Architect, P.C., John Francis Borrelli, Interior Construction

Corp., Joseph Bruzesse, Creative Environment Solutions Corp., H & B Construction Services, Inc., M & B Construction, and M & B Construction Services alleges:

## PARTIES

1.     Plaintiff Ronit D. Appel is a natural person residing in New York, New York.  Ronit D. Appel is an attorney duly admitted to practice law in New York and Israel who was employed as an attorney by defendant Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman") from September 8, 2009 through April 24, 2013, when she was unlawfully terminated by Schoeman.

2.     Defendant Schoeman Updike Kaufman Stern & Ascher LLP is a law firm with its place of business in New York, New York that is, upon information and belief, a limited liability partnership organized and existing under the laws of the State of New York.

3.     Defendant Mindy H. Stern is a natural person residing, upon information and belief, in New York, New York.  Mindy H. Stern is a member of Schoeman and the managing partner of Schoeman.

4.     Defendant Beth L. Kaufman is a natural person residing, upon information and belief, in New Rochelle, New York.  Beth L. Kaufman is a member of Schoeman.

5.     Defendant Charles B. Updike is a natural person residing, upon information and belief, in New Rochelle, New York.  Charles B. Updike is a member of Schoeman.

2

6.    Defendant Andrea D. Ascher is a natural person residing, upon information and belief, in Chappaqua, New York. Andrea D. Ascher is a member of Schoeman.

7.    Defendant Susan S. Casero is a natural person who is Counsel at Schoeman.

8.    Defendant Cindy Nygaard is a natural person residing, upon information and belief, in Staten Island, New York. Cindy Nygaard is the Office Manager of Schoeman.

9.    Defendant Veronica Law is a natural person residing, upon information and belief, in New York, who is employed as a secretary at Schoeman.

10.    Defendant Laurie Zeligson is a natural person residing, upon information and belief, in New York, New York. Laurie Zeligson is, upon information and belief, the sole member of The Zeligson Firm.

11.    Defendant The Zeligson Firm is a law firm with its principal place of business in New York, New York.

12.    Defendant Paul E. Breene is a natural person who is a partner at Reed Smith LLP and who works in Reed Smith LLP's New York office.

13.    Defendant Reed Smith LLP is a law firm that is, upon information and belief, a limited liability partnership organized and existing under the laws of the State of New York, with an office in New York, New York.

3

14. Defendant Madison 96 Associates, LLC is a limited liability corporation with its principal place of business in New York, New York.

15. Defendant Stuart J. Boesky is a natural person residing in New York, New York. Stuart J. Boesky is a member of Madison 96 Associates, LLC.

16. Defendant Jamison Weiner is a natural person residing in New York, New York. Jamison Weiner is a member of Madison 96 Associates, LLC.

17. Defendant French Partners, LLC is, upon information and belief, a foreign limited liability corporation with its principal office in New York, New York. Upon information and belief, French Partners, LLC owns the building located at 551 Fifth Avenue, New York, New York.

18. Defendant The Feil Organization, Inc. is, upon information and belief, a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York. Upon information and belief, The Feil Organization owns the building located at 551 Fifth Avenue, New York, New York and/or is the managing agent of the building located at 551 Fifth Avenue, New York, New York.

19. Defendant Jeffrey Management Corp. is, upon information and belief, a New York corporation with its principal office in New York, New York. Upon information and belief, Jeffrey Management Corp. is the managing agent of the building located at 551 Fifth Avenue, New York, New York.

4

20.    Jeffrey Feil is a natural person who is, upon information and belief, the Chief Executive Officer of The Feil Organization and Jeffrey Management Corp.

21.    Defendant John Francis Borrelli Architect, P.C. is, upon information and belief, a professional corporation with its principal office in New York, New York.

22.    Defendant John Francis Borrelli is a natural person who is, upon information and belief, the owner and Chief Executive Officer of John Francis Borrelli Architect, P.C.

23.    Defendant Interior Construction Corp. is, upon information and belief, a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

24.    Defendant Joseph Bruzzese is a natural person who is, upon information and belief, the Chief Executive Officer of Interior Construction Corp.

25.    Defendant Creative Environment Solutions Corp. is, upon information and belief, a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

26.    Defendant H & B Construction Services, Inc. is, upon information and belief, a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

27.    Defendant M & B Construction is, upon information and belief, a construction company doing business in New York, New York.

28.    Defendant M & B Construction Services is, upon information and belief, a construction company doing business in New York, New York.

## JURISDICTION AND VENUE

29.    This Court has jurisdiction in this action pursuant to CPLR §§ 301 and 302.

30.    Venue is proper in this Court pursuant to CPLR § 503(a) because plaintiff resides in New York County.

## FACTUAL ALLEGATIONS

31.    Plaintiff Ronit D. Appel was employed as an attorney at Schoeman from September 8, 2009 through April 24, 2013, when she was unlawfully terminated by Schoeman in retaliation for her having exercised her rights under the Occupational Safety and Health Act (the "OSH Act"), in retaliation for her having filed a work-safety complaint with the Occupational Safety and Health Administration ("OSHA"), in retaliation for her having complained of other unlawful activities at Schoeman, as discussed herein, and as part of a pattern of religious and age discrimination that plaintiff was subjected to at Schoeman.

## Plaintiff Was, Per Schoeman, Schoeman's Star Associate

32.    Prior to commencing her employment as an attorney at Schoeman in September of 2009, plaintiff worked as a summer associate at Schoeman during the summer of 2008. Schoeman was very pleased with plaintiff and at the conclusion of the summer, Schoeman extended an offer to plaintiff to return to Schoeman as a

6

second-year associate in September of 2009, after the completion of plaintiff's articled clerkship at Meitar Liquornik Geva Leshem Brandwein Law Offices, an internationally renowned law firm that is one of the largest and most prestigious law firms in Israel and that is widely considered to be Israel's leading international law firm.

33.    Throughout plaintiff's employment at Schoeman, plaintiff's exceptional skills as an attorney, particularly plaintiff's exceptional analytical abilities and exceptional research and writing skills, were well-known amongst the attorneys at Schoeman and plaintiff was given significant responsibilities during her time at Schoeman.  In addition to drafting motions for high-profile litigation matters, which were submitted to court with very minimal or no editing by any Schoeman partner or attorney, plaintiff routinely appeared in court alone to argue motions and attend court conferences, without the accompaniment of any other Schoeman partner or attorney.

34.    Throughout plaintiff's employment at Schoeman, it was well-known amongst the members of Schoeman that plaintiff is exceptionally bright and was Schoeman's best and most capable associate.

35.    During her employment at Schoeman, plaintiff co-authored at least two articles with partners at Schoeman that were published in outside publications under plaintiff's name and the name of a Schoeman partner.

7

36.    On at least one occasion while plaintiff was employed at Schoeman, in or about 2011, Charles B. Updike, the most senior partner at Schoeman, referred to plaintiff as the firm's "star associate."

37.    On at least one occasion, in 2012, while plaintiff was employed at Schoeman, Andrea D. Ascher, a partner at Schoeman, referred to plaintiff as the firm's best researcher when giving plaintiff a research assignment.

38.    On at least one occasion, in or about 2011, while plaintiff was employed at Schoeman, Cindy Nygaard, the firm's office manager referred to plaintiff as the firm's expert in writing.

39.    On at least one occasion while plaintiff was employed at Schoeman, in or about 2012, Cindy Nygaard, the firm's office manager, stated that plaintiff is a pleasure to work with and that she wished that all of the attorneys at Schoeman were as easy to work with as plaintiff.

40.    On at least one occasion while plaintiff was employed at Schoeman Dolores Van Scott, one of the firm's accountants, referred to plantiff as being very polite.

41.    On numerous occasions during plaintiff's employment at Schoeman, members or employees of Schoeman referred to plaintiff as being a pleasure to work with.

42.    In 2011, plaintiff received a $5,000.00 pay increase.

8

43.    During her employment at Schoeman, plaintiff received numerous bonuses from Schoeman, including a bonus received shortly before plaintiff's termination, in January of 2013.

### Plaintiff Was Viewed as One of The Most Talented and Highly-Regarded Students in Her Law School

44.    During her studies at the Radzyner School of Law at the Interdisciplinary Center Herzliya, one of Israel's most prestigious law schools, plaintiff excelled in her law studies and was viewed by her peers and lecturers alike as a brilliant student with unique talents and abilities.

45.    Plaintiff was born to American parents and grew up in New York City in an English-speaking home. After graduating from high school, plaintiff commenced law studies in Israel in Hebrew at the age of 18 and quickly became bilingual in English and Hebrew. Plaintiff mastered a superb level of academic Hebrew and was one of the best writers in her class, which was comprised entirely of Israeli students. Plaintiff was among a very small number of students selected to serve as members of the school's Law Review. In four years, plaintiff simultaneously earned both a law degree as well as a B.A. in Government. Plaintiff was on the Dean's List and graduated in the top 12% of her class. Plaintiff served on the school's very selective Hebrew-speaking debate team and participated in numerous prestigious programs throughout law school that were very competitive to be accepted to.

9

46.    During the last year of plaintiff's studies, plaintiff was a member of the very prestigious Argov Fellows Program in Leadership and Diplomacy, which was very competitive to be accepted to, in which capacity plaintiff traveled to numerous cities around the world to meet with various leaders in the fields of law, business, and government.

47.    During her studies, plaintiff worked as a Research and Teaching Assistant for a Senior Lecturer of Public International Law, in which capacity, plaintiff, among other things, graded the papers and exams of law students studying Public International Law.

## Each Employer That Plaintiff Worked for Prior to Commencing Her Employment at Schoeman Was Extremely Impressed by Plaintiff's Intelligence, Work Product, and Interpersonal Skills

48.    During the summer following plaintiff's third year of law school, plaintiff clerked for Hon. Milton A. Tingling, Jr. of New York State Supreme Court as a Judicial Intern. Judge Tingling was extremely impressed with plaintiff and wrote her a glowing recommendation. In his letter of recommendation, Judge Tingling stated, *inter alia*, that plaintiff's "research, analytical, and writing skills are unsurpassed." Judge Tingling stated regarding his decision to hire plaintiff: "[i]n my twenty-five years as an attorney and a judge, I have never made a better decision." Judge Tingling concluded his letter of recommendation by stating that "I can not recommend [plaintiff] more highly."

10

49.   In order to be admitted to the Israel Bar, plaintiff was required to do a one-year articled clerkship in Israel.  After working as a summer associate at Schoeman during the summer of 2008, plaintiff worked for a year as an articled clerk at Meitar Liquornik Geva & Leshem Brandwein ("Meitar"), which is widely considered to be Israel's best and most prestigious international law firm and which is highly competitive to be accepted to.  Each attorney that plaintiff worked for at the firm was extremely impressed with plaintiff and plaintiff was told that plaintiff was the best articled clerk the firm ever had.  Plaintiff was further told by one of the most senior partners at the firm that plaintiff's writing abilities were superior to the writing abilities of the firm's senior associates.

50.   In Meitar's letter of recommendation to plaintiff, one of Meitar's most senior partners stated:

> I am a senior Partner at Meitar Liquornik Geva & Leshem Brandwein, an internationally acclaimed law firm located in Ramat Gan, Israel.  Ronit D. Appel worked as an articled clerk (the equivalent of a first year associate in NY) in our law firm from September 2008 through August 2009.
>
> During her time in our firm, Ronit worked on numerous litigation matters under my direct supervision, and I was fortunate enough to have had the opportunity to observe her talents and character.  In addition to working with me, Ronit worked with many other associates and partners in our firm, all of whom praised the level of her work, her talents, responsibility, and fine character.

11

Ronit worked in many of our firm's departments, yet dedicated the vast majority of her time to our Litigation and Corporate Departments. Her work in the Litigation Department was conducted in the Hebrew language, while her work in the Corporate Department was conducted for the most part in the English language. Ronit stood out in every department she worked in, and was an invaluable member of the firm's Litigation and Corporate Departments in particular.

Ronit is an extraordinarily talented soon-to-be lawyer. She has demonstrated that she possesses a vast legal knowledge and has the unique ability to astutely and creatively apply such knowledge to achieve the best possible legal results for our clients. It became quickly evident that Ronit is a quick thinker, with superb legal analysis abilities. Her ability to express herself both orally and in writing is exceptional, and legal documents and memos which she drafted were highly regarded. Her writing abilities, both in Hebrew and in English, are remarkable, and never cease to impress me.

Ronit handled each matter she worked on with extreme diligence, care, initiative, and enthusiasm, and her work product was highly valued by our firm's lawyers and clients alike. She also had excellent interpersonal relations with our firm's clients and legal and administrative staff, as well as with lawyers of other firms.

I consider myself privileged to have had the opportunity to work with Ronit and I am confident that any law firm which will hire Ronit as a lawyer will be equally impressed by her many talents. I know that Ronit will be highly successful in all her future endeavors.

12

## Plaintiff's Complaint Regarding the Unsafe and Toxic Air at Schoeman

51.    After completing her articled clerkship at Meitar at the end of August of 2009, plaintiff immediately began working as a second-year associate at Schoeman on September 8, 2009.  At the time plaintiff commenced her employment at Schoeman, Schoeman's office was located at 60 East 42nd Street, New York, New York.  In or about the fall of 2012, Schoeman's lease on its office space at 60 East 42nd Street came to an end.  Several months before the lease ended, Schoeman entered into a new lease for office space located on the twelfth floor of 551 Fifth Avenue, New York, New York, which was to undergo extensive construction and renovation work before Schoeman would move in to the space.  However, the renovation and construction work was not completed by the time Schoeman's lease at 60 East 42nd Street expired.  As a result, in or about November of 2012, Schoeman moved into a temporary office space on the fourteenth floor of 551 Fifth Avenue as the renovation and construction work on the twelfth floor of 551 Fifth Avenue continued.   The renovation and construction work performed on the twelfth floor was extensive.  Attached hereto as **Exhibit A** are print-outs from the Department of Building's website that show that an estimated $251,900.00 worth of interior renovations, including demolition of existing, and construction of new, partitions and finishes, and an estimated $95,400.00 in mechanical and plumbing work were performed on the twelfth floor space.  In April of 2013, the construction and renovation work was still not complete.  Nonetheless, over the weekend of April

13

5, 2013, although the twelfth floor was still undergoing heavy renovation and construction work, Schoeman moved from its temporary location on the fourteenth floor of 551 Fifth Avenue to its permanent location on the twelfth floor of 551 Fifth Avenue.

52.    Before the move, on each of the at least two times that plaintiff entered the twelfth floor of 551 Fifth Avenue, she experienced symptoms as a result of the toxic work environment on the twelfth floor: (i) once, a few weeks prior to the move, when plaintiff stepped out of the elevator on the twelfth floor because Cindy Nygaard, Schoeman's Office Manager, pressured her to go to the twelfth floor to select an office despite plaintiff's voiced unwillingness to enter the construction area to the dangerous fumes and dust there, plaintiff immediately began coughing heavily and became nauseous and returned upstairs. Ms. Nygaard had told plaintiff prior to plaintiff's entering the twelfth floor and after plaintiff had repeatedly expressed concerns regarding the health risks of entering the twelfth floor, that the area was safe and that there were no fumes, which, upon exiting the elevator on the twelfth floor, plaintiff realized was not the case at all. Plaintiff thereafter told Ms. Nygaard that she would pick an office without seeing the new offices because she did not want to expose herself to the dangerous construction dust and fumes. Thereafter, despite plaintiff's insistence that she did not want to go down to the twelfth floor to select an office prior to the move, one of the partners at the firm, Andrea D. Ascher, tried to pressure plaintiff numerous times prior to

14

the move to go down to the new space to select an office, at one point swearing that the area was safe and the firm would not subject plaintiff to an unsafe environment, and that if plaintiff wanted to, she could use a handkerchief as a mask, but plaintiff refused to go downstairs because of the health risks involved; and (ii) a day or two before the move, when the movers were present, when Ms. Nygaard showed plaintiff her new office on the twelfth floor, after reassuring plaintiff that the twelfth floor was completely safe, which plaintiff later realized was not the case, plaintiff became nauseous and returned upstairs after informing Ms. Nygaard that the air on the twelfth floor was making her nauseous.

53.    On Monday, April 8, 2013, upon arriving to work at Schoeman's new location on the twelfth floor, plaintiff became very nauseous and began to cough from the construction fumes and dust.

54.    The conference room immediately adjacent to plaintiff's office, that shares a wall with plaintiff's personal office, was undergoing heavy construction. Another conference room directly diagonal from plaintiff's office was also undergoing heavy construction. Heavy construction work was also underway in the hallway right outside of the reception area, which was directly in front of plaintiff's office.

55.    Plaintiff immediately told Schoeman's office manager, Cindy Nygaard, that she would be working from home on April 8th and 9th because of the fumes and dust. Ms. Nygaard did not object. Ms. Nygaard knew that the construction fumes

15

and dust had caused plaintiff to experience symptoms in the past as well when plaintiff had entered the twelfth floor prior to the move.

56. When plaintiff asked Ms. Nygaard how long the construction would be going on for, Ms. Nygaard responded that it would take approximately a month to complete the construction, including completion of the construction in the conference room immediately adjacent to plaintiff's personal office.

57. Plaintiff was advised by her father, a highly-respected physician in Manhattan, then and on subsequent occasions, not to expose herself to the toxic construction environment at Schoeman.

58. Plaintiff worked from home on April 8th and 9th and was away on a previously-scheduled vacation from April 10th through April 12th. Upon entering the twelfth floor after returning from vacation on Monday, April 15th, plaintiff again began to experience heavy coughing and nausea from the construction dust. She opened her window in her office very high. It was a very cold day and even though plaintiff sat with her coat on, she was freezing and kept shivering. After staying in her office for about two hours, plaintiff walked out of her office into the reception area, where Ms. Nygaard and the receptionist, Pamela Banks, were present. They both immediately exclaimed that plaintiff's hands were entirely blue and Ms. Banks said that plaintiff's face was blue as well and that plaintiff looked completely flushed. Ms. Nygaard said that she would not allow plaintiff to continue to work like this and attempted to set plaintiff up in another office, but the construction

16

dust in the hallway caused plaintiff to experience coughing and nausea. Plaintiff notified Ms. Nygaard that she would go home and work from home. Ms. Nygaard then told plaintiff that the days plaintiff had worked from home the previous week would be counted as vacation days, per the instructions she received from two partners at the firm, Beth L. Kaufman and Charles B. Updike. Plaintiff told Ms. Nygaard that that was very unfair. After trying unsuccessfully to speak with Mindy H. Stern, who was on the phone, plaintiff returned home to work from home and told Ms. Nygaard that she would contact Ms. Stern later in the day.

59.    After returning home on April 15, 2013, plaintiff immediately contacted the Occupational Safety and Health Administration ("OSHA") and reported the unsafe work environment at Schoeman, whereupon OSHA immediately contacted Schoeman and sent Schoeman a letter requesting that the appropriate action be taken by Schoeman to correct the situation.

60.    In addition, upon returning home on April 15, 2013, plaintiff attempted, upon instructions from Ms. Nygaard, to download certain VPN software that would allow plaintiff to connect remotely to Schoeman's server from home. After attempting unsuccessfully to install the software, plaintiff contacted the firm's IT Department Head, Joe Badoloto, who attempted to help plaintiff install the software. When Mr. Badoloto was unsuccessful in helping plaintiff install the software, he told plaintiff that he would need to remotely connect to plaintiff's personal home computer (*i.e.*, plaintiff would need to grant him remote access to her

17

personal home computer) in order to complete the installation because it was too complicated for plaintiff to perform herself. Plaintiff told Mr. Badoloto that she did not feel comfortable having the firm access her personal home computer and that if plaintiff needs any documents while working from home, she would contact someone at the firm and ask them to send her the documents she needs. Plaintiff then sent Ms. Nygaard an e-mail in which she asked whether the firm could provide her with a laptop on which it can install the VPN software, which plaintiff could use at home. In her e-mail, plaintiff wrote:

> Cindy,
>
> Joe advised me that in order to complete the installation of the VPN software, he wants to connect to my personal home computer because he believes the process is too complicated for me to complete. I am not prepared to grant anyone access to my personal home computer as it contains personal information. Please let me know if the firm can provide me with a laptop that I can pick up from the office and use at home. If the Joe can install the software on a firm laptop, I can bring it home and use it at home.
>
> Thanks.
>
> Ronit

61.    Plaintiff did not receive a response from Ms. Nygaard to her e-mail.

62.    That day, plaintiff also sent a letter to Mindy H. Stern, on which she copied Beth L. Kaufman, Charles B. Updike, and Cindy Nygaard, in which plaintiff wrote:

18

Dear Mindy:

Last Monday, April 8, 2013, upon entering the office, I began coughing heavily and got very nauseous due to the fumes and construction dust in the office. I spoke with Cindy and told her that I would be working from home on April 8th and April 9th. I also attempted to send an e-mail to Beth, Charlie, Paulette, Cindy, Veronica, and Reception 39 to that effect but the firm e-mail was not working. I told Cindy that I would send an e-mail later in the day, which I did. On both of those days I worked from home. From Wednesday, April 10th through Friday, April 12th, I was out on vacation, as I notified the firm I would be on April 3, 2013. Upon returning from my vacation today, I began to cough and get nauseous again from the dust from the construction. I opened my window to air out the office but my hands became blue from the cold and I could not continue to stay in the office. I spoke with Cindy and both she and Pam commented on how blue my hands were and Pam commented that I looked completely flushed. I told Cindy that I would work from home, whereupon she told me that upon instructions from Beth and Charlie, the days I worked from home last week would be counted as vacation days. I told her that that was very unfair. She said that I should speak with you regarding this matter because Beth and Charlie are traveling. She further mentioned that the renovation work would not be complete until the end of the month. I went to your office, but you were on the phone. While I waited, Dolores asked me if I was okay and I said that I was not because of all of the dust in the office. After waiting for a bit, I told Cindy that I would go home and would contact you later.

The work environment at our firm is currently unsafe and causes me to be sick. It is unreasonable and highly inappropriate for the firm

19

to deduct vacation days because I choose to work from home rather than subject myself to a hazardous work environment. I do not consider Monday, April 8th and Tuesday, April 9th and any other days I will be working from home to be vacation days and I expect them to be counted as paid working days. I request that this be corrected immediately.

Thank you for your prompt attention to this matter.

Very truly yours,

Ronit D. Appel

cc: Beth L. Kaufman
    Charles B. Updike
    Cindy Nygaard

63. Schoeman refused to allow plaintiff to work from home despite the toxic and hazardous work environment at Schoeman.

64. On April 16, 2013, plaintiff received the following e-mail from Mindy H. Stern:

Ronit – the firm does not have a policy allowing employees to work from home for extended periods on days when the office is open. In addition, we do not provide laptops for employees to use outside the office. The firm does have short-term disability coverage, and Cindy has been asked to provide the applications forms for that to you.

As to the allocation of the 8th and 9th and any other days this month you were absent from the office, I refer you to our office manual with respect to our policies regarding sick days and vacation days.

20

Mindy

65.    According to Ms. Stern's e-mail, Schoeman would not allow plaintiff to work from home while the construction and renovation work was ongoing and the office was unsafe because, according to Ms. Stern, the firm does not have a policy that would allow plaintiff to work from home for an extended period of time. However, it has always been a policy at Schoeman to allow lawyers to work from home for short periods of time when they choose to do so for various reasons. Moreover, the days plaintiff worked at home on April 8th and 9th cannot be viewed as working from home for extended periods of time and yet, Schoeman still refused to recognize them as work days.  Moreover, in Ms. Stern's e-mail, she inappropriately recommended that plaintiff apply for short-term disability coverage even though she knew that plaintiff was not disabled.

66.    After receiving Ms. Stern's e-mail, plaintiff responded to Ms. Stern's e-mail and addressed her response to Ms. Stern and three other partners at the firm, Ms. Kaufman, Mr. Updike, and Ms. Ascher and copied Ms. Nygaard and the entire firm on her response.  Plaintiff's e-mail stated:

> Mindy, Beth, Charlie, and Andrea,
>
> I will not endanger my health by coming into the office.  It is unsafe to have people working in an office where there is ongoing construction and renovation and where the air may include asbestos and/or lead and other dangerous substances.  Each of the at least four times I came onto the twelfth

21

floor and was exposed to the construction dust and fumes, I became ill; once, a few weeks ago, when I stepped out of the elevator on the twelfth floor because Cindy wanted me to select an office, I immediately began coughing heavily and became nauseous and returned upstairs. I thereafter told Cindy that I would pick an office without seeing the new offices because I did not want to expose myself to the toxic construction dust and fumes; once, right before the move when Cindy showed me my new office and I became nauseous, and on April 8th and 15th, when I came into the office and became very nauseous and began coughing. Your requiring me to come into an unsafe work environment and not permitting me to work from home constitutes blatant harassment in the work place.

Since the firm will not provide a laptop for my use out of the office, I am willing to purchase a new computer today so that Joe can download the VPN software on it so that I can use it as a work computer and connect remotely to the server from my home. Mindy's mention of short-term disability coverage is highly inappropriate. I am not disabled now and I do not wish to become disabled by coming into the office and exposing myself to toxic fumes and dust.

The firm and everyone who works for the firm are hereby on notice that they are required to place an immediate litigation hold on any and all e-mails, documents, pleadings, whether in draft or final form, and any other documents sent from or to me, worked on by me, that mention me, or that relate to me in any manner at all, beginning from January 1, 2008 through the present. All members and employees of the firm must be informed by the firm of the litigation hold by e-mail today.

Please let me know immediately today whether the firm will permit me to work from home and not

22

count the days I worked from home and will work from home as vacation days or as unpaid days. If I do not receive confirmation from you today that the firm will allow me to work from home and treat the days I worked and will work from home as fully-paid work days, I will immediately commence a lawsuit against the firm and individuals at the firm. As an employee of the firm, I am entitled to be paid my full salary and expect that the firm will continue to pay me my full salary.

The firm and each of Mindy, Beth, Charlie, and Andrea, and perhaps others as well, will be held fully liable for any illnesses I may have contracted or will contract by breathing in the polluted air in the office. The firm and each of Mindy, Beth, Charlie, and Andrea, and perhaps others as well, will further be held fully liable for any damages, including but not limited to physical illnesses, loss of pay, loss of vacation days, and mental anguish that I have incurred or may incur in the future as a result of your actions.

For the benefit of those copied on this e-mail who did not receive my letter to Mindy yesterday, I am attaching a copy of the letter I sent to Mindy yesterday.

Ronit

67. The next day, on April 17, 2013 at approximately 10:00 a.m., having still received no response to her e-mail, plaintiff sent the firm an e-mail letting everyone know that she would be working from home until the construction and renovation work is completed and stating that she expects to be paid for the days she works from home and that she expects that those days will not be counted as vacation days, as she is not on vacation.

23

68.    At approximately 4:28 p.m. on April 17, 2013, Mindy H. Stern sent an

e-mail to the entire firm stating:

> All –
>
> You may have received or seen recent emails expressing concern about "dust and fumes" or other air quality issues that are alleged to be due to the renovation of the 12th floor.
>
> The Firm has no reason to believe that the air quality in our new space has been, is now, or may in the future be harmful to anyone. Although any construction site tends to be dusty, particularly in the early or demolition phase and paints, varnishes and adhesives sometimes emit odors, we have been assured by both the building and the contractor that all of our work has been and is being done in accordance with applicable standards, rules and regulations and that there is no safety or health issue.
>
> All of the partners regularly visited the site for extended periods during the entire construction process and we would not have agreed to move in had we been concerned about our own or anyone else's health being adversely impacted by the transition from 14 to 12. Notwithstanding our own comfort level and the assurances from building and construction personnel, we have received an inquiry from the U.S. Occupational Safety and Health Administration prompted by an anonymous complaint. In accordance with applicable law, we have posted this notice in the lunch room. We have asked the building and construction people to investigate and report back to us. Our response to OSHA, informed by this investigation and our own observations, will also be posted in accordance with law.

24

> We reiterate that we do not believe that the air quality or any other aspect of our beautiful new workspace has been, is or will be hazardous to the health of any employee.

69.    In Ms. Stern's e-mail, she admitted that "any construction site tends to be dusty" and that "paints, varnishes, and adhesives sometimes emit odors." Such odors are toxic and can cause serious harm if breathed in for prolonged periods.

70.    At approximately 4:32 p.m. on April 17, 2013, Mindy H. Stern sent the following e-mail to the entire firm:

> All –
>
> As a follow up to the email I just sent:
>
> At our request, the landlord engaged a consultant to test the air quality in the office and elevator lobby. The consultant just arrived, and is expected to begin testing shortly. He alerted me that the testing may be a bit noisy. We ask your indulgence during the testing process.
>
> Thank you.
>
> Mindy

71.    At approximately 5:36 p.m. on April 17, 2013, plaintiff received an e-mail from Charles B. Updike stating:

> Ronit –
>
> As stated by Mindy in her e-mail to you of yesterday, we have no policy that allows people to work from home for extended periods. If you believe you have a health issue or condition that you would like us to try to accommodate in some

25

way, please provide to us as soon as possible a
doctor's not [sic] documenting the condition and
what accommodation is being sought.

As indicated by Mindy, we will treat your prior
absences in accordance with standing personnel
policy as set forth in our Office Manual.

Finally, the subject of your recent emails has been
the Firm's employment relationship with you. It is
not an appropriate subject for discussion with all of
the Firm's other personnel. The firm has
designated me as its contact person for these
issues. Accordingly, I ask that you address any
further communications on these matters only to
me and refrain from sending them to other email
addresses at the Firm, especially including
"DOMAIN".

72.    Plaintiff responded to Mr. Updike that she did not have any health issues or conditions that needed to be accommodated but that she needed to work from home because of the toxic fumes and construction dust in the office. It was the work environment at Schoeman that was causing plaintiff to experience heavy coughing and nausea, not any health issues or conditions. Mr. Updike knew this well and his e-mail was entirely disingenuous.

73.    Despite Schoeman's refusal to allow her to work from home, plaintiff continued to work from home so as not to endanger her health by coming into the office.

74.    On April 17, 2013, plaintiff submitted a discrimination complaint to OSHA, in which plaintiff stated, *inter alia*:

26

> My firm is clearly discriminating against me
> because of my exercise of rights afforded to me by
> the OSH Act. My firm is also discriminating
> against me because of my filing a complaint with
> OSHA. I am very concerned that my firm will stop
> paying me or will terminate me because I wish to
> work from home rather than expose myself to toxic
> fumes and dust at the office. I intend to continue to
> work from home until the work environment at my
> office is safe.

75. In addition to plaintiff's communications with Schoeman regarding plaintiff's insistence on working from home due to the toxic work environment at Schoeman, on April 18, 2013, plaintiff sent a letter, by e-mail and regular mail, to the firm's architect and to the firm's landlord regarding the hazardous work environment at Schoeman.

76. Plaintiff's letters to the architect, John Francis Borrelli of John Francis Borrelli Architect, P.C. and to Jeffrey Feil, French Partners, LLC, both stated:

> I am writing to put you on notice that the
> construction and renovation work being performed
> on the twelfth floor of 551 Fifth Avenue poses a
> serious health risk to the employees of Schoeman
> Updike Kaufman Stern & Ascher LLP
> ("Schoeman"), whose office is located on the twelfth
> floor of 551 Fifth Avenue. I am employed as an
> attorney at Schoeman and work on the twelfth floor
> of 551 Fifth Avenue.
>
> As you may be aware, on the weekend of April 5th,
> Schoeman moved from its temporary location on
> the fourteenth floor of 551 Fifth Avenue to the
> twelfth floor of 551 Fifth Avenue, despite the fact
> that the construction and renovation work on the

27

> twelfth floor, which has been ongoing for months, is not yet complete.
>
> Each of the at least four times I came onto the twelfth floor and was exposed to the toxic construction dust and fumes, I became ill. I have not returned to my office due to the toxic construction dust and fumes on the twelfth floor and am presently working from home.
>
> It is a serious hazard to the health of employees to expose us to construction dust and fumes that may contain lead, asbestos, carcinogens, or other harmful substances. I will hold [the ownership of 551 Fifth Avenue/you and your company] full liable for any past, present, and future damages, including, but not limited to, physical illnesses, loss of pay, loss of employment, and mental anguish, that I have sustained or may sustain in the future as a result of my exposure to any asbestos, lead, dust, fumes, and any toxic, carcinogenic, or other unhealthy substances that I have been exposed to on the twelfth floor of 551 Fifth Avenue.

77.    Plaintiff received no response from either the architect or the landlord. Neither took any action to rectify the unsafe work conditions at Schoeman.

78.    Although OSHA allegedly did not disclose to Schoeman that it was plaintiff who had filed the work safety complaint with OSHA, Schoeman knew that it was plaintiff who had filed the complaint. Schoeman knew that plaintiff had experienced symptoms of heavy coughing and nausea when she was exposed to the air on the twelfth floor, where renovation and construction work was being performed. Schoeman knew that plaintiff complained to Schoeman about the unsafe work environment on the twelfth floor, insisted on working from home, and

28

sent an e-mail to the whole firm and a letter to the firm's landlord and architect regarding the hazardous work environment at Schoeman after Schoeman refused to allow her to work from home. In its Letter of Termination, Schoeman stated that this was one of the reasons it terminated plaintiff. Schoeman itself stated in its April 19, 2013 response to plaintiff's April 15, 2013 complaint to OSHA that aside from plaintiff, who declined to return to work until all of the construction would be complete, "[a]ll of our remaining employees have reported to work as usual."

79.    Under the circumstances, there can be no doubt that Schoeman knew that it was plaintiff who had filed the work-safety complaint with OSHA.

80.    On April 19, 2013, Schoeman responded to plaintiff's April 15, 2013 OSHA complaint by sending OSHA a response that attached a copy of tests allegedly performed by Schoeman's landlord at Schoeman's request that, according to Schoeman, showed that the air quality at Schoeman was safe. A copy of the air quality tests submitted by Schoeman to OSHA is attached hereto as **Exhibit B**. Plaintiff was not provided then with a copy of the tests performed. However, during a telephone call with David Bunton, an OSHA employee, Mr. Bunton informed plaintiff that the reports submitted by Schoeman to OSHA did not include the results of tests of the air quality in plaintiff's personal office or of the air quality in the personal offices of any of the firm's attorneys.

29

81.    When plaintiff received a copy of the tests several months later, she saw herself that the tests did not include the results of any tests of the air quality in plaintiff's personal office or in any of the Schoeman attorneys' personal offices.

## Schoeman's Air Quality Tests

82.    The air quality tests performed at Schoeman's request were performed, upon information and belief, by Creative Environment Solutions Corporation and H& B Construction Services and/or M & B Construction and/or M & B Construction Services.

83.    The air quality tests purported to show that the air at Schoeman was safe when it in fact was unsafe to breathe in.

84.    The tests submitted by Schoeman to OSHA conveniently omitted any tests of the air in any of the Schoeman attorneys' personal offices, including plaintiff's own office.

85.    The experts retained to test the air quality at Schoeman were grossly negligent in testing the air quality at Schoeman and submitting a report that purported to show that the air quality at Schoeman was safe when it was not and in failing to include in the report the results of tests of the air quality in plaintiff's personal office.

86.    Moreover, those who were responsible for ordering the air quality tests, including, but not limited to, Schoeman, Charles B. Updike, French Partners, LLC, the Feil Organization, Jeffrey Management, and Jeffrey Feil, were grossly

30

negligent when arranging for the air quality at Schoeman to be tested and in submitting a report that purported to show that the air quality at Schoeman was safe when it was not and when such report did not contain the results of tests of the air quality in plaintiff's personal office. These defendants knew that OSHA would rely upon the report it submitted and that plaintiff would be harmed by the report which purported to show that the air quality at Schoeman was safe.

87.    On April 22, 2013, Mindy H. Stern sent an e-mail to the entire firm with the subject line "The Twelfth Floor" stating:

> As you probably noticed when you arrived at the office today, the work in the elevator area was finished this weekend. Aside from installing light fixtures there and in one of the conference rooms, and completing various punch list items, the construction is done.
>
> Plans are underway to celebrate our arrival in this wonderful new space. Stay tuned for details.
>
> The Committee for a Smooth Movement.

88.    On April 22, 2013, plaintiff sent Ms. Stern an e-mail responding to Ms. Stern's above e-mail, in which plaintiff wrote:

> Mindy,
>
> Please let me know when the construction work will be completed in the conference room and wherever else construction work is being done and when the installation of the carpeting will be completed. Please also let me know what punch list items remain and when those are expected to be completed.

31

Thank you.

Ronit

89.    On April 23, 2013, Mindy H. Stern advised plaintiff by e-mail that the construction work in the office, which had been ongoing for months, was complete and that plaintiff was expected to come in to the office. Ms. Stern's e-mail to plaintiff stated:

> Ronit – The renovation is finished except for some
> lighting fixtures, "punch list" items (the list has not
> yet been prepared) and decorations. We do not
> know when the last of these will be completed, but
> they have no impact on our ability to work in the
> office. The air quality was tested last week, and
> the findings are satisfactory. We expect you to
> come to the office tomorrow.
>
> Mindy

90.    When plaintiff arrived in the office on April 24, 2013, at approximately 9:20 a.m., plaintiff immediately began coughing heavily and became very nauseous from the residual construction dust in the air. Plaintiff contacted her father for his medical advice. He told plaintiff to leave the site and not return until the work environment was safe and did not cause plaintiff to experience these symptoms.

91.    While plaintiff was in the office, the firm's receptionist, Pamela Banks, suggested to plaintiff that perhaps Cindy Nygaard could set plaintiff up to work on the sixteenth floor, which the firm had offices on for the months preceding the move to the twelfth floor, and which, Ms. Banks told plaintiff, the firm still had

32

possession of and where no renovation work was being performed. This was the first time anyone had mentioned that Schoeman still had possession of its space on the sixteenth floor and plaintiff, surprised that no one had previously suggested that plaintiff work on the sixteenth floor, asked Ms. Nygaard whether she could work on the sixteenth floor. Ms. Nygaard initially said that she was not sure plaintiff could because Schoeman would only have possession of the space for another few days but that plaintiff should speak with Mindy H. Stern, who she said would be arriving any minute. When Ms. Stern failed to arrive and after plaintiff asked Ms. Nygaard to phone Ms. Stern and ask whether plaintiff could work on the sixteenth floor, Ms. Nygaard told plaintiff that she could not work on the sixteenth floor because there was no Internet there and it is not worth it to run a wire to the sixteenth floor since the firm would only have possession of the sixteenth floor for another few days. Plaintiff informed Ms. Nygaard that she would continue to work from home and would contact Ms. Stern. At 12:01 p.m. on April 24, 2013, plaintiff sent Ms. Stern the following e-mail:

> Mindy,
>
> I arrived at the office today at about 9:20 a.m. I immediately began coughing heavily when I entered my office and I became very nauseous from the air I was breathing in. I met Pam in the hallway, who told me that maybe Cindy could set me up on the 16th floor, which the firm still has, and where there is no renovation work being done. I went to Cindy and told her that I was coughing and nauseous from the dust in the air and asked if

33

I could work on the 16th floor. She said that she was not sure I could because the firm only has possession of the 16th floor space for another few days. She said that I should speak with you and that you would be arriving any minute. I told her that I would step outside to get some fresh air and would return shortly to speak with you. In addition to asking the receptionist to notify me when you arrive, I returned to the office numerous times to check if you had arrived, but you had not arrived. At approximately 10:10 a.m., Pam informed me that you would not arrive until about 4:00 this afternoon. I then went to Cindy and asked her to phone you to ask whether I could work on the 16th floor. Cindy then told me that I could not work on the 16th floor because there is no internet on the 16th floor and it is not worth it to run a wire to the 16th floor since the firm only has the 16th floor for another few days. I told her that I would continue to work from home and would be in touch with you.

Apparently, the air in the office is still not safe despite any tests that may have been performed at the firm's request and there are toxic substances in the residual construction dust in the air that are causing me to be sick. If the air was safe, it would not make me cough heavily and become very nauseous. I will continue to work from home until I am sure that the air in the office is safe to breathe in. I expect to be paid in full for the days I have worked at home and will work at home.

Ronit

92.    At approximately 1:36 p.m., plaintiff received an e-mail from Mindy H. Stern in which Ms. Stern requested that plaintiff come into the office and inform the receptionist on the twelfth floor when she arrived for a meeting with Ms. Stern and Mr. Updike, which would take place on the 16th floor. Ms. Stern's e-mail stated:

34

> Ronit – Charlie and I would like to speak with you today.  We will meet in one of the 16th floor conference rooms.  Please come to the office at 4:00 p.m. and let Pam know when you arrive.

93.    Plaintiff declined to come into the office for the meeting.  Schoeman had already made very clear that it would not allow plaintiff to work from home and plaintiff felt that the purpose of the meeting was for Schoeman to try to pressure plaintiff to abandon her working from home and return to the twelfth floor and plaintiff responded to Mr. Updike and Ms. Stern that, *inter alia*, plaintiff would be happy to discuss an amicable resolution of the matter with them via e-mail.  In Schoeman's response to plaintiff's OSHA discrimination complaint and in Schoeman's Letter of Termination, Schoeman stated that the purpose of the meeting was to terminate plaintiff.

94.    Although in her e-mail Ms. Stern said that the meeting would be held on the sixteenth floor, in her e-mail, Ms. Stern requested that plaintiff first come to the office and let the receptionist on the twelfth floor know when she arrives even though Ms. Stern and Schoeman knew that the air on the twelfth floor caused plaintiff to experience symptoms of heavy coughing and nausea.

95.    That same day, plaintiff received by mail a letter from OSHA dated April 23, 2013 stating that OSHA feels that, based upon Schoeman's response dated April 19, 2013, the work-safety case that was opened on April 15, 2013 can be closed

on the grounds that the hazardous conditions at Schoeman have been corrected or no longer exist. A copy of OSHA's letter is attached hereto as **Exhibit C**.

96.     That evening, plaintiff noticed on her Blackberry that an e-mail was sent to her Schoeman account. When she tried to open the e-mail, she noticed that she had been locked out of her firm e-mail account. Plaintiff immediately sent an e-mail to Mindy H. Stern, the managing partner at Schoeman demanding, as an attorney at Schoeman, that Schoeman grant her access to her firm e-mail account. In response, at 6:21 p.m., Ms. Stern sent plaintiff en e-mail attaching a copy of a letter of termination that the firm had just sent to plaintiff's firm e-mail account. A copy of the April 24, 2013 letter of termination (the "Letter of Termination") is attached hereto as **Exhibit D**. The Letter of Termination terminated plaintiff effective that very same day with no severance package. Plaintiff was given no advance notice of her termination and no opportunity to secure another job prior to her termination. Plaintiff was also not given an opportunity to pack up her own belongings. As Schoeman stated it would in the Letter of Termination, Schoeman went through plaintiff's own personal belongings and chose what it wanted to return to plaintiff.

97.     As soon as Schoeman felt that it was in the clear with OSHA, it terminated plaintiff. The manner in which plaintiff was terminated makes very clear that plaintiff was terminated with a vengeance and with malice. Generally, when a law firm decides to terminate an attorney, the firm will allow the attorney

to continue to work at the firm for some time while the attorney searches for another job so that the attorney will have the opportunity to secure another job without the stigma of having been terminated. This did not happen in plaintiff's case. Schoeman terminated plaintiff effective the very same day she received her notice of termination, which she received in the evening, and has refused to say anything good about plaintiff when contacted by prospective employers. Plaintiff received no severance pay at all and was not even allowed to pack up her personal belongings. It is unheard of for an attorney to be terminated in this manner.

## Schoeman's Letter of Termination

98.    In its Letter of Termination, Schoeman libeled and defamed plaintiff by presenting entirely distorted and non-factual descriptions of events that transpired at Schoeman involving plaintiff dating back to 2009 in an attempt to make it seem as though plaintiff was terminated due to plaintiff's own fault. Schoeman listed numerous episodes where plaintiff refused to cooperate with Schoeman and attorneys outside of Schoeman because Schoeman and others were engaging in unlawful activities. However, Schoeman presented a distorted description of the episodes in an attempt to make it seem as though plaintiff's refusal to cooperate showed a lack of good judgment and an inability to work well with others.

99.    In the Letter of Termination, Schoeman wrote:

37

Dear Ronit:

We have been considering whether to continue your employment with us for some time and have concluded that we should terminate it. We planned to advise you of that decision at the meeting we asked you to attend this afternoon. In light of your most recent email, however, we are communicating our decision in writing. Accordingly, we hereby advise you that we are terminating your employment with us effective at the close of business today.

Although you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below.

After consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work effectively with your colleagues. We have come to this conclusion after reflecting on the incidents described below, among others.

- The first incident occurred in the summer of 2010 when we were preparing a response to a questionnaire from our insurance carrier and you refused to answer a question about whether any claims had been made against you. We let this issue pass but it did raise concerns on our part about your candor and willingness to speak openly to your colleagues.

- Also in 2010, there was a disturbing incident involving your refusal to

38

share material you had prepared at the Firm's request and on the Firm's time for another project with which Deirdre Sheridan was involved. You even accused her of "plagiarism", which was highly inappropriate. This was an example of poor judgment on your part and an inability to work well with your colleagues.

- In January 2012, there was a heated exchange between you and our colleagues at Reed Smith that again demonstrated poor judgment on your part and an inability to get along well with your colleagues. Your emails to them, sent without consulting Charles Updike, the supervising partner, were totally inappropriate communications.

- A similar incident occurred in April 2012 when you accused a colleague of religious discrimination because she asked if you could work over the weekend, not knowing that you were a Sabbath observer who could not work on Saturday. Again, your reaction demonstrated both poor judgment and an inability to have constructive dialogue with your colleagues. A further indication of your poor judgment in our view was your refusal to participate in the investigation that we felt obligated to conduct because of your complaint of religious discrimination.

- Another more recent incident of poor judgment occurred during our discussions about the content of a letter demanding payment of legal

39

fees in full by an insurance carrier. Your vigorous opposition to that approach was listened to and taken into account. Your adamant refusal to cooperate in making the demand, however, again reflected poor judgment on your part, especially in light of your unresponsiveness to the suggestion that you research the issue.

- Another example was your persistence in raising specious questions about advice we received from an Israeli lawyer about a transfer of real estate last year and your refusal to continue working on the matter. Again, this reflected poor judgment on your part.

- Most recently, you have shown poor judgment in other communications regarding the office relocation. While you certainly have the right to complain about conditions in the office, there are appropriate procedures for doing so. Your decision to send an email about your concerns to the entire office reflected poor judgment, as did your belligerent and adversarial communications with our architect and landlord, particularly because you did not seek the Firm's permission to communicate with those individuals or even advise us that you were considering doing so.

- Finally, despite the fact that you have acknowledged that you have no illness or medical condition, and air quality testing was done to ensure there is no problem, you have refused to come to work.

40

Needless to say, judgment is a critical part of a lawyer's job and as a firm, we pride ourselves in delivering excellent legal service to our clients, which includes exercising sound judgment on their behalf. Teamwork is also very important, especially in a small firm. We have reached the point where we have no confidence that you will conduct yourself in an appropriate way and exercise appropriate judgment.

In short, this decision has been long in coming, as there have been many incidents during your employment here that have caused the partners to have serious concerns about your judgment and ability to work with others. We have therefore decided that your employment with the Firm should end, effective immediately.

Although our personnel policy does not require it, you will be paid through today as if you had not been absent for the past two weeks (other than April 10th, 11th and 12th, which you requested as vacation days). You will also receive any accrued vacation pay that may be due to you in accordance with the office manual. You will receive a letter regarding your COBA rights. We will pack up your personal belongings in your office. You have a BlackBerry that belongs to the Firm. We ask that you contact Cindy about the logistics of picking up or delivering your personal property and the return of the BlackBerry. Our response to any inquiries about your employment with us will be limited to confirming the dates of your employment and your position.

Your email refers to "reaching an amicable solution to this matter". That is one of the reasons we sought today's meeting. If it is something you wish to pursue, please let us know what you have in mind.

41

Very truly yours,

Mindy H. Stern

MHS/blw

100.    Mindy H. Stern signed the letter of termination, which was, upon information and belief, typed by Schoeman secretary Barbara Wojciechowski. Upon information and belief, the letter was drafted by Charles B. Updike, Beth L. Kaufman, Mindy H. Stern, and Andrea D. Ascher.

101.    The letter of termination was e-mailed to plaintiff and sent to plaintiff by Federal Express overnight delivery. Upon information and belief, Schoeman secretary Veronica Law sent plaintiff the letter by Federal Express.

102.    Schoeman's termination letter is replete with libelous and defamatory statements, which have caused and continue to cause plaintiff serious harm, including serious harm to plaintiff's reputation and business.

103.    First, the Letter of Termination indicates that plaintiff was terminated for cause. The letter states:

> Although you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below.
>
> After consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work

42

effectively with your colleagues. We have come to this conclusion after reflecting on the incidents described below, among others.

104. In support of its statement that plaintiff was terminated for cause, the letter lists several "causes" for plaintiff's termination. However, as discussed herein, the "causes" listed by Schoeman contain blatant distortions of the truth and falsely and maliciously attempt to make it appear as though Schoeman had cause to terminate plaintiff. However, the correct version of the facts as they transpired makes clear that there was no lawful cause for plaintiff's termination. As such, Schoeman's statement that plaintiff was terminated for cause constitutes libel and defamation.

105. Moreover, in the first bullet-point paragraph in the Letter of Termination, Schoeman writes:

> The first incident occurred in the summer of 2010 when we were preparing a response to a questionnaire from our insurance carrier and you refused to answer a question about whether any claims had been made against you. We let this issue pass but it did raise concerns on our part about your candor and willingness to speak openly to your colleagues.

The statements contained in the above paragraph are false, libelous, and defamatory. Relevant e-mail correspondence relating to the "incident" Schoeman describes shows that Schoeman's description of the above "incident" is false. Below is the factual version of what transpired.

43

106.    In an e-mail dated September 24, 2009, Marvin Artis, then a partner at Schoeman, sent an e-mail to all attorneys at Schoeman stating:

> As part of an initial step of an RFP from certain New York State agencies, we have been asked to provide responses to the following questions. If you have any information that is responsive to the questions below, please let me know by reply email by noon tomorrow.  Thanks.
> 1.    Has the firm provided legal services to any public entities (either within or outside NY) within the last two years?  If so, what are the entities?
>
> 2.    In the last 5 years, has any individual in the firm or the firm been involved in any criminal, civil or disciplinary proceeding, including bankruptcy.

107.    On September 24, 2009, plaintiff responded to Mr. Artis's e-mail by stating:

> Marvin,
>
> 1.    I am not aware that the firm has provided legal services to any public entities within the last two years.
>
> 2.    As I recall, Laura Barbieri, who was with the firm when I worked here last summer, was named as a defendant in the Lastra case, which Charlie and Erin are working on.
> In addition, I was involved in a civil proceeding in Israel in November, 2005.  The case was settled by a court-ordered settlement agreement in November, 2005.
>
> Ronit

44

108.   After plaintiff sent Mr. Artis her above response, Mr. Artis sent plaintiff an e-mail on September 30, 2009 stating:

> Ronit – can you tell me the general nature of the proceeding in Israel that you referred to in your response to the New York State RFI regarding the litigation in which you have been involved in the last 5 years?

109.   On September 30, 2009, plaintiff sent Mr. Artis the following response:

> Marvin,
>
> Can you please tell me who this information will be transmitted to?
>
> Thanks,
>
> Ronit

110.   Mr. Artis wrote back:

> Are you in the office?  You can swing by to talk about this if you prefer.

111.   Plaintiff responded:

> Yes, I am here now.  I will stop by your office now.

112.   Plaintiff subsequently discussed the matter with Charles B. Updike. He advised plaintiff that the firm would need this information for its annual insurance questionnaire.  When plaintiff declined to provide him with details regarding the civil matter in Israel, he left plaintiff's office and to plaintiff's recollection, he did not press plaintiff further on the matter.

45

113.  Schoeman's distorted version of what transpired, as set forth in the letter of termination, is false, libelous, and defamatory.

114.  Additional libelous and defamatory statements are found in the second bullet-point paragraph of the Letter of Termination, which states:

> Also in 2010, there was a disturbing incident involving your refusal to share material you had prepared at the Firm's request and on the Firm's time for another project with which Deirdre Sheridan was involved.  You even accused her of "plagiarism", which was highly inappropriate.  This was an example of poor judgment on your part and an inability to work well with your colleagues.

115.  The statements in the above paragraph are libelous and defamatory. Schoeman's characterization of the incident that transpired between plaintiff and Ms. Sheridan in 2010 is false and does not accurately represent what transpired in 2010 when Ms. Sheridan plagiarized an article plaintiff had co-authored with Beth L. Kaufman.  Schoeman falsely states that plaintiff refused "to share material [plaintiff] had prepared at the Firm's request and on the Firm's time" when plaintiff did in fact share the material in question, an article plaintiff had co-authored while at the firm, which was subsequently plagiarized and published by Ms. Sheridan under her own name and the name of Schoeman partner Beth L. Kaufman, without any mention of plaintiff's name.  Contrary to Schoeman's misrepresentations, plaintiff's accusing Ms. Sheridan of plagiarism was not inappropriate and this incident did not reflect any poor judgment on plaintiff's part or any inability of

46

plaintiff to work well with her colleagues. To the contrary, the incident reflected poor judgment, at best, of Ms. Sheridan, Ms. Kaufman, and Schoeman. Schoeman's statement that "there was a disturbing incident involving [plaintiff's] refusal to share material [plaintiff] had prepared at the Firm's request and on the Firm's time for another project with which Deirdre Sheridan was involved" is false, libelous, and defamatory. Moreover, Schoeman's statement that plaintiff's accusing Ms. Sheridan of plagiarism "was highly inappropriate" is libelous and defamatory. Schoeman's statement that "[t]his was an example of poor judgment on your part and an inability to work well with your colleagues" is libelous and defamatory. The events as they transpired are set forth below.

116. In 2009, plaintiff co-authored an article with Beth L. Kaufman for an outside publication. The authors of the article were listed as Beth L. Kaufman and plaintiff. In 2010, before the article had been published, another attorney at the firm, Deirdre J. Sheridan, who was presenting a CLE presentation on a different topic, asked plaintiff to send her a copy of the article plaintiff had co-authored. When plaintiff sent it to her, plaintiff notified her that it had not yet been published and should therefore not be annexed to her CLE materials. Later that night, Ms. Sheridan sent Ms. Kaufman a copy of her written CLE materials, which would be distributed at the CLE program and into which she incorporated a large portion of plaintiff's article without plaintiff's permission and without referencing plaintiff's name, which constitutes plagiarism. In Ms. Sheridan's e-mail to Ms. Kaufman,

47

which plaintiff was copied on, Ms. Sheridan wrote, *inter alia*, "I added a section regarding legal and ethical obligations of counsel, taken, for the most part, from the article that you drafted with Ronit." Ms. Sheridan did not list plaintiff as an author of her CLE materials. She listed Ms. Kaufman and herself as the authors. Plaintiff informed Ms. Sheridan that she had no permission to use the article plaintiff had co-authored without plaintiff's consent. The next day, Ms. Sheridan stormed into plaintiff's office and began screaming at plaintiff, demanding that plaintiff send her copies of certain court cases cited in the article plaintiff had co-authored. Plaintiff told Ms. Sheridan that Ms. Sheridan had plagiarized plaintiff's article and that she did not understand why Ms. Sheridan was asking plaintiff to assist Ms. Sheridan in her plagiarism. Plaintiff was upset at, and disappointed in, Ms. Sheridan's conduct. When an attorney at a law firm drafts an article on the law firm's time, that does not mean that any attorney at the firm can plagiarize the article at will and claim it as their own. Nonetheless, despite plaintiff's being upset at Ms. Sheridan's conduct, several weeks after the incident, plaintiff sent Ms. Sheridan an e-mail asking whether Ms. Sheridan had any work for plaintiff and plaintiff worked amicably with Ms. Sheridan without incident until Ms. Sheridan left the firm.

117.   Additional libelous and defamatory statements are contained in the third bullet-point paragraph of the Letter of Termination, which states:

48

In January 2012, there was a heated exchange between you and our colleagues at Reed Smith that again demonstrated poor judgment on your part and an inability to get along well with your colleagues. Your emails to them, sent without consulting Charles Updike, the supervising partner, were totally inappropriate communications.

118.    This paragraph too constitutes libel and defamation. Schoeman's characterization of the incident that transpired between plaintiff and Reed Smith in 2012 is false and does not accurately represent what transpired in 2012 between plaintiff and the attorneys at Reed Smith with whom plaintiff was working on summary judgment motions on behalf of a client, Madison 96 Associates, LLC ("Madison 96"). The events as they transpired are set forth below.

119.    In or about January of 2012, when plaintiff was working together with Schoeman's co-counsel, Reed Smith, to draft summary judgment motions against insurance carriers in an action brought by Madison 96, Schoeman's client against two insurance carriers, plaintiff noticed that the papers drafted by Reed Smith contained a factually incorrect material statement. Plaintiff had a phone call with Jean M. Farrell, a Reed Smith attorney working on the case, in which it became clear to plaintiff that Ms. Farrell had no intention of removing the material factual misrepresentation from the summary judgment papers. Plaintiff explained to Ms. Farrell that the statement was factually inaccurate and could not be included in the papers. Ms. Farrell became antagonistic and shortly thereafter ended the

49

conversation.  Before the summary judgment papers were to be filed, plaintiff sent an e-mail to the attorneys at Reed Smith, requesting that the attorneys at Reed Smith send her the final version of the papers as plaintiff wished to confirm that the factual misrepresentation was not in the papers.  Paul Breene, the Reed Smith partner handling the case, refused to send plaintiff the papers, claiming that "we really do not have time for another go round."  Plaintiff politely responded to Mr. Breene's e-mail by stating:

> When I spoke with Jean, she said she would send us the revised papers so that we could review them before they are filed.  We need to see them before they are filed.  Please send them to us now and we will look at them right away.
>
> Thank you.
>
> Ronit

120.    Mr. Breene responded with an entirely improper e-mail stating:

> Ronit - - do not send me e-mails.  Ever.

121.    Plaintiff sent the following response to Mr. Breene:

> Paul,
>
> Please be advised that you are not authorized to submit the papers without our reviewing and approving them first.

122.    Mr. Breene responded:

> Then I will speak to the client now and remove your name from the papers.

50

123. Plaintiff responded:

> That is not acceptable. We must see the papers before they are filed. I expect that you will send them to us promptly.

124. Mr. Breene responded:

> You have seen them, commented on them, and made extra work for us enough. We have your comments. If this must go further, Charles should call me and we should speak to [the client] ·· together. You are wasting my time.

125. Plaintiff responded to Mr. Breene's e-mail as follows:

> Paul,
>
> What we commented on was a very initial draft. We must see that the necessary revisions have been incorporated into the final draft. Jean had promised that she would send us the papers once our revisions were incorporated so that we could review them before they are filed. Again, you are not authorized to submit the papers without our reviewing and approving them first. We expect that you will send us the papers now so that they can be timely filed today.
>
> Ronit

126. Ultimately, the attorneys at Reed Smith gave in and sent plaintiff the final papers, which plaintiff reviewed to confirm that they did not contain the factual misrepresentation that plaintiff feared would be in the papers that Reed Smith planned to file. Paul Breene's obnoxious and entirely out-of-line e-mail to plaintiff directing plaintiff to never send him e-

51

mails again stands in stark contrast to plaintiff's polite e-mails to him and is indicative of an irate attorney whose dishonest plans have been foiled and who is exceedingly frustrated that he cannot carry through with his plans to mislead the Court and the insurance company. Mr. Updike was copied on plaintiff's communications with Mr. Breene but did not intervene until after Mr. Breene sent a final e-mail asking if Mr. Updike was available for a call with the client, whereupon Mr. Updike responded, "Paul – Go ahead and file. No need to speak with [the client]."

127. Upon information and belief, before Mr. Breene sent one last e-mail, which was sent only to Mr. Updike and not to plaintiff, Mr. Updike and Mr. Breene had a telephone conversation in which Mr. Updike and Mr. Breene slandered and defamed plaintiff. Mr. Breene then sent an e-mail sent to Mr. Updike after their telephone conversation, for the purpose of defaming plaintiff and to create a written record libeling plaintiff in an attempt to make it seem that plaintiff was incompetent and to cover up his and Mr. Updike's wrongdoing so that when plaintiff would be terminated by Schoeman because of her refusal to cooperate with the fraud, it would seem that plaintiff was terminated because she was a poor employee rather than because of her refusal to cooperate with the fraud. In his e-mail, Mr. Breene wrote:

52

Charlie:

Jean sent the final to Ronit for her review. I assume she will provide additional comments.

We will need to discuss future filings. While we need and want input from you and Ronit on the facts and procedural history of this case, Jean and I have won a dozen of these motions – one last week· and it has not been productive for Ronit to insist that we make changes in legal arguments that (i) she does not understand, and (ii) relate to insurance issues in which we have developed an expertise. Ronit's input on these has vastly increased the cost to us of making this motion. Your firm is being paid, we are on a contingency and unnecessary work has made this an unprofitable proposition.

I don't believe I have ever sent harsher e-mails to anyone than those I sent to Ronit today but, frankly, the frustration level of dealing with Ronit on this matter has really boiled over for both Jean and myself.

For the next round of briefing I'd like to figure out a smoother plan.

Thanks.

Paul

128. Schoeman's false statement in the Letter of Termination that "there was a heated exchange" between plaintiff and the attorneys at Reed Smith is a false statement of fact. Plaintiff's e-mails to the Reed Smith attorneys cannot be characterized as a "heated exchange." Plaintiff's e-mails were polite and professional. Moreover, the e-mails plaintiff sent certainly

53

did not demonstrate poor judgment on plaintiff's part or an inability of plaintiff to get along well with her colleagues. Finally, Charles B. Updike, the Schoeman partner working on the case with plaintiff, was copied on the e-mails with the Reed Smith attorneys. Thus, Schoeman's statement that plaintiff's e-mails were sent "without consulting Charles Updike, the supervising partner" is a distortion of the facts and misleading. Moreover, Schoeman's statement that plaintiff's e-mails "were totally inappropriate communications" is false. Plaintiff sent the e-mails to prevent the perpetration of a fraud on the insurance company and a deceit on the court.

129.    Moreover, as discussed herein, at a later point, after the Court issued a decision and order stating that QBE Insurance Corporation is obligated to defend Madison 96 Associates, LLC ("Madison 96"), Madison 96, Stuart J. Boesky, Jamison Weiner, Schoeman, Reed Smith, and Paul E. Breene perpetrated criminal fraud on the Court and the insurance company, including, among other fraud, the fraudulent alteration of an engagement modification agreement, in an effort to recover more money from the insurance company than Madison 96 is entitled to recover.

130.    Additional libelous and defamatory statements are found in the fourth bullet-point paragraph of the Letter of Termination, which states:

> A similar incident occurred in April 2012 when you accused a colleague of religious discrimination because she asked if you could work over the

54

weekend, not knowing that you were a Sabbath observer who could not work on Saturday. Again, your reaction demonstrated both poor judgment and an inability to have constructive dialogue with your colleagues. A further indication of your poor judgment in our view was your refusal to participate in the investigation that we felt obligated to conduct because of your complaint of religious discrimination.

131. Once again, Schoeman presented a false version of what transpired. Schoeman's false recitation of what transpired constitutes libel, slander, and defamation. Contrary to Schoeman's distortion of the truth, the events as they transpired are set forth below. In early April of 2012, Susan S. Casero, an attorney at the firm, had a discussion with plaintiff about plaintiff's being an Orthodox Jew and not working on the Sabbath or Jewish holidays. Shortly thereafter, on April 19, 2012, Ms. Casero asked plaintiff during a discussion in her office if plaintiff could come in and work on Saturday because she had not arranged for child care for her son on Saturday. In an e-mail to Ms. Casero dated April 20, 2012, plaintiff stated, *inter alia*, that in addition to Ms. Casero's improper communications with plaintiff on April 20, 2012, which caused plaintiff to ask Ms. Casero to leave plaintiff's office on April 20, 2012, her asking plaintiff to work on Saturday on April 19, 2012 was inappropriate. An e-mail exchange ensued in which Ms. Casero implied that she had not asked if plaintiff could work on Saturday and in which she denied knowing that plaintiff does not work on Saturday, both of which were untruthful. In a previous e-mail sent only to Beth L. Kaufman, Ms. Casero stated that she had

55

asked if plaintiff could work on Saturday or Sunday, which was also untrue. Ms. Casero did ask if plaintiff could work on Saturday but at no time did she ask if plaintiff could work on Sunday.

132. Almost two months later, on June 15, 2012, Beth L. Kaufman informed plaintiff that she felt that there needs to be an investigation into the e-mail exchanges between plaintiff and Ms. Casero, on which she was copied, which took place in April of 2012. She informed plaintiff that the firm had hired an employment lawyer who would come in and interview plaintiff, Ms. Casero, and other people at the firm on Monday, June 18, 2012. Plaintiff informed Ms. Kaufman via e-mail that, *inter alia*, plaintiff did not consent to be interviewed by the attorney and would not consent to any discovery of the matter at that time and that if there needs to be discovery, it would be done under the supervision of a court of law. Plaintiff also informed Ms. Kaufman that plaintiff felt that Ms. Kaufman's intention to interview other people at the firm other than Ms. Casero and plaintiff was perplexing and would undoubtedly result in plaintiff's being slandered by the firm. Given the firm's pattern of mistreating plaintiff throughout plaintiff's employment and in light of Ms. Kaufman's statement that she intended to interview others in the firm aside from Ms. Casero and plaintiff, plaintiff felt that the investigation the firm intended to conduct was intended for the purpose of slandering plaintiff and weakening plaintiff's position in the event that plaintiff would bring a lawsuit against Schoeman for religious discrimination and

56

constituted harassment in the workplace and plaintiff notified Ms. Kaufman of such by e-mail. Plaintiff's e-mail to Ms. Kaufman stated:

> Beth,
>
> When I was in your office just now, you said that you feel that there needs to be an investigation into the e-mail exchanges between me and Susie, on which you were copied, which took place back in April. You said that the firm had hired an employment lawyer who will come in and interview me, Susie, and other people in the firm this Monday.
>
> Please be advised that this serves as notice to you and the firm that I do not consent to be interviewed by this attorney. I will not consent to any discovery of the matter at this point. If there needs to be discovery, it will be done under the supervision of a court of law.
>
> The timing of this investigation is particularly odd, given that this exchange took place nearly two months ago. Your intention to interview people at the firm other than Susie and myself regarding this matter is also perplexing and will undoubtedly result in my being slandered by the firm. This investigation that you wish to conduct at this time constitutes harassment in the workplace.
>
> Ronit

133. In response to plaintiff's e-mail, Ms. Kaufman sent plaintiff an e-mail stating:

> Ronit:
>
> There is no effort to harass you; nor is there any "discovery" being undertaken. We are conducting

57

an internal investigation, prompted by the e-mails on which you copied me. We believe this to be a Human Resources "best practice" in response to such accusations.

In addition to seeking to interview Susie and you, the outside investigator also wants to interview anyone who overhead the discussion between Susie and you. We have no reason to believe that anyone would slander you under any circumstances, and do not understand why this is of concern to you.

We respect your decision not to be interviewed. Should you change your mind, please let us know and we will schedule a time for you to be interviewed on Monday.

Beth

134. Plaintiff never heard anything more regarding the issue and was not aware that a report was prepared by Laurie Zeligson, the employment attorney hired by Schoeman, until plaintiff received Schoeman's response to her OSHA whistleblower complaint in the summer of 2013, which attached a copy of the report prepared by Ms. Zeligson. A copy of the report is attached hereto as **Exhibit E**. When plaintiff saw a copy of the report, her belief that the firm's intention was to harass and slander her was confirmed, as the entire report, comprised of blatant misrepresentations and distortions of the truth, constitutes libel and defamation and in fact strays far from the issue of the exchanges between plaintiff and Ms. Casero in April of 2012, which, per Ms. Kaufman, was the issue that the employment attorney was hired to investigate. Moreover, although Ms. Zeligson

58

interviewed other people at the firm who had no involvement with the incident involving Ms. Casero and plaintiff, but who were eager to libel and defame plaintiff, the report makes no mention of any interview with Rachel Abramowitz, the firm's paralegal, who overheard at least part of the exchange between plaintiff and Ms. Casero on April 20, 2012.

135.    Notably, although in her e-mail dated June 15, 2012, Ms. Kaufman wrote that the firm "respected [plaintiff's] decision not to be interviewed," in its Letter of Termination, the firm stated that plainiff's refusal to be interviewed was "[a] further indication of [plaintiff's] poor judgment." Clearly, as indicated by Ms. Kaufman's e-mail to plaintiff, and in contrast to what the firm wrote in its Letter of Termination, the firm did not view plaintiff's decision not to be interviewed as an indication of poor judgment. Yet, in an attempt to libel and defame plaintiff in the Letter of Termination, the firm wrote in its termination letter that it viewed such decision as an indication of poor judgment on plaintiff's part.

136.    Additional libelous and defamatory statements are found in the fifth bullet-point paragraph of the Letter of Termination, which states:

> Another more recent incident of poor judgment occurred during our discussions about the content of a letter demanding payment of legal fees in full by an insurance carrier. Your vigorous opposition to that approach was listened to and taken into account. Your adamant refusal to cooperate in making the demand, however, again reflected poor judgment on your part, especially in light of your

59

unresponsiveness to the suggestion that you research the issue.

137. Again, Schoeman presented an entirely false version of the facts in an attempt to cover up its own misconduct and defame plaintiff. The reason for plaintiff's "vigorous opposition" to an approach taken by Schoeman with respect to a demand for payment made to an insurance company was because such demand constituted criminal fraud.

138. In March of 2013, after Schoeman's client, Madison 96, won a summary judgment motion against its insurance carrier, Charles B. Updike wanted to make a claim against the carrier for payment of Madison 96's alleged defense costs. Mr. Updike wanted such demand to include a higher amount of fees than Madison 96 had actually incurred. Specifically, Mr. Updike wanted to make a demand to the insurance carrier that the insurance carrier, QBE Insurance Corporation, pay $282,940.00 in attorneys' fees plus disbursements for the fees of Reed Smith, special insurance counsel to Madison 96, when Madison 96's engagement letter with Reed Smith, the terms of which QBE had no knowledge of at the time the demand was made by Schoeman, explicitly capped the fees that Reed Smith could recover from Madison 96 at $200,000.00 in attorneys' fees plus disbursements.

139. After plaintiff sent an e-mail to Mr. Updike before the demand was made by Schoeman to QBE stating that, in light of the $200,000.00 attorneys' fees

60

cap in the engagement letter, Mr. Updike should not make a demand that QBE pay more than $200,000.00 in attorneys' fees plus disbursements for Reed Smith's services, Mr. Updike responded by stating, *inter alia*, that the engagement letter between Madison 96 and Reed Smith "is none of QBE's concern" and that "[i]f they wanted to, Madison 96th and Reed Smith could revise their agreement to make it time at standard rates." This e-mail documents Mr. Updike's admission that he had no reservation about altering an engagement letter in order to recover from an insurance company on his client's behalf a higher amount of fees than his client is entitled to.

140.    Later that day, Mr. Updike sent a letter dated March 13, 2013 to counsel for QBE seeking to recover on behalf of Madison 96 $282,940.00 in attorneys' fees plus disbursements for Reed Smith's services. When Mr. Updike asked plaintiff to draft a motion to the Court asking the Court to fix the amount of fees owed by QBE to Madison 96, plaintiff told Mr. Updike that to seek a higher amount of fees than the client had a legal obligation to pay constitutes fraud and that plaintiff was not prepared to draft a motion requesting more than QBE was legally obligated to pay Madison 96. Mr. Updike told plaintiff to find a case with the same circumstances as this case in which the court held that to make such a demand would be fraudulent. Plaintiff told Mr. Updike that any case stating the elements of fraud would suffice but he insisted that he would only be satisfied with a case with the same circumstances as this case. Plaintiff told him that what he

61

wanted to do was so blatantly and obviously fraudulent that no specific court case was needed to prove that it was fraudulent. Ultimately, after Mr. Updike saw that plaintiff was unwilling to cooperate with the fraud, Mr. Updike told plaintiff to draft the motion to the court as she wished and to include the numbers that she wanted to include. Plaintiff drafted the motion and with respect to the fees the client sought to recover for Reed Smith's services, plaintiff included a demand for $200,000.00, which is the capped amount of fees that the client owed.

141. After vigorously refusing to participate in the fraud, plaintiff was terminated by Schoeman shortly thereafter, on April 24, 2013, after working as an attorney at Schoeman for nearly four years.

142. At the time Schoeman and Mr. Updike sent the March 13, 2013 payment demand to QBE, they, and others who were intimately involved with the fraud, including Reed Smith, Breene, Madison 96, Boesky, and Weiner were guilty of the commission of criminal fraud.

143. Ultimately, when Mr. Updike made a motion to the Court asking the Court to, *inter alia*, direct entry of a judgment in favor of Madison 96 against QBE in the amount of $1,576,894.29, Mr. Updike notified the Court that in calculating Madison 96's costs of defense fees through December 31, 2012, Schoeman had excluded Reed Smith's fees. Although Schoeman recently produced Madison 96's engagement letter with Reed Smith to QBE, it was clear to plaintiff on March 13, 2013, in light of Mr. Updike's e-mail stating that the engagement letter was "none

62

of QBE's concern" and could be revised, that when Mr. Updike made the fraudulent payment demand to QBE on March 13, 2013, Mr. Updike's intention was that QBE would never be given a copy of the engagement letter between Madison 96 and Reed Smith that capped the fees that Madison 96 would owe Reed Smith at $200,000.00 plus disbursements and, in fact, QBE did not receive a copy of the engagement letter until approximately half a year after the fraudulent payment demand was made. It was clear to plaintiff that Mr. Updike's intention at the time the fraudulent payment demand was made on March 13, 2013 was that the engagement letter would either be hidden by Schoeman from QBE or materially altered by Schoeman to remove the cap on attorneys' fees contained in the letter.

144. After plaintiff's termination, plaintiff became aware of additional criminal fraud perpetrated by Schoeman, Reed Smith, Paul E. Breene, Madison 96, Stuart J. Boesky, and Jamison Weiner, among others, including the fraudulent alteration of a fee modification agreement between Schoeman on the one hand and Madison 96, Stuart J. Boesky, and Jamison Weiner on the other hand in an effort to defraud QBE. A copy of an October 10, 2013 affirmation that plaintiff submitted to Hon. Shirley Werner Kornreich, the Justice presiding over the litigation between Madison 96 and QBE apprising Judge Kornreich of the fraud perpetrated by Schoeman, among others, on QBE is attached hereto as **Exhibit F.** The affirmation states:

63

RONIT D. APPEL, an attorney duly admitted to practice law in the State of New York, affirms, under the penalties of perjury:

1.     I am former counsel to Madison 96 Associates, LLC ("Madison 96") in the above-captioned actions. I was formerly employed by Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman"), counsel for Madison 96 in the above-captioned actions. I submit this affirmation because I have knowledge of certain insurance fraud committed in the above-referenced litigation by Schoeman and by Schoeman partner Charles B. Updike in their attempts to recover money on behalf of Madison 96 from QBE Insurance Corporation ("QBE").

2.     I was counsel to Madison 96 in the above-captioned actions from 2009 until I was unlawfully terminated by Schoeman on April 24, 2013. The first instance of insurance fraud committed by Schoeman and Charles B. Updike, counsel for Madison 96, occurred shortly before my termination. One of the unlawful reasons for my termination listed by Schoeman in its April 24, 2013 termination letter to me was my "vigorous opposition" to "the content of a letter demanding payment of legal fees in full by an insurance carrier," and my "adamant refusal to cooperate in making the demand." The payment demand made by Schoeman that I refused to cooperate with, which constituted fraud, consisted of the making of a demand by Schoeman to QBE that QBE pay $282,940.00 in attorneys' fees plus disbursements for the services of Reed Smith LLP, special insurance counsel to Madison 96, when Madison 96's engagement letter with Reed Smith, the terms of which QBE had no knowledge of at the time the demand was made by Schoeman, explicitly capped the fees that Reed Smith could recover from

64

Madison 96 at $200,000.00 in attorneys' fees plus disbursements.

3.      After I sent an e-mail dated March 13, 2013 to Mr. Updike stating that, in light of the $200,000.00 attorneys' fees cap in the engagement letter, he should not make a demand that QBE pay more than $200,000.00 in attorneys' fees plus disbursements for Reed Smith's services, Mr. Updike responded by stating, *inter alia*, that the engagement letter between Madison 96 and Reed Smith "is none of QBE's concern" and that "[i]f they wanted to, Madison 96th and Reed Smith could revise their agreement to make it time at standard rates." A copy of Mr. Updike's e-mail documenting Mr. Updike's admission that he had no reservation about altering an engagement letter in order to recover from an insurance company on his client's behalf a higher amount of fees than his client is entitled to is attached hereto as Exhibit A. Later that day, Mr. Updike sent a letter dated March 13, 2013 to counsel for QBE seeking to recover on behalf of Madison 96 $282,940.00 in attorneys' fees plus disbursements for Reed Smith's services. A copy of Mr. Updike's letter to counsel for QBE is attached hereto as Exhibit B.

4.      Ultimately, when Mr. Updike made a motion to the Court asking the Court to, inter alia, direct entry of a judgment in favor of Madison 96 against QBE in the amount of $1,576,894.29, Mr. Updike notified the Court that in calculating Madison 96's costs of defense fees through December 31, 2013, Schoeman had excluded Reed Smith's fees.

5.      Although Schoeman recently produced Madison 96's engagement letter with Reed Smith to QBE, it was clear to me on March 13, 2013, in light of Mr. Updike's e-mail stating that the engagement letter was "none of QBE's concern" and could be revised, that when Mr. Updike made the

65

fraudulent payment demand to QBE on March 13, 2013, Mr. Updike's intention was that QBE would never be given a copy of the engagement letter between Madison 96 and Reed Smith that capped the fees that Madison 96 would owe Reed Smith at $200,000.00 plus disbursements and, in fact, it is my understanding that QBE did not receive a copy of the engagement letter until approximately half a year after the fraudulent payment demand was made. It was clear to me that Mr. Updike's intention at the time the fraudulent payment demand was made on March 13, 2013 was that the engagement letter would either be hidden by Schoeman from QBE or materially altered by Schoeman to remove the cap on attorneys' fees contained in the letter.

6.      I have now become aware of additional insurance fraud being committed by Schoeman in its attempts to recover money on behalf of Madison 96 from QBE. In or about November of 2010, Schoeman and Madison 96 modified their fee arrangement. In the course of the discovery sought by QBE in preparation for a hearing to set the amount of attorneys' fees owed by QBE to Madison 96, Schoeman provided QBE with what it purports to be the November 7, 2010 fee modification agreement between Schoeman and Madison 96. However, the unsigned letter provided by Schoeman, attached as Exhibit J to QBE's proposed order to show cause dated October 8, 2013, and attached hereto as Exhibit C, which Schoeman is attempting to pass off as the fee modification agreement in effect between Schoeman and Madison 96, is not the actual signed fee modification agreement dated on or about November 7, 2010 that was executed by the parties.

7.      During the course of my employment at Schoeman, I read the actual signed fee modification agreement numerous times. The fee modification

66

agreement that I read while employed at Schoeman, which was a PDF document saved on Schoeman's server, was signed and contains materially different terms than the terms contained in the unsigned letter provided by Schoeman to QBE attached as Exhibit J to QBE's October 8, 2013 motion papers and attachd hereto as Exhibit C. For instance, the original signed fee modification agreement contained no provision regarding any obligation of Madison 96 to pay any "Additional Fees" as such term is defined in the letter attached as Exhibit J to QBE's motion papers and attached hereto as Exhibit C.

8.      I never saw either a signed or unsigned copy of the letter attached as Exhibit J to QBE's motion papers and attached hereto as Exhibit C while I was employed at Schoeman and to my knowledge, no such letter was ever drafted, executed, or in effect between Schoeman and Madison 96 while I was employed at Schoeman.

9.      I respectfully submit that in order to prevent QBE from becoming the victim of insurance fraud, Schoeman should be orderd to produced the PDF signed copy of the November 7, 2010 fee modification agreement that shows the date the document was last modified as well as an electronic copy of the unsigned letter Schoeman recently submitted to QBE, attached as Exhibit J to QBE's October 8, 2013 motion papers and attached hereto as Exhibit C, that shows when that document was last modified.

145.    As discussed herein, Reed Smith and Paul E. Breene were intimately involved with all of the fraud committed by Schoeman and Charles B. Updike, including the fraud committed while plaintiff was employed at Schoeman and before her termination as well as the fraud committed after

67

plaintiff's termination. Their intimate involvement with the perpetration of the fraud, which resulted in plaintiff's termination by Schoeman, became especially apparent to plaintiff after plaintiff submitted an affirmation to the Court dated October 10, 2013 regarding the fraud committed, including regarding the unsigned fraudulently altered fee modification agreement letter passed off as the original fee modification letter in effect, and Reed Smith and Breene continued to perpetrate the fraud and continued to represent to the Court that the fraudulently altered fee modification letter was the binding modification letter in effect between the parties.

146. In addition, as discussed herein, Madison 96, Boesky, and Weiner were also intimately involved with all of the fraud committed by Schoeman and Charles B. Updike on their behalf, including the fraud committed while plaintiff was employed at Schoeman and before her termination as well as the fraud committed after plaintiff's termination. The intimate involvement of Madison 96, Boesky, and Weiner with the perpetration of the fraud, which resulted in plaintiff's termination by Schoeman, only became apparent to plaintiff: 1. On September 22, 2013, after plaintiff sent Boesky and Weiner a request for an immediate implementation of a litigation hold on certain documents relating to the litigation in which the fraud was perpetrated and Boesky's response to plaintiff's e-mail did not address the issue of the fraud committed, but, rather, his disappointment

68

that plaintiff "dr[e]w us into your issues with your previous employer"; and 2. after Madison 96, Boesky, and Weiner continued to represent to the Court that the fraudulently altered modified fee agreement was the original and binding modified fee agreement even after plaintiff submitted an affirmation to the Court dated October 10, 2013 regarding the fraud committed. It is inconceivable that Madison 96, Boesky, and Weiner were not involved with the fraud when they continued to pursue their fraudulent payment demands in reliance on the fraudulently altered modified fee agreement even after plaintiff submitted her affirmation the Court regarding the fraud. Upon information and belief, while plaintiff was employed at Schoeman, Madison 96, Boesky, and Weiner were aware that plaintiff, who was the associate at Schoeman assigned to the litigation in which the fraud was committed, refused to cooperate with the fraud but they nonetheless continued to perpetrate the fraud.

147.    Schoeman's false version of the facts surrounding plaintiff's refusal to cooperate in the making of the fraudulent payment demand to QBE and its intentional omission of crucial facts relating to plaintiff's refusal to cooperate with Schoeman's fraudulent demand to QBE constitutes libel and defamation.

148.    Additional libelous and defamatory statements are found in the sixth bullet-point paragraph of the Letter of Termination, which states:

69

Another example was your persistence in raising specious questions about advice we received from an Israeli lawyer about a transfer of real estate last year and your refusal to continue working on the matter. Again, this reflected poor judgment on your part.

149. Once again, Schoeman presented an entirely distorted version of the facts in an attempt to cover up its own fraud and libel and defame plaintiff.

150. The reason plaintiff refused to continue working on the matter referred to in Schoeman's Letter of Termination involving a transfer of real estate in Israel was because it became clear to plaintiff, who is an attorney admitted to practice law in both New York and Israel, that Schoeman intended to defraud the IRS by misrepresenting to the IRS that a certain real estate transfer was completed in Israel in 2012 when there was no real estate transfer in 2012. Contrary to Schoeman's representation, plaintiff did not raise "specious questions" about the matter. Instead, plaintiff notified Schoeman that as an attorney admitted to practice law in both New York and Israel, plaintiff felt that Schoeman's conduct was not lawful and that plaintiff would therefore not continue to work on the matter.

151. The events as they transpired are set forth below. In December of 2012, Mindy H. Stern, the firm's managing partner and a partner in the firm's real estate department, asked for plaintiff's assistance with a matter involving the transfer of real estate located in Israel. Ms. Stern emphasized to plaintiff that it was very important that the transfer of the real estate in Israel be completed by the

70

end of 2012. This was for United States tax purposes. After working on the matter for a few days and after discussions with the attorney in Israel handling the matter, it became clear to plaintiff that the transfer, which was comprised of several stages, would not be completed for tax purposes in 2012 but that Schoeman intended to represent to the IRS that it had been completed in 2012. As an attorney admitted to practice law in both New York and Israel, and based upon information provided by the attorney Schoeman was working with in Israel, it became clear to plaintiff that Schoeman could not lawfully represent to the IRS that the transfer was completed in 2012 for tax purposes. When it became apparent to plaintiff that Schoeman intended to engage in misrepresentations to the IRS, plaintiff told Ms. Stern that she could not continue to work on the matter because she did not feel comfortable with what the firm was doing. Ms. Stern became very angry at plaintiff for her refusal to continue working on the matter.

152. Schoeman's false statements in the Letter of Termination with respect to what transpired and its statement that plaintiff raised "specious questions" with respect to the real estate transfer constitute libel and defamation.

153. Additional libelous and defamatory statements are found in the seventh bullet-point paragraph of the Letter of Termination, which states:

> Most recently, you have shown poor judgment in other communications regarding the office relocation. While you certainly have the right to complain about conditions in the office, there are appropriate procedures for doing so. Your decision

71

> to send an email about your concerns to the entire office reflected poor judgment, as did your belligerent and adversarial communications with our architect and landlord, particularly because you did not seek the Firm's permission to communicate with those individuals or even advise us that you were considering doing so.

154. Here, Schoeman states that plaintiff showed "poor judgment" in certain communications regarding the office relocation. However, Schoeman presents a distorted version of the nature of the communications sent by plaintiff to the entire firm and to the architect and landlord, which related to unsafe and toxic work conditions at Schoeman, which plaintiff reported to OSHA. Schoeman falsely portrays plaintiff's e-mails as being "regarding the office relocation" when in truth, plaintiff's e-mails related to the air on the twelfth floor causing plaintiff to experience symptoms of heavy coughing and nausea and her being unable to work in her office at Schoeman due to the very unsafe and toxic work environment at Schoeman, which was a construction site. Copies of the communications referred to by Schoeman in the seventh bullet-point paragraph of the Letter of Termination are attached hereto as **Exhibit G**. It is very clear to anyone reading those communications that they did not relate to the "office relocation" but, rather, to the unsafe and toxic work environment at Schoeman, which caused plaintiff to experience symptoms of heavy coughing and nausea.

155. Additional libelous and defamatory statements are found in the eighth bullet-point paragraph of the Letter of Termination, which states:

72

Finally, despite the fact that you have acknowledged that you have no illness or medical condition, and air quality testing was done to ensure there is no problem, you have refused to come to work.

156.    Here, again, Schoeman presents a distorted version of the facts and misrepresents what transpired. First, Schoeman neglects to mention that the construction dust and fumes on the twelfth floor caused plaintiff to experience symptoms of heavy coughing and nausea. The fact that plaintiff had no prior illness or medical condition is irrelevant to the fact that the dust and fumes on the twelfth floor caused plaintiff to experience heavy coughing and nausea. Moreover, Schoeman makes it seem as though air quality testing was done to ensure plaintiff's personal work space was safe when the air quality tests submitted by Schoeman to OSHA did not include the results of any tests of the air quality in plaintiff's personal office or in any of the Schoeman attorneys' personal offices. Moreover, Schoeman makes it seem as though plaintiff refused to work ("you have refused to come to work") and neglected to mention that plaintiff was working from home during the time she did not come into the office due to the toxic work environment at Schoeman.

157.    The next paragraph of the Letter of Termination is likewise libelous and defamatory. In this paragraph, Schoeman states, *inter alia*:

73

> We have reached the point where we have no confidence that you will conduct yourself in an appropriate way and exercise appropriate judgment.

158. This statement, predicated upon the prior false statements of fact contained in the Letter of Termination, constitutes libel and defamation.

159. In the next paragraph of the Letter of Termination, Schoeman states:

> In short, this decision has been long in coming, as there have been many incidents during your employment here that have caused the partners to have serious concerns about your judgment and ability to work with others. We have therefore decided that your employment with the Firm should end, effective immediately.

160. This statement, predicated upon the prior false statements of fact contained in the Letter of Termination, constitutes libel and defamation.

161. In the second to last paragraph of the Letter of Termination, Schoeman states:

> Our response to any inquiries about your employment with us will be limited to confirming the dates of your employment and your position.

162. As discussed herein, this statement constitutes libel and defamation and has resulted in plaintiff's being libeled, slandered, and defamed.

74

## Religious Discrimination at Schoeman

163.    Throughout plaintiff's employment at Schoeman, plaintiff, who is an Orthodox Jew, was subjected to religious discrimination at Schoeman.

164.    As discussed herein, throughout plaintiff's employment, Schoeman repeatedly discriminated against plaintiff in the terms, conditions and privileges of plaintiff's employment because of plaintiff's religious beliefs.

165.    As discussed herein, in April of 2012, during a meeting in Ms. Casero's office, Susan S. Casero, Counsel at Schoeman, asked plaintiff to work on Saturday when she knew that plaintiff is an Orthodox Jew and that plaintiff does not work on the Sabbath and Jewish holidays, as she and plaintiff had discussed this earlier that month. Plaintiff told Ms. Casero in an e-mail plaintiff sent her the following day that her asking plaintiff to work on Saturday was inappropriate. An e-mail exchange ensued in which Ms. Casero implied that she had not asked if plaintiff could work on Saturday and in which she denied knowing that plaintiff does not work on Saturday, both of which were untruthful. In a previous e-mail sent only to Beth L. Kaufman, Ms. Casero stated that she had asked if plaintiff could work on Saturday or Sunday, which was also untrue. Ms. Casero did ask if plaintiff could work on Saturday but at no time did she ask if plaintiff could work on Sunday. Almost two months later, on June 15, 2012, Beth L. Kaufman informed plaintiff that she felt that there needs to be an investigation into the e-mail exchanges between plaintiff and Ms. Casero which took place in April of 2012. She informed

75

plaintiff that the firm had hired an employment lawyer who would come in and interview plaintiff, Ms. Casero, and other people at the firm on Monday, June 18, 2012. Plaintiff informed Ms. Kaufman via e-mail that, *inter alia*, she did not consent to be interviewed by the attorney and would not consent to any discovery of the matter at that time and that if there needs to be discovery, it would be done under the supervision of a court of law. Plaintiff also informed Ms. Kaufman that she felt that Ms. Kaufman's intention to interview other people at the firm other than Ms. Casero and plaintiff was perplexing and would undoubtedly result in plaintiff's being slandered by the firm. Given the firm's pattern of mistreating plaintiff throughout plaintiff's employment and in light of Ms. Kaufman's statement that she intended to interview others in the firm aside from Ms. Casero and plaintiff, plaintiff felt that the investigation the firm intended to conduct was intended for the purpose of slandering plaintiff and weakening plaintiff's position in the event plaintiff would bring a lawsuit against Schoeman for religious discrimination and constituted harassment in the workplace and plaintiff notified Ms. Kaufman of such. In a response e-mail, Ms. Kaufman wrote:

> Ronit:
>
> There is no effort to harass you; nor is there any "discovery" being undertaken. We are conducting an internal investigation, prompted by the e-mails on which you copied me. We believe this to be a Human Resources "best practice" in response to such accusations. In addition to seeking to interview Susie and you, the outside investigator

76

also wants to interview anyone who overheard the discussion between Susie and you. We have no reason to believe that anyone would slander you under any circumstances, and do not understand why this is of concern to you.

We respect your decision not to be interviewed. Should you change your mind, please let us know and we will schedule a time for you to be interviewed on Monday.

Beth

166. Plaintiff never heard anything more regarding the issue and did not receive a copy of the report prepared by the employment lawyer, Laurie Zeligson, which plaintiff did not even know existed, until plaintiff received Schoeman's response to plaintiff's OSHA whistleblower complaint in the summer of 2013. When plaintiff saw a copy of the report, her belief that the firm's intention was to harass and slander her was confirmed, as the entire report, comprised of blatant misrepresentations and distortions of the truth, constitutes libel and in fact strays far from the issue of the exchanges between plaintiff and Ms. Casero in April of 2012, which, per Ms. Kaufman, was the issue that Ms. Zeligson was hired to investigate. Clearly, rather than investigate the religious discrimination that plaintiff was subjected to at Schoeman, Schoeman used this biased and distorted investigation as an opportunity to slander, libel, and defame plaintiff and to make it seem as though plaintiff's claims of religious discrimination lacked any basis when this was far from the case. Although Ms. Zeligson did not speak with plaintiff about

77

plaintiff's claims of religious discrimination, she surprisingly and maliciously came to the unwarranted and incorrect conclusion in her investigation report that there was no basis to plaintiff's claims of religious discrimination, which served as the basis for one of the reasons for plaintiff's unlawful termination by Schoeman. In its Letter of Termination, Schoeman wrote that one of the reasons for plaintiff's Termination was her accusing Ms. Casero of religious discrimination.

167.    Moreover, although Schoeman knew that plaintiff left early on Fridays in order to get home for the Sabbath, in or about January 2013, Beth L. Kaufman, a member of Schoeman, gave plaintiff an extensive assignment on Friday afternoon that would take hours to complete and demanded that plaintiff complete it before leaving for the Sabbath.

168.    Furthermore, although Schoeman knew that plaintiff is an Orthodox Jew who eats only kosher food, Schoeman did not make accommodations for plaintiff when it requested that plaintiff attend gatherings or firm celebrations at non-kosher restaurants or luncheons at hotels, which plaintiff was expected to attend. In addition, during her employment at Schoeman, the firm held luncheons for its female attorneys at non-kosher restaurants. Plaintiff was generally not invited to attend these luncheons because plaintiff is an Orthodox Jew and cannot eat food at a non-kosher restaurant. The firm never chose to hold a luncheon at a kosher restaurant.

78

169.    Toward the end of plaintiff's employment at Schoeman, particularly during March of 2013, the firm would order pizza for all firm employees on a regular basis on Fridays. Despite plaintiff's explicit request that the firm order pizza from a kosher pizza shop, the firm did not order kosher pizza for plaintiff. Plaintiff would often order kosher pizza on her own, at her own expense, while the firm treated the other employees to non-kosher pizza at the firm's expense. Cindy Nygaard, the office manager at Schoeman, and the members of Schoeman knew that plaintiff cannot eat the non-kosher pizza the firm ordered, yet, not once did the firm order kosher pizza for plaintiff or reimburse plaintiff for the lunches plaintiff ordered when the firm sponsored a pizza lunch for the other employees of the firm.

170.    Aside from not ordering kosher pizza for plaintiff, the firm did not make accommodations for plaintiff when it ordered other types of non-kosher food for the firm's employees, even though it knew that plaintiff is an Orthodox Jew who eats only kosher food. For instance, each month, the firm had a birthday party to celebrate the birthdays of any firm member or employee who had a birthday that month. Eleven out of twelve months a year, the birthday cakes that the firm ordered were non-kosher and plaintiff was unable to eat anything at the birthday celebrations. Nonetheless, plaintiff was expected to attend these birthday celebrations, which were extremely uncomfortable for plaintiff as plaintiff was the only Orthodox Jew at the firm and, as such, the only person who could not eat

79

anything. The only time the firm ordered a kosher cake was in July because plaintiff was the only one who celebrated a birthday in July.

## Defamatory and Libelous Report Prepared in Response to Plaintiff's Complaint of Religious Discrimination at Schoeman

171. As discussed herein, in April of 2012, Susan S. Casero, an attorney at Schoeman, subjected plaintiff to religious discrimination.

172. Although Schoeman initially did nothing to investigate the matter, approximately two months after the incident, Schoeman informed plaintiff that it had hired an employment attorney to investigate the matter.

173. It was very clear to plaintiff that Schoeman hired the attorney, Laurie Zeligson, not for the purpose of conducting an objective, *bona fide* investigation but for the purpose of slandering and libeling plaintiff in an effort to strengthen its position if there should be a lawsuit against Schoeman for religious discrimination. For this reason, plaintiff refused to be interviewed by Ms. Zeligson and Beth L. Kaufman, a partner at Schoeman informed plaintiff that the firm respected plaintiff's decision not to be interviewed.

174. The result of Ms. Zeligson's investigation was a one-sided libelous and defamatory report replete with false statements of fact concerning plaintiff.

175. The report, attached hereto as **Exhibit E**, contains libelous and defamatory statements made by Ms. Zeligson as well as by other members and

80

employees of Schoeman and documents slander by numerous members and employees of Schoeman, as well as by others.

176.    Some examples of libel and defamation contained in the report, as well as documentation of slander, are set forth below.

177.    Page 2 of the Report states that "Ronit is stern and can be abrasive." The statement that Ronit is "stern" and "can be abrasive" is false and defamatory.

178.    Page 3 of the Report documents a statement by Susan S. Casero that "Ronit had been condescending toward her in a meeting with the contract attorneys." This is a false and defamatory statement.

179.    The Report contains false statements of fact relating to plaintiff's accusation of religious discrimination by Ms. Casero and presents an entirely distorted version of what transpired. The Report is replete with blatant lies and distortions of the truth. For instance, the recitation of the circumstances surrounding Ms. Casero's asking plaintiff to work on Saturday are entirely false. Contrary to what is stated in the Report, on April 19, 2012, Ms. Casero specifically asked plaintiff if she could come in and work on Saturday because she had not arranged for childcare for her son on Saturday. Moreover, the circumstances surrounding Ms. Casero's confrontation with plaintiff in plaintiff's office are falsely stated in the Report. Contrary to the false statements of fact contained in the Report, when Susan S. Casero went to plaintiff's office to ask her some questions, plaintiff was speaking with Rachel Abramowitz, a paralegal at the firm, and asked

81

Ms. Casero to return in ten minutes. Ms. Casero became annoyed but plaintiff politely repeated her request that Ms. Casero return in ten minutes, as plaintiff was in the middle of a meeting with Ms. Abramowitz. When Ms. Casero returned to plaintiff's office and began to speak in an inappropriate and condescending manner to plaintiff, plaintiff informed Ms. Casero that she had no right to speak to plaintiff in the manner she was speaking to her in and asked her to leave plaintiff's office. In response, instead of leaving as requested, Ms. Casero shut the door to plaintiff's office and continued to speak to plaintiff in an inappropriate and condescending manner. Plaintiff repeated her request that Ms. Casero leave the office, which Ms. Casero finally did.

180. Page 4 of the Report contains a statement by Ms. Casero that "Ronit cannot be managed." This is false and defamatory.

181. Page 4 of the Report contains a statement by Ms. Casero that plaintiff was "in over her head." This too is false and defamatory.

182. Page 4 of the Report contains a statement by Ms. Casero that "she believes Ronit is a liability to the firm. She thinks Ronit is too unpredictable and wouldn't put her in front of a client." This statement of opinion is false and defamatory and gives the impression that it sets forth the facts upon which the opinion is based, but the facts are false and grossly distorted.

82

183.    Page 4 of the Report contains a statement by Ms. Casero that "Ronit was robotic, cold" during a witness prep session with Lisa Lyons. This statement is false and defamatory.

184.    Page 4 of the Report contains a statement by Ms. Casero that she "does not trust that Ronit will not have another blowup and feels she cannot rely on her." This statement regarding plaintiff constitutes slander and defamation of plaintiff.

185.    Page 4 of the Report contains a statement by Cindy Nygaard that she "found [plaintiff] to be structured and tightly wound." This characterization of plaintiff is false and defamatory.

186.    Page 5 of the Report contains a statement by Ms. Nygaard that plaintiff "works behind closed doors." This statement constitutes defamation by innuendo, the innuendo being that plaintiff is doing something wrong by working with her door closed.

187.    Page 5 of the Report contains a statement by Ms. Nygaard that plaintiff has "had issues with others in the firm." This too constitutes slander and defamation by Ms. Nygaard and libel and defamation in the Report.

188.    Page 5 of the Report contains a statement by Ms. Nygaard that "Ronit might have an inability to work with her peers." This too constitutes slander and defamation by Ms. Nygaard and libel and defamation in the Report.

189.    Page 6 of the Report contains a statement by Paul E. Breene, a partner at Reed Smith, that it was frustrating to deal with plaintiff in that "she was

83

creating more work for them and because she did not understand the legal arguments being made or the details of the insurance issues in which his firm had a particular expertise." These statements are false and constitute libel, slander, and defamation.

190. Page 6 of the Report contains the Report's conclusion that "I conclude that [plaintiff]'s allegation of inappropriate conduct by Susie on the basis of her religion has no merit." This conclusion was based upon false statements of fact provided by Schoeman and selective members and employees of Schoeman and constitutes libel and defamation.

191. Page 6 of the Report contains the Report's conclusion that "I have noted some concerns about [plaintiff]'s communication style that may have contributed to Susie's perception of hostile behavior." This conclusion was likewise based upon false statements of fact and constitutes libel and defamation.

192. Page 7 of the Report states that plaintiff's e-mail "suggests that Susie should have known better than to even ask [if plaintiff could work on Saturday]. There is no evidence to support this claim." This is a false statement of fact and constitutes libel and defamation. Contrary to the Report's misrepresentations, there is evidence to support plaintiff's claim that Ms. Casero should not have asked whether plaintiff could come in to the office on Saturday, including, but not limited to, plaintiff's e-mail sent to Ms. Casero documenting a conversation between

84

plaintiff and Ms. Casero regarding plaintiff's being an Orthodox Jew and not working on the Sabbath and Jewish holidays.

193. Page 7 of the Report contains a statement by Ms. Casero that plaintiff's behavior was "unacceptable and hostile." This is a false statement of opinion that gives the impression that it sets forth the facts upon which the opinion is based, but those facts are falsely and grossly statement. This statement constitutes slander, libel, and defamation.

194. Page 8 of the Report states that plaintiff's "communication skills need improvement." This false conclusion is based upon false statements of fact regarding events that transpired involving plaintiff and constitutes libel and defamation. This statement gives the impression that it sets forth the facts upon which the conclusion is based, but those facts are false and grossly distorted.

195. Page 8 of the Report states that "[f]or one of the more junior attorneys to be communicating in such an accusatory manner with more senior attorneys in her own firm, even where there is not a hierarchical structure, shows a lack of judgment." This false conclusion implies a basis in facts that are not disclosed to the reader and is predicated upon false statements of fact regarding events that transpired involving plaintiff and constitutes libel and defamation.

196. Page 8 of the Report states that "[a]nd when her communications with partners in another firm led one of them to write to her, 'Do not send me e-mails. Ever,' this raises yet another cause for concern. What this suggests to me is that

85

Ronit has not taken the time to consider, or shows no concern about, how the tone and substance of her communications will be received by others. These kind of communications do not engender goodwill or foster the development of professional relationships." These false conclusions are predicated upon false statements of fact and imply a basis in facts undisclosed to the reader regarding events that transpired involving plaintiff and constitute libel and defamation.

197.    Page 8 of the Report contains a comment by Ms. Nygaard that she "questioned [plaintiff]'s ability to work with her peers." This statement constitutes slander, libel, and defamation.

198.    Page 8 of the Report states that "it does appear that [plaintiff's] communications are impairing her ability to work effectively with others." This false conclusion is predicated upon false statements of fact and constitutes libel and defamation.

199.    Page 8 of the Report contains the slanderous and libelous comment that plaintiff has been described as "curt and cold in her personal interactions." Plaintiff is a warm and friendly person and is not "curt and cold in her personal interactions." This statement is false, libelous, and defamatory.

200.    Page 8 of the Report states that: "[Plaintiff's] style, and by that I mean the tone and substance of her communications, may lead to questions about her ability to sustain productive working relationships...." This false conclusion is

86

predicated upon false statements of fact and implies a basis in facts undisclosed to the reader and is libelous and defamatory.

201. The Report republished numerous slanderous remarks about plaintiff made by members and employees of Schoeman, among others.

202. The contents of the Report were republished in Schoeman's April 24, 2013 Letter of Termination.

203. The Report was further republished when it was sent to third parties outside of Schoeman, including, but not limited to, OSHA, in June of 2013.

204. There can be no question that the purpose of the Report was to maliciously defame, libel, and slander plaintiff in an attempt to weaken plaintiff's position in the event that she would bring a lawsuit against the firm or individuals at the firm alleging religious discrimination.

## Age Discrimination at Schoeman

205. Another unlawful reason for plaintiff's termination was her young age. Plaintiff is currently 27 years old  At the time plaintiff was terminated by Schoeman on April 24, 2013, she was a fifth year associate and was only 26 years old, which is a very young age for a fifth year associate.  In addition, throughout plaintiff's employment at Schoeman, plaintiff was subjected to discrimination because of her young age, which led to and culminated in plaintiff's being terminated because, among other unlawful reasons, of her young age.

87

206. Plaintiff was discriminated against by Schoeman in plaintiff's compensation because of her age. In plaintiff's nearly four years at Schoeman she only received a pay raise once whereas, upon information and belief, other attorneys at Schoeman, who are older than plaintiff, received yearly pay raises. In addition, upon information and belief, plaintiff's salary was lower than the salary Schoeman paid other attorneys who are older than plaintiff when they were at plaintiff's level of seniority.

207. In addition, throughout plaintiff's employment, Schoeman would repeatedly discriminate against plaintiff in the terms, conditions and privileges of plaintiff's employment because of plaintiff's age.

208. For instance, on numerous occasions throughout plaintiff's employment at Schoeman, members of Schoeman, including Charles B. Updike, Beth L. Kaufman, and employees of Schoeman, would belittle and humiliate plaintiff because of her age. For instance, throughout plaintiff's employment, which terminated on April 24, 2013, Charles B. Updike would repeatedly tell plaintiff and others that plaintiff was only a "first year associate" or a "second year associate" when she was in fact much more senior than a first year or second year associate. When plaintiff was terminated, she was a fifth year associate.

209. Upon information and belief, when speaking about plaintiff to the firm's clients or individuals outside of Schoeman, Schoeman partners would refer to

88

plaintiff as a first or second-year associate when she was in fact far more senior than a first or second year associate.

210.   On numerous occasions throughout plaintiff's employment at Schoeman, from September 8, 2009 through April 24, 2013, Beth L. Kaufman and others at Schoeman would disparage plaintiff in front of clients and others because of plaintiff's age. In speaking to plaintiff in front of others, including attorneys of other firms and clients, Beth L. Kaufman would not treat plaintiff as an attorney and colleague, as she treated other older attorneys at Schoeman, but, rather, would treat plaintiff as a paralegal with a strictly administrative role. For instance, during conference calls that Ms. Kaufman asked plaintiff to participate in, Ms. Kaufan would often not announce or acknowledge plaintiff's presence on the call but would completely ignore plaintiff. When other, older attorneys at Schoeman participated in conference calls with Ms. Kaufman, Ms. Kaufman would announce and acknowledge their participation in the call. Moreover, on at least one occasion when Ms. Kaufman asked plaintiff to accompany her to a court appearance in a case in which plaintiff had not yet met the other attorneys working on the case, Ms. Kaufman did not treat plaintiff as a colleague or as an attorney and did not introduce plaintiff to the other attorneys working on the case, but completely ignored plaintiff, as though she was just a paralegal who she brought along to watch the proceedings. This subjected plaintiff to great discomfort and embarrassment.

89

211. On numerous occasions throughout plaintiff's employment at Schoeman, members of Schoeman, particularly Beth L. Kaufman, would limit plaintiff's interaction with clients and others outside of Schoeman because of plaintiff's age. Beth L. Kaufman specifically told plaintiff that the reason for her limiting plaintiff's interaction with others outside of Schoeman was because plaintiff was "a young attorney." Beth L. Kaufman informed plaintiff that because plaintiff was a "young attorney," plaintiff was not allowed to respond to e-mails sent to her by clients and other attorneys outside of Schoeman without first asking Beth L. Kaufman to review plaintiff's e-mails. When other attorneys at Schoeman were at plaintiff's level of seniority, they were treated differently than plaintiff and were not treated as "young attorneys" because they were older than plaintiff. Schoeman did not limit their interaction with others outside of Schoeman because they were a "young attorney," as Schoeman did with plaintiff.

212. When plaintiff would need to respond to a client or an attorney outside of Schoeman and would send a draft response e-mail to Beth L. Kaufman for her approval, Beth L. Kaufman would often ignore plaintiff's e-mail and not respond to plaintiff. This would put plaintiff in an embarrassing and uncomfortable situation vis-à-vis clients and other attorneys outside of Schoeman who perceived plaintiff to be ignoring them when plaintiff did not respond to their e-mail.

213. Because of plaintiff's young age, Beth L. Kaufman would generally not allow plaintiff to meet with clients and would either meet with clients alone or

90

would send another attorney instead of plaintiff to meet with clients, even though plaintiff was the most knowledgeable attorney on the facts of the clients' case who had spent the most time working on the clients' case.

214. Throughout plaintiff's employment at Schoeman, employees of Schoeman, including, but not limited to Cindy Nygaard, Veronica Law, and Xavier Saunders would routinely ignore requests made of them by plaintiff and treat plaintiff as an inferior whose requests they did not need to pay any attention to.

215. For instance, in March of 2013, Cindy Nygaard chose to ignore e-mails sent to her by plaintiff complaining of the unbearable heat in the office and requesting that the heat be turned off or lowered.

216. From in or about December of 2012 until plaintiff was terminated, plaintiff's secretary, Veronica Law, would routinely ignore plaintiff's work assignments and hardly performed any work at all for plaintiff. When plaintiff would follow-up on her requests, Veronica Law would claim she was otherwise occupied and did not have time to handle plaintiff's assignments. Often, Ms. Law would purposely choose not to answer her phone when she saw on her caller ID that plaintiff was calling her. It was clear to plaintiff that Veronica Law did not treat plaintiff as she treated other, older attorneys at the firm and it was clear to plaintiff that Ms. Law resented the fact that she had to perform assignments for plaintiff, who was only 26 years old at the time Ms. Law was assigned as plaintiff's secretary. In the few instances when Ms. Law did perform small assignments for plaintiff,

91

such as creating a Fed-Ex label, Ms. Law would create unnecessary work for plaintiff, such as asking plaintiff for the phone number of a corporation when Ms. Law herself could have ascertained such information with a quick Google search. After plaintiff complained to Cindy Nygaard that Veronica Law was not doing the work plaintiff assigned her, Cindy Nygaard did not take the necessary action to ensure that Veronica Law would begin to perform the work assignments assigned to her by plaintiff.

217.    Throughout plaintiff's employment at Schoeman, including throughout 2012 and 2013, Xavier Saunders, the firm's litigation support manager, would also routinely not timely perform assignments plaintiff asked him to perform. Plaintiff would at times have to follow-up with Mr. Saunders numerous times before he would perform the assignments plaintiff requested that he perform. Upon information and belief, Mr. Saunders treated plaintiff with less deference and respect than he treated other, older attorneys at Schoeman because of plaintiff's young age.

218.    Moreover, throughout plaintiff's employment at Schoeman, aside from displaying a personal portrait of plaintiff next to her bio, Schoeman declined to feature plaintiff on any of the photos featured throughout Schoeman's website. At one time during plaintiff's employment, a photographer was hired to take photos of the attorneys in the office to feature on the website. The photos that were taken included many photos of plaintiff. Schoeman only had the photos up on the website

92

for a few days before removing them and since that time, the photos with plaintiff were never returned to the website. As of April 24, 2013, the date of plaintiff's termination, the photos had still not been returned to the website. Upon information and belief, Schoeman discriminated against plaintiff because of her young age in refusing to have any photos of plaintiff on Schoeman's website aside from plaintiff's personal portrait next to her bio. Even with respect to plaintiff's bio photo, Schoeman discriminated against plaintiff. Whereas other attorneys were given several portrait photos to look through and select which one would be their bio photo, Schoeman did not display on its website the portrait photo selected by plaintiff, but, rather, selected another photo that was not a portrait photo and that not intended to be used as a bio photo, but was, rather, intended to be featured elsewhere on Schoeman's website. Upon information and belief, Schoeman selected this photo to be used as plaintiff's bio photo because plaintiff appeared to look older in this photo than in any of the portrait photos that were taken of her. Plaintiff was the only attorney at Schoeman whose bio photo was not a portrait photo but, rather, was a photo taken of plaintiff in her office, with a view of buildings in the background.

219. Furthermore, although the firm's website would feature summaries of victories in cases involving other associates, who are older than plaintiff, throughout plaintiff's employment, Schoeman declined, except for once, to feature summaries of victories in cases involving plaintiff. Beth L. Kaufman would tell

plaintiff that plaintiff had to send her a summary of the victory for her review and then when plaintiff would send her the summary, Beth L. Kaufman would never respond to plaintiff's e-mail and the summary would never be published on the firm's website.

220.    Moreover, because of plaintiff's young age, Schoeman never hesitated to subject plaintiff to blatant religious discrimination as well. Although the firm knew that plaintiff is an Orthodox Jew who eats only kosher food, the firm did not make accommodations for plaintiff when the firm requested that plaintiff attend gatherings or firm celebrations at non-kosher restaurants or luncheons at hotels, which plaintiff was expected to attend. In addition, during plaintiff's employment at Schoeman, the firm held luncheons for its female attorneys at non-kosher restaurants. Plaintiff was generally not invited to attend these luncheons because she is an Orthodox Jew and cannot eat food at a non-kosher restaurant. The firm never chose to hold a luncheon at a kosher restaurant. Furthermore, toward the end of plaintiff's employment at Schoeman, particularly during March of 2013, the firm would order pizza for all firm employees on a regular basis on Fridays. Despite plaintiff's explicit request that the firm order pizza from a kosher pizza shop, the firm did not order kosher pizza for plaintiff. Plaintiff would often order kosher pizza on her own, at her own expense, while the firm treated the other employees to non-kosher pizza at the firm's expense. Aside from not ordering kosher pizza for plaintiff, the firm did not make accommodations for plaintiff when it ordered other

94

types of non-kosher food for the firm's employees, even though it knew that plaintiff is an Orthodox Jew who eats only kosher food.  For instance, each month, the firm had a birthday party to celebrate the birthdays of any firm member or employee who had a birthday that month.  Eleven out of twelve months a year, the birthday cakes that the firm ordered were non-kosher and plaintiff was unable to eat anything at the birthday celebrations.  Nonetheless, plaintiff was expected to attend these birthday celebrations, which were extremely uncomfortable for plaintiff as she was the only Orthodox Jew at the firm and, as such, the only person who could not eat anything.  The only time the firm ordered a kosher cake was in July because plaintiff was the only one who celebrated a birthday in July.  At one point, a secretary at Schoeman, Barbara Wojciechowski, informed plaintiff that she had tried to convince Schoeman to order kosher cakes all year round and not just in July but had not been successful in her attempts.  Schoeman felt comfortable subjecting plaintiff to such humiliation throughout her employment as Schoeman because it viewed plaintiff as a young person who it could subject to inferior conditions at work.

221.    Furthermore, throughout plaintiff's employment at Schoeman, and especially during 2012, Charles B. Updike, a senior partner at the firm, would repeatedly have plaintiff accompany him to court conferences via subway while plaintiff was carrying a very heavy load of documents.  Traveling by subway required ascending and descending many steps, which was very difficult for plaintiff

95

who was carrying numerous heavy redwelds of documents. Upon information and belief, Charles B. Updike felt comfortable allowing plaintiff to carry so much weight up and down many stairs, rather than take a cab, because of plaintiff's young age.

222. As discussed herein, on numerous occasions, Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, Andrea D. Ascher, and others at Schoeman declared, printed, and circulated and caused to be declared, printed and circulated statements that express discrimination as to plaintiff's age and an intent to make such discrimination. Below are a few of many examples.

223. On or about June 26, 2012, Schoeman caused to be declared, printed and circulated within Schoeman Laurie S. Zeligson's June 26, 2012 Investigation Report, which expresses discrimination against plaintiff as to her age and an intent to make such discrimination. One example of age discrimination in the report is that the report states that as of the time the report was prepared, plaintiff was "a second year Associate" when in fact, plaintiff was a fourth year associate at the time the report was prepared. Schoeman repeatedly throughout plaintiff's employment at Schoeman referred to plaintiff as being a more junior attorney than she actually was in order to belittle her due to her young age and Schoeman caused the statement regarding plaintiff being "a second year Associate" to be included in the Investigation Report. Schoeman caused the statements containing age discrimination in the Investigation Report to be declared, printed and circulated. In

96

addition, on or about June 26, 2012 and at subsequent times thereafter, Schoeman itself circulated the Investigation Report.

224.    In addition, on or about June 11, 2013, Schoeman circulated and caused to be circulated to parties outside of Schoeman a copy of Laurie S. Zeligson's June 26, 2012 Investigation Report, which expresses discrimination against plaintiff as to her age and an intent to make such discrimination.

225.    In addition, in Schoeman's response to plaintiff's whistleblower complaint to OSHA, submitted to OSHA on or about June 11, 2013 and signed by Charles B. Updike, Schoeman, when discussing its offer to plaintiff of an "entry level" position beginning in September of 2009, stated that "Ms. Appel first worked for us in the summer of 2008.  Although young and somewhat immature, she was intelligent and energetic."  This statement constitutes the declaration, printing and circulation of a statement that expresses discrimination as to plaintiff's age and an intent to make such discrimination.  The clear implication of the statement is that plaintiff's young age was viewed by Schoeman as a detriment. Moreover, plaintiff was not immature by any standards but was exceptionally mature and was in fact praised by many for her high level of maturity.  Schoeman's statement regarding plaintiff's young age and its mention that she was "somewhat immature" expresses discrimination against plaintiff on the basis of her age and an intent to make such discrimination.  Moreover, plaintiff was not offered an "entry level position," but, rather, was hired as a second-year associate.  Schoeman's reference to plaintiff

97

being offered an "entry-level position" constitutes age discrimination and an intent to make such discrimination.

226.    Schoeman's numerous acts of declaring, printing and circulating and causing to be printed and circulated statements relating to plaintiff's young age expressed an intent to discriminate against plaintiff based on her age.

227.    The age discrimination that plaintiff was subjected to at Schoeman was carried out under the direct supervision and control of Beth L. Kaufman, Mindy H. Stern, Charles B. Updike, and Andrea D. Ascher while rendering professional services on behalf of Schoeman.

## Schoeman's Actions Have Destroyed Plaintiff's Career, Irreparably Destroyed Plaintiff's Reputation, and Have Caused Plaintiff Severe Economic, Emotional and Other Damage

228.    The manner in which Schoeman terminated plaintiff (i.e., with no notice at all and with no opportunity for plaintiff to secure another job prior to termination) and Schoeman's refusal to say anything good about plaintiff when contacted by prospective employers has destroyed plaintiff's career, has irreparably damaged plaintiff's reputation, has prevented plaintiff from obtaining other employment, has prevented plaintiff from ever becoming partner at a law firm, and has caused plaintiff severe economic, emotional, and other damage, including, but not limited to, lost past and future wages and the loss of plaintiff's home.

229.    Plaintiff's intelligence, skills, talents, and legal experience are outstanding, unique, and unmatched.  If not for Schoeman's vindictive termination

98

of plaintiff, plaintiff would have had a brilliant, very successful career ahead of her.

If not for Schoeman's vindictive termination of plaintiff, plaintiff would have

obtained a very lucrative position as a partner at a large law firm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### LIBEL BY SCHOEMAN, MINDY H. STERN, BETH L. KAUFMAN, CHARLES B. UPDIKE, AND ANDREA D. ASCHER

230.  Plaintiff repeats and realleges paragraphs 1 through 229 as if fully set forth herein at length.

231.  Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

232.  As discussed in paragraphs 98 through 162, herein, the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

233.  As discussed in paragraphs 98 through 162, herein, the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

234.  As discussed in paragraphs 98 through 162 herein, the Letter of Termination also contains unprotected derogatory statements of opinion that give

99

the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

235.    First, the Letter of Termination states:

> Although you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below.
>
> After consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work effectively with your colleagues.  We have come to this conclusion after reflecting on the incidents described below, among others.

236.    The above paragraphs, which indicate that plaintiff was terminated for cause, constitute libel by defendants Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.  As discussed herein, the "causes" listed by Schoeman contain blatant distortions of the truth and falsely and maliciously attempt to make it appear as though Schoeman had cause to terminate plaintiff.  However, the correct version of the facts as they transpired makes clear that there was no lawful cause for plaintiff's termination.

237.    The first bullet-point paragraph of the Letter of Termination, Schoeman states:

> The first incident occurred in the summer of 2010 when we were preparing a response to a questionnaire from our insurance carrier and you

100

> refused to answer a question about whether any claims had been made against you. We let this issue pass but it did raise concerns on our part about your candor and willingness to speak openly to your colleagues.

238. This paragraph constitutes libel by defendants Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

239. As discussed in paragraphs 98 through 162 herein, the first bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

240. As discussed in paragraphs 98 through 162, herein, the first bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

241. As discussed in paragraphs 98 through 162 herein, the first bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

242. The second bullet-point paragraph in the Letter of Termination states:

> Also in 2010, there was a disturbing incident involving your refusal to share material you had prepared at the Firm's request and on the Firm's

101

time for another project with which Deirdre Sheridan was involved. You even accused her of "plagiarism", which was highly inappropriate. This was an example of poor judgment on your part and an inability to work well with your colleagues.

243. The second bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

244. As discussed in paragraphs 98 through 162 herein, the second bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

245. As discussed in paragraphs 98 through 162, herein, the second bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

246. As discussed in paragraphs 98 through 162 herein, the second bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

247. The third bullet-point paragraph in the Letter of Termination states:

102

> In January 2012, there was a heated exchange between you and our colleagues at Reed Smith that again demonstrated poor judgment on your part and an inability to get along well with your colleagues. Your emails to them, sent without consulting Charles Updike, the supervising partner, were totally inappropriate communications.

248. The third bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

249. As discussed in paragraphs 98 through 162 herein, the third bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

250. As discussed in paragraphs 98 through 162, herein, the third bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

251. As discussed in paragraphs 98 through 162 herein, the third bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

103

252. The fourth bullet-point paragraph in the Letter of Termination states:

A similar incident occurred in April 2012 when you accused a colleague of religious discrimination because she asked if you could work over the weekend, not knowing that you were a Sabbath observer who could not work on Saturday. Again, your reaction demonstrated both poor judgment and an inability to have constructive dialogue with your colleagues. A further indication of your poor judgment in our view was your refusal to participate in the investigation that we felt obligated to conduct because of your complaint of religious discrimination.

253. The fourth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

254. As discussed in paragraphs 98 through 162 herein, the fourth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

255. As discussed in paragraphs 98 through 162 herein, the fourth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

256. As discussed in paragraphs 98 through 162 herein, the fourth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory

104

statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

257.   The fifth bullet-point paragraph in the Letter of Termination states:

> Another more recent incident of poor judgment occurred during our discussions about the content of a letter demanding payment of legal fees in full by an insurance carrier. Your vigorous opposition to that approach was listened to and taken into account. Your adamant refusal to cooperate in making the demand, however, again reflected poor judgment on your part, especially in light of your unresponsiveness to the suggestion that you research the issue.

258.   The fifth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

259.   As discussed in paragraphs 98 through 162 herein, the fifth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

260.   As discussed in paragraphs 98 through 162 herein, the fifth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

105

261. As discussed in paragraphs 98 through 162 herein, the fifth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

262. The sixth bullet-point paragraph in the Letter of Termination states:

> Another example was your persistence in raising specious questions about advice we received from an Israeli lawyer about a transfer of real estate last year and your refusal to continue working on the matter. Again, this reflected poor judgment on your part.

263. The sixth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

264. As discussed in paragraphs 98 through 162 herein, the sixth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

265. As discussed in paragraphs 98 through 162, herein, the sixth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

106

266.    As discussed in paragraphs 98 through 162 herein, the sixth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

267.    The seventh bullet-point paragraph in the Letter of Termination states:

> Most recently, you have shown poor judgment in other communications regarding the office relocation. While you certainly have the right to complain about conditions in the office, there are appropriate procedures for doing so. Your decision to send an email about your concerns to the entire office reflected poor judgment, as did your belligerent and adversarial communications with our architect and landlord, particularly because you did not seek the Firm's permission to communicate with those individuals or even advise us that you were considering doing so.

268.    The seventh bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

269.    As discussed in paragraphs 98 through 162 herein, the seventh bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

107

270.    As discussed in paragraphs 98 through 162, herein, the seventh bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

271.    As discussed in paragraphs 98 through 162 herein, the seventh bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

272.    The eighth bullet-point paragraph in the Letter of Termination states:

> Finally, despite the fact that you have acknowledged that you have no illness or medical condition, and air quality testing was done to ensure there is no problem, you have refused to come to work.

273.    The eighth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

274.    As discussed in paragraphs 98 through 162 herein, the eighth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

108

275. As discussed in paragraphs 98 through 162 herein, the eighth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

276. As discussed in paragraphs 98 through 162 herein, the eighth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

277. In addition, the Letter of Termination further states:

> We have reached the point where we have no confidence that you will conduct yourself in an appropriate way and exercise appropriate judgment.

278. The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

279. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

109

280.    As discussed in paragraphs 98 through 162, herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

281.    As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

282.    In addition, the Letter of Termination further states:

> In short, this decision has been long in coming, as there have been many incidents during your employment here that have caused the partners to have serious concerns about your judgment and ability to work with others. We have therefore decided that your employment with the Firm should end, effective immediately.

283.    The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

284.    As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

110

285. As discussed in paragraphs 98 through 162, herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

286. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

287. In addition, the Letter of Termination further states, *inter alia*:

> Our response to any inquiries about your employment with us will be limited to confirming the dates of your employment and your position.

288. The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

289. The aforementioned paragraph of the Letter of Termination contains a defamatory inference that plaintiff was a poor employee and that Schoeman has nothing good to say about plaintiff.

290. It is widely known amongst employers that when a prospective employee's prior employer states that it will only confirm the dates of an employee's

111

employment and the employee's position, that means that the employee was a poor employee.

291. During interviews, after plaintiff was forced to repeat the contents of the aforementioned paragraph of the Letter of Termination when asked if Schoeman would say good things about her, the prospective employers immediately lost all interest in plaintiff and all communications with plaintiff were terminated.

292. The negative inference that plaintiff was a poor employee is a defamatory false statement of fact that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

293. The negative inference that plaintiff was a poor employee is a defamatory unprotected derogatory statement of opinion that implies a basis in facts which are not disclosed to the reader in the Letter of Termination.

294. The negative inference that plaintiff was a poor employee is an unprotected derogatory statement of opinion that gives the impression that it sets forth the facts upon which the opinion is based, but those underlying facts are falsely misrepresented and grossly distorted in the Letter of Termination.

295. The Letter of Termination, including, but not limited to, Schoeman's statement that it would only confirm the dates of plaintiff's employment and her position, imputes to plaintiff unprofessional conduct.

112

296.    The Letter of Termination, including, but not limited to, Schoeman's statement that it would only confirm the dates of plaintiff's employment and her position, imputes to plaintiff improper performance of her duties as an attorney.

297.    The Letter of Termination, including, but not limited to, Schoeman's statement that it would only confirm the dates of plaintiff's employment and her position, imputes to plaintiff an unfitness to practice as an attorney.

298.    The Letter of Termination, including, but not limited to, Schoeman's statement that it would only confirm the dates of plaintiff's employment and her position, intended to and did injure plaintiff in her business and profession.

299.    The Letter of Termination, including, but not limited to, Schoeman's statement that it would only confirm the dates of plaintiff's employment and her position, intended to and did injure plaintiff's reputation as an attorney.

300.    The motivation of Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher in making the libelous and defamatory false statements of fact and opinion and false defamatory inferences regarding plaintiff in the Letter of Termination was malicious. The statements were made with malice, spite, and ill will, with knowledge of their falsity and with a reckless disregard for their falsity in retaliation for plaintiff's having exercised her rights under the OSH Act, for plaintiff's having contacted the Occupational Safety and Health Administration, and for plaintiff's having complained of the other unlawful conduct at Schoeman discussed herein.

301. Upon information and belief, the Letter of Termination, which was signed by Mindy H. Stern, was drafted by Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

302. The Letter of Termination and the contents of the Letter of Termination were published by Schoeman and by Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher to third parties, including, but not limited to, other employees at Schoeman and parties outside of Schoeman.

303. Schoeman's Letter of Termination was written and published to third parties under the direct supervision and control of Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher while rendering professional services on behalf of Schoeman.

304. In addition, plaintiff was forced to publish the Letter of Termination and the contents of the Letter of Termination to third parties.

305. The libelous statements contained in the Letter of Termination, including, but not limited to Schoeman's statement that it will only confirm the dates of plaintiff's employment and her position, have caused plaintiff serious harm, including, but not limited to: plaintiff's loss of employment, plaintiff's inability to secure other employment, severe damage to plaintiff's reputation, severe economic damage, including loss of past and future wages, the loss of plaintiff home, and emotional distress.

114

## SECOND CAUSE OF ACTION
## LIBEL PER SE BY SCHOEMAN, MINDY H. STERN, BETH L. KAUFMAN, CHARLES B. UPDIKE, AND ANDREA D. ASCHER

306. Plaintiff repeats and realleges paragraphs 1 through 222 as if fully set forth herein at length.

307. Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

308. As discussed herein, the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

309. As discussed herein, the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

310. As discussed herein, the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

311. First, the Letter of Termination states:

> Although you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is

115

> both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below.
>
> After consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work effectively with your colleagues.  We have come to this conclusion after reflecting on the incidents described below, among others.

312.   The above paragraphs, which indicate that plaintiff was terminated for cause, constitute libel *per se* by defendants Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.  As discussed herein, the "causes" listed by Schoeman contain blatant distortions of the truth and falsely and maliciously attempt to make it appear as though Schoeman had cause to terminate plaintiff.  However, the correct version of the facts as they transpired makes clear that there was no lawful cause for plaintiff's termination.

313.   The first bullet-point paragraph in the Letter of Termination states:

> The first incident occurred in the summer of 2010 when we were preparing a response to a questionnaire from our insurance carrier and you refused to answer a question about whether any claims had been made against you.  We let this issue pass but it did raise concerns on our part about your candor and willingness to speak openly to your colleagues.

314.   The first bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

116

315. As discussed in paragraphs 98 through 162 herein, the first bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

316. As discussed in paragraphs 98 through 162 herein, the first bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

317. As discussed in paragraphs 98 through 162 herein, the first bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

318. The second bullet-point paragraph in the Letter of Termination states:

> Also in 2010, there was a disturbing incident involving your refusal to share material you had prepared at the Firm's request and on the Firm's time for another project with which Deirdre Sheridan was involved. You even accused her of "plagiarism", which was highly inappropriate. This was an example of poor judgment on your part and an inability to work well with your colleagues.

117

319.    The second bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman and Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

320.    As discussed in paragraphs 98 through 162 herein, the second bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

321.    As discussed in paragraphs 98 through 162 herein, the second bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

322.    As discussed in paragraphs 98 through 162 herein, the second bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

323.    The third bullet-point paragraph in the Letter of Termination states:

> In January 2012, there was a heated exchange
> between you and our colleagues at Reed Smith that
> again demonstrated poor judgment on your part
> and an inability to get along well with your
> colleagues. Your emails to them, sent without
> consulting Charles Updike, the supervising

118

partner, were totally inappropriate communications.

324. The third bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendant Schoeman.

325. As discussed in paragraphs 98 through 162 herein, the third bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

326. As discussed in paragraphs 98 through 162, herein, the third bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

327. As discussed in paragraphs 98 through 162 herein, the third bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

328. The fourth bullet-point paragraph in the Letter of Termination states:

> A similar incident occurred in April 2012 when you accused a colleague of religious discrimination because she asked if you could work over the weekend, not knowing that you were a Sabbath observer who could not work on Saturday. Again, your reaction demonstrated both poor judgment

119

and an inability to have constructive dialogue with your colleagues. A further indication of your poor judgment in our view was your refusal to participate in the investigation that we felt obligated to conduct because of your complaint of religious discrimination.

329. The fourth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

330. As discussed in paragraphs 98 through 162 herein, the fourth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

331. As discussed in paragraphs 98 through 162, herein, the fourth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

332. As discussed in paragraphs 98 through 162 herein, the fourth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

333. The fifth bullet-point paragraph in the Letter of Termination states:

120

Another more recent incident of poor judgment occurred during our discussions about the content of a letter demanding payment of legal fees in full by an insurance carrier. Your vigorous opposition to that approach was listened to and taken into account. Your adamant refusal to cooperate in making the demand, however, again reflected poor judgment on your part, especially in light of your unresponsiveness to the suggestion that you research the issue.

334.    The fifth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

335.    As discussed in paragraphs 98 through 162 herein, the fifth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

336.    As discussed in paragraphs 98 through 162, herein, the fifth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

337.    As discussed in paragraphs 98 through 162 herein, the fifth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon

121

which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

338.    The sixth bullet-point paragraph in the Letter of Termination states:

> Another example was your persistence in raising specious questions about advice we received from an Israeli lawyer about a transfer of real estate last year and your refusal to continue working on the matter. Again, this reflected poor judgment on your part.

339.    The sixth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

340.    As discussed in paragraphs 98 through 162 herein, the sixth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

341.    As discussed in paragraphs 98 through 162, herein, the sixth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

342.    As discussed in paragraphs 98 through 162 herein, the sixth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon

122

which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

343.    The seventh bullet-point paragraph in the Letter of Termination states:

> Most recently, you have shown poor judgment in other communications regarding the office relocation. While you certainly have the right to complain about conditions in the office, there are appropriate procedures for doing so. Your decision to send an email about your concerns to the entire office reflected poor judgment, as did your belligerent and adversarial communications with our architect and landlord, particularly because you did not seek the Firm's permission to communicate with those individuals or even advise us that you were considering doing so.

344.    The seventh bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

345.    As discussed in paragraphs 98 through 162 herein, the seventh bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

346.    As discussed in paragraphs 98 through 162 herein, the seventh bullet-point paragraph of the Letter of Termination also contains unprotected derogatory

123

statements of opinion that imply a basis in facts which are not disclosed to the reader.

347.   As discussed in paragraphs 98 through 162 herein, the seventh bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

348.   The eighth bullet-point paragraph in the Letter of Termination states:

> Finally, despite the fact that you have acknowledged that you have no illness or medical condition, and air quality testing was done to ensure there is no problem, you have refused to come to work.

349.   The eighth bullet-point paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

350.   As discussed in paragraphs 98 through 162 herein, the eighth bullet-point paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

351.   As discussed in paragraphs 98 through 162, herein, the eighth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory

124

statements of opinion that imply a basis in facts which are not disclosed to the reader.

352. As discussed in paragraphs 98 through 162 herein, the eighth bullet-point paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

353. In addition, the Letter of Termination further states:

> We have reached the point where we have no confidence that you will conduct yourself in an appropriate way and exercise appropriate judgment.

354. The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

355. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

356. As discussed in paragraphs 98 through 162, herein, the aforementioned paragraph of the Letter of Termination also contains unprotected

125

derogatory statements of opinion that imply a basis in facts which are not disclosed to the reader.

357. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

358. In addition, the Letter of Termination further states:

> In short, this decision has been long in coming, as there have been many incidents during your employment here that have caused the partners to have serious concerns about your judgment and ability to work with others. We have therefore decided that your employment with the Firm should end, effective immediately.

359. The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

360. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination contains unprotected defamatory false statements of fact regarding plaintiff that Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher knew to be false.

361. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory

126

statements of opinion that imply a basis in facts which are not disclosed to the reader.

362. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination also contains unprotected derogatory statements of opinion that give the impression that they set forth the facts upon which the opinions are based, but those underlying facts are falsely misrepresented and grossly distorted.

363. In addition, the Letter of Termination further states, *inter alia*:

> Our response to any inquiries about your employment with us will be limited to confirming the dates of your employment and your position.

364. The aforementioned paragraph in Schoeman's Letter of Termination constitutes libel *per se* by defendants Schoeman, Mindy H. Stern, Beth L. Kaufman, Charles B. Updike, and Andrea D. Ascher.

365. As discussed in paragraphs 98 through 162 herein, the aforementioned paragraph of the Letter of Termination contain a defamatory inference that plaintiff was a poor employee and that Schoeman has nothing good to say about plaintiff.

366. It is widely known amongst employers that when a prospective employee's prior employer states that it will only confirm the dates of an employee's employment and the employee's position, that means that the employee was a poor employee.

127