44.    On her Forty-Fourth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100

398

million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

45.    On her Forty-Fifth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b)

for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present,

and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

46.    On her Forty-Sixth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a)

401

for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollard; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for

402

compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

47.    On her Forty-Seventh Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at

403

trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to

be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

48.    On her Forty-Eighth Cause of Action: (i) a judgment against Laurie S. Zeligson as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against the Zeligson Firm as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (iii) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and

405

disbursements of this action, and for such other and further relief as this Court deems just and proper.

49.    On her Forty-Ninth Cause of Action: a judgment against Susan S. Casero as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

50.    On her Fiftieth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and

406

future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future

407

wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

51.    On her Fifty-First Cause of Action: a judgment against Cindy Nygaard as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

52.    On her Fifty-Second Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be

408

not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial

409

but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and

410

disbursements of this action, and for such other and further relief as this Court deems just and proper.

53.    On her Fifty-Third Cause of Action, (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to,

411

lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress:

412

an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

54.    On her Fifty-Fourth Cause of Action, (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and

413

future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an

414

amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

55.     On her Fifty-Fifth Cause of Action, (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost

past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be

416

determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

56.    On her Fifty-Sixth Cause of Action, (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not

417

less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; (f) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100

418

million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but

419

not less than 500 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

57.    On her Fifty-Seventh Cause of Action: (i) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (ii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Charles B. Updike as follows: (a) for compensatory damages,

420

including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

58.    On her Fifty-Eighth Cause of Action: a judgment against Cindy Nygaard as follows: (a) for compensatory damages, including, but not limited to, lost

421

past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

59.     On her Fifty-Ninth Cause of Action: (i) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (ii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as

422

permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less

423

than 500 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

60.    On her Sixtieth Cause of Action: (i) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (ii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a

424

judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

61.    On her Sixty-First Cause of Action: a judgment against Cindy Nygaard as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

62.    On her Sixty-Second Cause of Action: a judgment against Susan S. Casero as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees,

426

the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

63.    On her Sixty-Third Cause of Action: (i) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (ii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be

427

determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

64.    On her Sixty-Fourth Cause of Action: a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be

428

not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; and (f) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

65.     On her Sixty-Fifth Cause of Action: a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; and (f) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

429

66.    On her Sixty-Sixth Cause of Action: a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) ordering Schoeman to immediately reinstate plaintiff as an attorney at Schoeman; and (f) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

67.    On her Sixty-Seventh Cause of Action: a judgment against Schoeman as follows: (a) ordering the reinstatement of plaintiff as an attorney at Schoeman; (b) ordering the reinstatement of full fringe benefits and seniority rights to plaintiff; (c) compensation for plaintiff's lost wages, benefits, and other remuneration; (d) for plaintiff's attorneys' fees, costs, and disbursements and for such other and further relief as this Court deems just and proper.

68.    On her Sixty-Eighth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be

not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an

431

amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

432

69.    On her Sixty-Ninth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

433

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (vi) a judgment against each of the defendants

434

mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

70.    On her Seventieth Cause of Action: a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

71.    On her Seventy-First Cause of Action: a judgment against French Partners, LLC as follows: a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future

435

emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

72.    On her Seventy-Second Cause of Action: a judgment against French Partners, LLC as follows: a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

73.    On her Seventy-Third Cause of Action: a judgment against The Feil Organization, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as

436

permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

74.     On her Seventy-Fourth Cause of Action: a judgment against The Feil Organization, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

75.     On her Seventy-Fifth Cause of Action: a judgment against The Feil Organization, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial

437

but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

76.    On her Seventy-Sixth Cause of Action: a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

77.    On her Seventy-Seventh Cause of Action: a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not

438

limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

78.    On her Seventy-Eighth Cause of Action: a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

439

79.    On her Seventy-Ninth Cause of Action: a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

80.    On her Eightieth Cause of Action: a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees,

440

the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

81.    On her Eighty-First Cause of Action: a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

82.    On her Eighty-Second Cause of Action: a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an

441

amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

83.    On her Eighty-Third Cause of Action: a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

84.    On her Eighty-Fourth Cause of Action: a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial

442

but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

85.    On her Eighty-Fifth Cause of Action: a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

86.    On her Eighty-Sixth Cause of Action: a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for

443

past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

87.    On her Eighty-Seventh Cause of Action: a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

88.    On her Eighty-Eighth Cause of Action: (i) a judgment against John Francis Borrelli, P.C. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

444

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

89.    On her Eighty-Ninth Cause of Action: (i) a judgment against John Francis Borrelli, P.C. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

90.    On her Ninetieth Cause of Action: (i) a judgment against John Francis Borrelli, P.C. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

446

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

91.    On her Ninety-First Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at

447

trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iii) a judgment against The Feil Organization, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and

448

future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iv) a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (v) a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less

449

than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (vi) a judgment against John Francis Borrelli Architect P.C. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (vii) a judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive

450

damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (viii) a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; and (ix) a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at

451

trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (x) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (xi) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the

452

costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (xii) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; and (xiii) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees,

the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper;

92.    On her Ninety-Second Cause of Action: (i) a judgment against Madison 96 Associates, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (ii) a judgment against Stuart J. Boesky as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million

454

dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iii) a judgment against Jamison Weiner as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

93.    On her Ninety-Third Cause of Action: (i) a judgment against Madison 96 Associates, LLC as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against Stuart J. Boesky as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (iii) a judgment against Jamison Weiner as follows: (a) for past, present, and future

455

emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (iv) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

94.     On her Ninety-Fourth Cause of Action: (i) a judgment against Reed Smith LLP as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; and (ii) a judgment against Paul E. Breene as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

456

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper;

95.    On her Ninety-Fifth Cause of Action: (i) a judgment against Reed Smith LLP as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (c) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; and (ii) a judgment against Paul E. Breene as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (c) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

96.    On her Ninety-Sixth Cause of Action: (i) a judgment against Schoeman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against Mindy H. Stern as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (iii) a judgment against Beth L. Kaufman as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount

458

to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (iv) a judgment against Charles B. Updike as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against Andrea D. Ascher as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (vi) a judgment against Cindy Nygaard as follows: (a) for

459

compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (vii) a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (viii) a judgment against The Feil Organization, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for

460

past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ix) a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (x) a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (xi) a judgment against John Francis Borrelli Architect, P.C. as follows: (a) for compensatory damages, including, but not limited

461

to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (xii) a judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (xiii) a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional

462

distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (xiv) a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (xv) a judgment against Creative Environment Solutions Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (xvi) a judgment against H & B Construction Services, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future

463

wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (xvii) a judgment against M & B Construction as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (xviii) a judgment against M & B Construction Services as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial

464

but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (xix) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

97.    On her Ninety-Seventh Cause of Action: (i) a judgment against Creative Environment Solutions Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against H & B Construction Services, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100

465

million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (iii) a judgment against M & B Construction as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (iv) a judgment against M & B Construction Services as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

466

98.    On her Ninety-Eighth Cause of Action: (i) a judgment against French Partners, LLC as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against The Feil Organization as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (iii) a judgment against Jeffrey Management Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present,

467

and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (iv) a judgment against Jeffrey Feil as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (v) a judgment against John Francis Borrelli Architect, P.C. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (vi) a

468

judgment against John Francis Borrelli as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; and (vii) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

99.    On her Ninety-Ninth Cause of Action: (i) a judgment against Interior Construction Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such

469

other and further relief as this Court deems just and proper; and (ii) a judgment against Joseph Bruzzese as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 500 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper;

100.    On her One Hundredth Cause of Action: (i) a judgment against Creative Environment Solutions Corp. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action,

470

and for such other and further relief as this Court deems just and proper; (ii) a judgment against H & B Construction Services, Inc. as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages; an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper; (iii) a judgment against M & B Construction as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court

471

deems just and proper; (iv) a judgment against M & B Construction Services as follows: (a) for compensatory damages, including, but not limited to, lost past, present and future wages: an amount to be determined at trial but believed to be not less than 300 million dollars, plus 9% statutory interest as permitted by law; (b) for past, present, and future injury to reputation: an amount to be determined at trial but believed to be not less than 300 million dollars; (c) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (d) punitive damages in an amount to be determined at trial but not less than 900 million dollars; (e) for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

101.    On her One Hundred and First Cause of Action: (i) a judgment against French Partners, LLC as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against the Feil Organization as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (iii) a judgment against Jeffrey Management Corp. as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but

472

believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (iv) a judgment against Jeffrey Feil as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (v) a judgment against John Francis Borrelli Architect, P.C. as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (vi) a judgment against John Francis Borrelli as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; (vii) a judgment against Interior Construction Corp. as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (viii) a judgment against Joseph Bruzzese as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 500 million dollars; and (ix) a judgment against each of the defendants mentioned in this

473

paragraph for plaintiff's attorneys' fees, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

102.    On her One Hundred and Second Cause of Action: (i) a judgment against Creative Environment Solutions Corp. as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (ii) a judgment against H & B Construction Services, Inc. as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (iii) a judgment against M & B Construction as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; (iv) a judgment against M & B Construction Services as follows: (a) for past, present, and future emotional distress: an amount to be determined at trial but believed to be not less than 100 million dollars; (b) for punitive damages: an amount to be determined at trial but not less than 900 million dollars; and (v) a judgment against each of the defendants mentioned in this paragraph for plaintiff's attorneys'

474

fees, the costs and disbursements of this action, and for such other and further

relief as this Court deems just and proper.


Dated:  New York, New York
        February 20, 2014


RONIT D. APPEL

322 West 78th Street
New York, NY 10024
(347) 387-6100
ronitdappel@gmail.com
*Plaintiff and Attorney for Plaintiff*

475

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )


I, Ronit D. Appel, an attorney duly admitted to practice in New York, having been duly sworn, depose and state that the facts as alleged in the foregoing Verified Complaint are true and correct, and those factual matters which are stated upon information and belief are believed by me to be true.


_____

RONIT D. APPEL


Subscribed to and sworn before me this
20th day of February, 2014

_____
Notary Public


DAMON J. ROBLES
Notary Public, State of New York
Qualified in Queens County
Reg. No. 01RO6233651
My Commission Expires Jan. 3, 2015

Case 1:14-cv-02065-AJN    Document 2-4    Filed 03/25/14    Page 80 of 137

# EXHIBIT A TO VERIFIED COMPLAINT OF
# RONIT D. APPEL DATED FEBRUARY 20, 2014





always open

[cc] CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## Application Details

Premises: 547 5 AVENUE MANHATTAN
BIN: <u>1035389</u>   Block: 1281   Lot: 1

JUMP TO:  Doc 1  ·   Go

Job No: 121389586
Document: 01 OF 2
Job Type  A2 - ALTERATION TYPE 2

| <u>Document Overview</u> | <u>Items Required</u> | <u>Virtual Job Folder</u> | <u>All Permits</u> | <u>Schedule B</u> |
| --- | --- | --- | --- | --- |
| <u>Fees Paid</u> | <u>Forms Received</u> | | <u>All Comments</u> | <u>Plumbing Inspections</u> |
| <u>Crane Information</u> | <u>Plan Examination</u> | | | |
| <u>After Hours Variance Permits</u> | | | | |

This job is not subject to the Department's Development Challenge Process. For any issues, please contact the relevant borough office.

--------------- * PROFESSIONALLY CERTIFIED * ---------------------

## Last Action: PERMIT ISSUED - PARTIAL JOB 11/20/2012 (Q)
## Application approved on: 09/27/2012

Pre-Filed: 09/26/2012   Building Type: Other
Date Filed: 09/26/2012
Fee Structure: STANDARD
Review is requested under Building Code  1968

Estimated Total Cost  $251,900.00
Electronically Filed: Yes

<u>Job Description</u>   <u>Comments</u>

**1  Location Information (Filed At)**
House No(s): 551          Street Name: 5TH AVENUE
Borough: Manhattan        Block: 1281
Work on Floor(s): 012                              Lot: 1      BIN <u>1035389</u>      CB No: 105
                                        Apt/Condo No(s):                        Zip Code: 10017

**2  Applicant of Record Information**
Name: JOHN FRANCIS BORRELLI
Business Name: JOHN FRANCIS BORRELLI ARCHITECT
Business Address: 9 EAST 38TH STREET NEW YORK NY 10016
E-Mail: JFBARCHITECT@AOL.COM

Business Phone: 212-685-7354
Business Fax:
Mobile Telephone:
License Number: 016754

Applicant Type: ☐ P E   ☒ R A  ☐ Sign Hanger  ☐ Other

Directive 14 Applicant
Not Provided
Previous Applicant of Record
Not Applicable

**3  Filing Representative**
Name: NATASHA CRUZ
Business Name: WILLIAM VITACCO ASSOCIATES

Business Phone: 212-791-4578

Business Address: 299 BROADWAY NEW YORK NY 10007
E-Mail: DCUMMINGS@VITACCO.COM

Business Fax:
Mobile Telephone:
Registration Number: X07097

**4 Filing Status**

Click Here to View

**5 Job Types**

☐ Alteration Type 1
☐ Change in Exits/Egress
☐ Change in Number of Stories
☐ Change in Number of Dwelling Units
☐ Change in Room Count / Dwelling Units
☐ Change in Occupancy / Use
☐ Change inconsistent with current Cert. of Occup
☐ Alteration Type 1, OT "No Work"

☐ New Building

☒ Alteration Type 2
☐ Alteration Type 3
☐ Sign

☐ Full Demolition
☐ Subdivision: Improved
☐ Subdivision: Condo

Directive 14 acceptance requested?   ☒ Yes   ☐ No

**6 Work Types**

☐ BL - Boiler
☐ FP - Fire Suppression
☐ SP - Sprinkler
☒ OT - GEN CONSTR

☐ FA - Fire Alarm
☐ MH - Mechanical
☐ EQ - Construction Equipment

☐ FB - Fuel Burning
☐ PL - Plumbing
☐ CC - Curb Cut

☐ FS - Fuel Storage
☐ SD - Standpipe

**7 Plans/Construction Documents Submitted**

Plans Page Count: 054

**8 Additional Information**

Enlargement proposed?
☒ No   ☐ Yes

**9 Additional Considerations, Limitations or Restrictions**

Yes No

☐ ☒ Structural peer review required per BC §1627
☐ ☒ Filed to Comply with Local Law
☐ ☒ Other, Specify:
☐ ☒ Restrictive Declaration / Easement
☐ ☒ Zoning Exhibit Record (I,II,III etc)
☒ ☐ Landmark
☐ ☒ Filed to Address Violation(s)
☐ ☒ Legalization
☐ ☒ "Little E" Hazmat Site
☐ ☒ Unmapped Street
☐ ☒ Adult Establishment
☐ ☒ Compensated Development (Inclusionary Housing)
☐ ☒ Low Income Housing (Inclusionary Housing)
☐ ☒ Single Room Occupancy (SRO) Multiple Dwelling
☐ ☒ Filing Includes Lot Merger / Reapportionment (If Yes,17)
☐ ☒ Includes permanent removal of standpipe, sprinkler or fire suppression related systems
☐ ☒ Work includes partial demolition as defined in AC §28-101.5
☐ ☒ Structural Stability affected by proposed work
☒ ☐ Work includes lighting fixture and/or controls, installation or replacement. [§ECC 404 and 505]
☐ ☒ Site Safety Job / Project

Peer Reviewer License No.(P.E.):
Local Law No./Year:

Landmark Docket Number: 136671

Yes No
☐ ☒ Included in LMCCC
☐ ☒ Infill Zoning
☐ ☒ Loft Board
☐ ☒ Quality Housing

BSA Calendar No.(s):
CPC Calendar No.(s):

**10 NYCECC Compliance** New York City Energy Conservation Code (Applicant Statement)

☒ To the best of my knowledge, belief and professional judgment, this application is in compliance with the NYCECC.

☐ Energy analysis is on another job number:

Yes No

☐ ☒ This application is, or is part of, a project that utilizes trade-offs among different major systems

☐ ☒ This application utilizes trade-offs within a single major system

☐ To the best of my knowledge, belief and professional judgment, all work under this application is exempt from the NYCECC in accordance with one of the following:

☐ The work is an alteration of State or National historic building.

☐ The scope of work is entirely in a low-energy building and is limited to the building envelope.

☐ The scope of work does not affect the energy use of the building

☐ This is a post-approval amendment and exempt under a prior edition of the energy code.

11  Job Description

INTERIOR RENOVATION TO INCLUDE DEMO OF EXISTING AND CONSTRUCTION OF NEW PARTITIONS AND FINISHES AS SHOWN ON PLANS

Related BIS Job Numbers:

Primary application Job Number:

12  Zoning Characteristics

District(s):  C5-3 - RESTRICTED CENTRAL COMMERCIAL DISTRICT    C5-2 5  RESTRICTED CENTRAL COMMERCIAL DISTRICT

Overlay(s):

Special District(s):  MID - MIDTOWN

Map No.: 8d                    Street legal width (ft.):

Zoning lot includes the following tax lots:  Not Provided                    Street status:  ☒  Public    ☐  Private

13  Building Characteristics

|  |  | 2008 Code Designations? |
|---|---|---|
| Occupancy Classification: Existing: | COM - COMMERCIAL BUILDINGS - OLD CODE | ☐ Yes ☒ No |
| Proposed: | COM - COMMERCIAL BUILDINGS - OLD CODE | ☐ Yes ☒ No |
| Construction Classification: Existing: | 1 FIREPROOF STRUCTURES | ☐ Yes ☒ No |
| Proposed: | 1 FIREPROOF STRUCTURES | ☐ Yes ☒ No |
| Multiple Dwelling Classification: Existing: |  |  |
| Proposed: |  |  |
| Building Height (ft.): Existing: | 397 |  |
| Proposed: | 397 |  |
| Building Stories: Existing | 37 |  |
| Proposed | 37 |  |
| Dwelling Units: Existing |  |  |
| Proposed |  |  |

Mixed use building?    ☐ Yes    ☒ No

14  Fill

☒ Not Applicable    ☐ Off-Site    ☐ On-Site    ☐ Under 300 cubic yards

15  Construction Equipment
Not Applicable

16  Curb Cut Description
Not Applicable

17  Tax Lot Characteristics
Not Provided

18  Fire Protection Equipment
Not Applicable

19  Open Spaces

20  Site Characteristics
Yes  No

Yes  No

☐ ☒ Tidal / Fresh Water Wetlands
☐ ☒ Urban Renewal

☒ — Fire District
— ☒ Flood Hazard Area

**21 Demolition Details**

Not Applicable

**22 Asbestos Abatement Compliance**

☐ The scope of work requires related asbestos abatement as defined in the regulations of the NYC Department of Environmental Protection (DEP).

☒ The scope of work does not require related asbestos abatement as defined in the regulations of the NYC DEP.

☐ The scope of work is exempt from the asbestos requirement as defined in the regulations promulgated by the NYC DEP (15 RCNY 1-23(b)).

**23 Signs**

Not Applicable

**24 Comments**

Comments for Document 01
PLEASE SEND ALL OBJECTIONS TO DCUMMINGS@VITACUO.COM

**25 Applicant's Statements and Signatures**   ( See paper form or check Forms Received )

Yes No

☐ ☐ For New Building and Alteration 1 applications filed under the 2008 NYC Building Code only: does this building qualify for high-rise designation?

☒ ☐ Directive 14 applications only: I certify that the construction documents submitted and all construction documents related to this application do not require a new or amended Certificate of Occupancy as there is no change in use, exits, or occupancy.

**26 Owner's Information**

Name: JEFFREY FEIL
Relationship to Owner: PARTNER
Business Name: FRENCH PARTNERS LLC
Business Address: 370 7TH AVENUE C/O JEFFREY MGMT  NEW YORK NY 10001
E-Mail: BZIMMERMAN@FEILORG.COM
Non Profit: ☐ Yes  ☒ No

Business Phone: 212-279-7600
Business Fax:
Owner Type: PARTNERSHIP

Yes No

☐ ☒ Owner's Certification Regarding Occupied Housing (Remain Occupied)
☐ ☒ Owner's Certification Regarding Occupied Housing (Rent Control / Stabilization)
☐ ☐ Owner DHCR Notification
☐ ☒ Owner's Certification for Adult Establishment
☒ ☐ Owner's Certification for Directive 14 (if applicable)

**Metes and Bounds**

To view metes and bounds, see the Plot Diagram (form PD-1). A scanned image may be available here

If you have any questions please review these Frequently Asked Questions, the Glossary  or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City





always open

CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## Application Details

Premises: 547 5 AVENUE MANHATTAN
BIN: 1035389   Block: 1281   Lot: 1

JUMP TO:  Doc 2  ·    Go
Job No: 121389586
Document: 02 OF 2
Job Type: A2 - ALTERATION TYPE 2

| Document Overview | Items Required | Virtual Job Folder | All Permits | | Schedule B |
| Fees Paid | Forms Received | | All Comments | | Plumbing Inspections |
| Crane Information | Plan Examination | | | | |
| After Hours Variance Permits | | | | | |

This job is not subject to the Department's Development Challenge Process. For any issues, please contact the relevant borough office

---------------- · PROFESSIONALLY CERTIFIED · -----------------

Last Action: PERMIT ISSUED - PARTIAL JOB 10/11/2012 (Q)
Application approved on: 09/27/2012

Pre-Filed: 09/26/2012   Building Type: Other
Date Filed: 09/26/2012
Fee Structure: STANDARD

Estimated Total Cost: $95,400.00
Electronically Filed: Yes

Job Description   Comments

**1 Location Information (Filed At)**
House No(s): 551         Street Name: 5TH AVENUE
Borough: Manhattan       Block: 1281
Work on Floor(s): 012                          Lot: 1   BIN: 1035389   CB No: 105
                                   Apt/Condo No(s):                  Zip Code: 10017

**2 Applicant of Record Information**
Name: BRUCE LILKER
Business Name: LILKER ASSOCIATES
Business Address: 1001 AVENUE OF THE AMERICAS NEW YORK NY 10018
E-Mail: DAGOSTINO@LILKER.COM

Business Phone: 212-695-1000
Business Fax
Mobile Telephone
License Number: 006059

Applicant Type: ☒ P E  ☐ R A  ☐ Sign Hanger  ☐ Other
Directive 14 Applicant
Not Provided
Previous Applicant of Record
Not Applicable

**3 Filing Representative**
Name: JER/NORBERT/MAR MARTIN/RODRIG/DIAZ
Business Name: WILLIAM VITACCO ASSOCIATES

Business Phone: 212-791-4578

Business Address: 295 BROADWAY ... NY

E-Mail: DCUMMINGS@VITA...COM

Business Fax.

Mobile Telephone:

Registration Number:

**4 Filing Status**

Click Here to View

**5 Job Types**

☐ Alteration Type 1

☐ Change in Exits, Egress
☐ Change in Number of Stories
☐ Change in Number of Dwelling Units
☐ Change in Room Count / Dwelling Units
☐ Change in Occupancy / Use
☐ Change inconsistent with current Cert. of Occup

☐ Alteration Type 1, OT "No Work"

☐ New Building

☒ Alteration Type 2
☐ Alteration Type 3
☐ Sign

☐ Full Demolition
☐ Subdivision: Improved
☐ Subdivision: Condo

Directive 14 acceptance requested?  ☒ Yes  ☐ No

**6 Work Types**

☐ BL - Boiler
☐ FP - Fire Suppression
☐ SP - Sprinkler
☐ OT - Other

☐ FA - Fire Alarm
☒ MH - Mechanical
☐ EQ - Construction Equipment

☐ FB - Fuel Burning
☒ PL - Plumbing
☐ CC - Curb Cut

☐ FS - Fuel Storage
☐ SD - Standpipe

**7 Plans/Construction Documents Submitted**

Plans Page Count: See Document 01 for totals

**8 Additional Information**

Not Applicable

**9 Additional Considerations, Limitations or Restrictions**

See 01 Document for this Information

**10 NYCECC Compliance** *New York City Energy Conservation Code* **(Applicant Statement)**

Not Provided

**11 Job Description**

MECHANICAL AND PLUMBING WORK AS SHOWN IN PLANS FILED HEREWITH
Related BIS Job Numbers:
Primary application Job Number:

**12 Zoning Characteristics**

See 01 Document for this Information

**13 Building Characteristics**

See 01 Document for this Information

**14 Fill**

See 01 Document for this Information

**15 Construction Equipment**

Not Applicable

**16 Curb Cut Description**

Not Applicable

**17 Tax Lot Characteristics**

See 01 Document for this Information

**18 Fire Protection Equipment**

See 01 Document for this Information

**19 Open Spaces**

## 20  Site Characteristics

See 01 Document for this information

## 21  Demolition Details

Not Applicable

## 22  Asbestos Abatement Compliance

See 01 Document for this information

## 23  Signs

Not Applicable

## 24  Comments

Comments for Document 02
PLEASE SEND ALL OBJECTIONS TO DCUMMINGS@VITACCO.COM

## 25  Applicant's Statements and Signatures    ( See paper form or check Forms Received )

See 01 Document for this Information

## 26  Owner's Information

Name: JEFFREY FEIL
Relationship to Owner: PARTNER
Business Name: FRENCH PARTNERS LLC
Business Address: 370 7TH AVENUE C/O JEFFREY MGMT  NEW YORK NY 10001          Business Phone: 212-279-7600
E-Mail: BZIMMERMAN@FEILORG COM                                                Business Fax.
Non Profit:  ☐ Yes   ☒ No                                                    Owner Type: PARTNERSHIP

## Metes and Bounds

To view metes and bounds  see the Plot Diagram  for this job  A scanned image may be available here

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City

Case 1:14-cv-02065-AJN     Document 2-4     Filed 03/25/14     Page 88 of 137

# EXHIBIT B TO VERIFIED COMPLAINT OF
# RONIT D. APPEL DATED FEBRUARY 20, 2014



# Creative Environment Solutions Corp.

39 West 37th Street, 14th Floor, New York, NY 10018
Phone: 212.290.6323  Fax: 212.290.6325
LICENSED & APPROVED by NYS DOH/DOL/DOS, NYC DOB/DEP, FDNY, PIE

**WBE Certified**
**www.CEScenter.com**

April 19, 2013

Mr. Barry Zimmerman
Authorized Agent
Jeffrey Management Corp
551 5 Avenue
New York, New York 10176

RE:     Asbestos A... ......... ...........
        Asbestos Ambient Air Sampling
        Private Building: 551 Fifth Avenue, New York, New York 10176
        CES Project # 13-04-194

Mr. Zimmerman,

In accordance with your request, Creative Environment Solutions Corporation (CES) performed the following services as detailed herewith:

## AMBIENT AIR SAMPLE COLLECTION AND ANALYSIS

CES was retained by H & B Construction Services to collect Ambient Air Samples throughout the 12th Floor of the above-referenced location. On April 17, 2013, CES' New York State Department of Labor (NYSDOL) Licensed Asbestos Project Monitor, Ivane Chikhladze, collected five (5) air samples throughout the 12th Floor.

Ambient air samples were collected in conformance with New York City Department of Environmental Protection Title 15 regulations. All samples were logged and transported under chain-of-custody protocol to America Science Laboratory (AmeriSci), an Environmental Laboratory Accreditation Program (ELAP) approved laboratory located in New York, New York Air Samples were analyzed via Phase Contrast Microscopy (PCM) methods in accordance with New York State Department of Health Environmental Laboratory Approval Program (NYSDOH ELAP) and NYCDEP requirements.

The laboratory analysis of each of the five (5) air samples collected were below the regulatory limits as established by the USEPA, NYSDOL and NYCDEP of 0.01 f/cc.

Please refer to the enclosed for a copy of the laboratory analytical results.

Should you have any questions or if we can be of any further assistance, please do not hesitate to contact me at our office.

Best regards,

Michael J. Ramacasa
Operations Director

ENCL:



Case 1:14-cv-02065-AJN   Document 2-4   Filed 03/25/14   Page 90 of 137

# Phase Contrast Microscopy (PCM) Fiber Results

213043563

ALAC

M & B Const : M & B Construction Serv  551 5th Ave., NYC  12th Floor ; Ambient

| Client Sample # | Date Collected | Flow Rate (liters/min.) | Duration (min.) | Air Filtered (liters) | Fields | | Fiber Density (Fibers/mm 2) | Fibers Conc. (Fibers/cc) | TWA |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 100 | | 2.55 | < 0.004 | |
| 1 | 04/17/13 | 9.75 | 65 | 634 | 100 | | 2.55 | < 0.004 | |
| tion: IWA East Of Corridor (By Elevators) 2 | 04/17/13 | 10 | 66 | 660 | 100 | | 3.82 | < 0.004 | |
| ation: IWA West Of Corridor (By Elevators) 3 | 04/17/13 | 10.25 | 68 | 697 | 100 | | 2.55 | < 0.004 | |
| cation: IWA Waiting Area 4 | 04/17/13 | 10 | 66 | 660 | 100 | 2 | 2.55 | < 0.004 | |
| cation: IWA Center Of Hallway (By Offices) 5 | 04/17/13 | 10 | 69 | 690 | 100 | 1 | 1.27 | Footnotes: 1 | |
| cation: IWA West End Of The Hallway (By Offices) 6 | 04/17/13 | 0 | 0 | 0 | 100 | 0 | ND | Footnotes: 1 | |
| ocation: FB 7 | 04/17/13 | 0 | 0 | 0 | 100 | | | | |
| Location: FB | | | | | | | | | |

Date Analyzed: 4/18/2013

## Reporting Notes:
(1) Fibers/cc cannot be calculated for samples (or blanks) with no air volume.

By NIOSH 7400(A) Method, Issue #2, 8/15/94; Using an Olympus, Model CHS PCM microscope, Serial #0A0076; Analyzed by: Kenneth R. Harrell (tg)  . This report relates ONLY to the sample analysis expressed as fibers/sq mm of
Limit of Detection= 5.5 fibers /100 fields or 7 fibers/mm2; Blank analyses are reported when available, however are not used to adjust results of associated samples in this report. TWA calculation assumes zero exposure for remainder of 8 hr period not sampled; Upper 95% Confidence limit (Employers Compliance
filter area; ND=No fibers observed; NA= Not Analyzed; Walton-Beckett graticle field area = 0.00785 mm2; TWA = 8 Hr TWA calculation assumes zero exposure for remainder of 8 hr period not sampled; Upper 95% Confidence limit (NY ELAP Lab 11480, AIHA Lab # 102843)
Test)- Calculated as a one sided UCL to determine 95% certainty of compliance with the 0.01 fiber/cc standard; Estimated RSD:  Intralab Sr=0.405, Interlab Sr=0.45. (NY ELAP Lab 11480, AIHA Lab # 102843)

END OF REPORT

Reviewed By: ___



# Creative Environment Solutions Corp.

39 West 37th Street, 14th Floor, New York, NY 10018    2 1 3 0 4 3 5 6 3

Phone: 212.290.6323  Fax: 212.290.6325

WBE Certified
www.CESwater.com

LICENSED & APPROVED by NYS DOH/DC/DOS, NYC DOB/DEP, FDNY, PIE

## SAMPLING CHAIN-OF-CUSTODY FORM    PAGE ( 1 OF 1 )

| Collected Date: OV/17/13 | Project Name: M 8B construction serv. | Client: H 8B const. | SCA Job #: N/A |
| Collected by: Ivane Chikhladze | Project Address: 551 5th ave NYC | CES Project #: | LLW #: N/A |
| Certification # 13-0108 | Rotameter # Ces 026  Cal. Date 2.21.13 | | Calibration Method: ☒ Calibrator Flow Cell ☐ Other |

LOCATION Of Work Area (s):    12th floor:        2 1 3 0 4 3 5 6 3

Activity: Background, Pre-Abatement/Clean-up, During Abatement/Clean-Up, Post Abatement/Clean-Up, Inspection, Repair/ Interim Control, Construction/Alteration/Demolition, ☒ Other: Ambient

Analysis Requested: ☒ PCM (NIOSH 7400A)  ☐ TEM (AHERA)

Laboratory: ☒ AmeriSci  ELAP No. 11480    ☐ Other:
            EMSL  ELAP No. 11506
                  ELAP No. _____

| Sample ID | Flow Rate Start | Flow Rate Finish | Average Flow Rate | Time Start | Time Finish | Total Minutes | Total Volume | IWA | OWA | Sample Location |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 9.5 | 9.75 | 17:15 | 8:20 | 65 | 634 | X | | east of cossidor (by elevators) |
| 2 | 10 | 10 | 10 | 17:16 | 8:22 | 66 | 660 | X | | West of cossidor (by elevators) |
| 3 | 10 | 10.5 | 10.25 | 17:17 | 8:25 | 68 | 697 | X | | Waiting area |
| 4 | 10 | 10 | 10 | 17:18 | 8:26 | 68 | 680 | X | | Center of hallway (by offices) |
| 5 | 10 | 10 | 10 | 17:19 | 8:28 | 69 | 690 | | X | West end of the hallway (by offices) |
| 6 | | | | | | | | | | FB |
| 7 | | | | | | | | | | FB |

Turn-Around-Time: For PCM ☒ Rush
                  For TEM ☐ 3 Hours ☐ 6 Hours

Results to: ☒ Fax    (212) 290 – 6325
            ☒ E-mail: ceslabresults@aol.com
            ☒ Other: i.chikhladze@mail.com

Notes: _____

| Site | | | Laboratory | | | | | |
|---|---|---|---|---|---|---|---|---|
| Relinquished By Name | Date | Time | Received By Name (Print) | Date | Time | Analyzed By Name (Print) | Date | Time |
| | 04 | | | 4/17/13 | 2130 | K.HARLEY | 4/18/13 | 0237 |
| | 17 | | | | | | | |

# EXHIBIT C TO VERIFIED COMPLAINT OF
# RONIT D. APPEL DATED FEBRUARY 20, 2014

U.S. Department of Labor       Occupational Safety and Health Administration
                               Manhattan, NY 0215000 Area Office
                               201 Varick Street
                               Room 908
                               New York, NY 10014
                               Phone: (212) 620-3200  Fax: (212) 620-4121
                               http://www.osha.gov

April 23, 2013

Ronit Appel
697 West End Ave  Apt 2D
NEW YORK, NY 10025

RE: OSHA Complaint No. 813512

Dear Ms Appel :

Schoeman Updike Kaufman Stern & Ascher has advised me that the hazards you complained about have been investigated.  A copy of the employer's response is enclosed.

With this information, OSHA feels the case can be closed on the grounds that the hazardous conditions have been corrected (or no longer exist).  If you do not agree that the hazards you complained about have been satisfactorily abated, please contact us by May 1, 2013.  If we do not hear from you within that time, we will assume that the hazard has been corrected or eliminated and will take no further action with respect to this case.

Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity.  If you believe you are being treated differently or action is being taken against you because of your safety and health activity, you may file a complaint with OSHA.  You should file this complaint as soon as possible, since OSHA normally can accept only those complaints filed within 30 days of the alleged discriminatory action.

Your action on behalf of safety and health in the workplace is sincerely appreciated.

Respectfully,

Kay Gee
Area Director

Enclosure(s)

SCHOEMAN
UPDIKE
KAUFMAN
STERN
ASCHER

Charles b. Updike
646.723.1043
cupdike@schoeman.com

April 19, 2013

VIA FEDERAL EXPRESS

Kay Gee
Area Director
U.S. Department of Labor
Occupational Safety and Health Administration
201 Varick Street, Room 908
New York, NY 10014

Re:    OSHA Complaint No. 813512

Dear Ms. Gee:

We write in response to your letter of April 15, 2013 (copy enclosed) and, in particular, to the request in the third paragraph thereof for a written response by April 22, 2013. A certificate of our posting of your letter is enclosed. In accordance with your instructions, we are posting this response today.

We are a small law firm with a total of 35 employees, including partners. On Friday, April 5, 2013, we moved into newly renovated space on the 12th floor of the Fred F. French Building, a New York City Landmarks building at 551 Fifth Avenue (corner of 45th Street). Although our renovation was nearly complete on that date, some finishing work remained to be done in two conference rooms and in the elevator lobby which is a public area outside of and not part of our offices. The conference room work included varnishing of woodwork and the elevator lobby area still needed plastering, painting, carpeting and the installation of light fixtures.

One of our employees complained of nausea shortly after arrival on our first day in the new space, went home and has declined to return to work until all construction is complete. All of our remaining employees have reported to work as usual. We have now continuously occupied the space since Monday, April 8, 2013.

The building is owned by the Feil Organization, a premier national real estate company which owns and operates multiple properties in New York and elsewhere. The renovation was done by a contractor hired and supervised by the building management in accordance with plans and specifications of our architect, an experienced and

Kay Gee
April 19, 2013
Page 2 of 2

highly regard... ...of office sp... ...architect has assu... ...us that the ren... ...tion ...carried out pur... ...l... ns and sp... ...n file-d with t... ...N... ...k City Dep...t...t of Buildings... ...n with appl... ...f...ign codes and... ...tions. The landlord's Co...t...o Manager... ...d... that to the b... of his knowledge ...d ...regular site in... during cons... ...n the architect's de...gn has been imp... ...ed in accordan... ...i...th... the City's applicable building codes and regulations including... ...ty code... They have... ...i...her assured us that they have no reason to ...spect the presenc... ...f a...bestos, lead or an...ther substance in potentially harmful quantities in the air of our premises.

Notwithstanding the foregoing, at our instance the landlord has undertaken, in a fully cooperative manner, to sample and test the air in both our space and the public lobby area. A copy of the sampling report and test results showing the absence of any hazardous substances or other problems with air quality is attached.

If you believe you need anything further from us at this time, please call me.

Very truly yours,

Charles B. Updike

CBU/blw

Enclosures

cc:    Barry Zimmerman (via e-mail)
       Kevin Driscoll (via e-mail)
       Lissete Sevilla (via-email)
       John Borelli (via e-mail)

Case 1:14-cv-02065-AJN    Document 2-4    Filed 03/25/14    Page 96 of 137

# EXHIBIT D TO VERIFIED COMPLAINT OF
# RONIT D. APPEL DATED FEBRUARY 20, 2014



SCHOEMAN
UPDIKE
KAUFMAN
STERN
ASCHER

**Mindy H. Stern**
646.723.1040 direct
mstern@schoeman.com

April 24, 2013

**VIA PDF & FEDERAL EXPRESS**

Ronit D. Appel
697 West End Avenue, Apt. 2D
New York, NY 10025

Dear Ronit:

We have been considering whether to continue your employment with us for some time and have concluded that we should terminate it. We planned to advise you of that decision at the meeting we asked you to attend this afternoon. In light of your most recent email, however, we are communicating our decision in writing. Accordingly, we hereby advise you that we are terminating your employment with us effective at the close of business today.

Although you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below.

After consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work effectively with your colleagues. We have come to this conclusion after reflecting on the incidents described below, among others.

- The first incident occurred in the summer of 2010 when we were preparing a response to a questionnaire from our insurance carrier and you refused to answer a question about whether any claims had been made against you. We let this issue pass but it did raise concerns on our part about your candor and willingness to speak openly to your colleagues.

- Also in 2010, there was a disturbing incident involving your refusal to share material you had prepared at the Firm's request and on the Firm's time for another project with which Deidre Sheridan was involved. You even accused her of "plagiarism", which was highly inappropriate. This was an

Ronit D. Appel
April 24, 2013
Page 2 of 3

example of poor judgment on your part and an inability to work well with your colleagues.

•    In January 2012, there was a heated exchange between you and our colleagues at Reed Smith that again demonstrated poor judgment on your part and an inability to get along well with your colleagues. Your emails to them, sent without consulting Charles Updike, the supervising partner, were totally inappropriate communications.

•    A similar incident occurred in April 2012 when you accused a colleague of religious discrimination because she asked you if you could work over the weekend, not knowing that you were a Sabbath observer who could not work on Saturday. Again, your reaction demonstrated both poor judgment and an inability to have constructive dialogue with your colleagues. A further indication of your poor judgment in our view was your refusal to participate in the investigation that we felt obligated to conduct because of your complaint of religious discrimination.

•    Another more recent incident of poor judgment occurred during our discussions about the content of a letter demanding payment of legal fees in full by an insurance carrier. Your vigorous opposition to that approach was listened to and taken into account. Your adamant refusal to cooperate in making the demand, however, again reflected poor judgment on your part, especially in light of your unresponsiveness to the suggestion that you research the issue.

•    Another example was your persistence in raising specious questions about advice we received from an Israeli lawyer about a transfer of real estate late last year and your refusal to continue working on the matter. Again, this reflected poor judgment on your part.

•    Most recently, you have shown poor judgment in other communications regarding the office relocation. While you certainly have the right to complain about conditions in the office, there are appropriate procedures for doing so. Your decision to send an email about your concerns to the entire office reflected poor judgment, as did your belligerent and adversarial communications with our architect and landlord, particularly because you did not seek the Firm's permission to communicate with those individuals or even advise us that you were considering doing so.

•    Finally, despite the fact that you have acknowledged that you have no illness or medical condition, and air quality testing was done to ensure there is no problem, you have refused to come to work.

Needless to say, judgment is a critical part of a lawyer's job and as a firm, we pride ourselves in delivering excellent legal service to our clients, which includes exercising sound judgment on their behalf. Teamwork is also very

Ronit D. Appel
April 24, 2013
Page 3 of 3

important, especially in a small firm. We have reached the point where we have no confidence that you will conduct yourself in an appropriate way and exercise appropriate judgment.

In short, this decision has been long in coming, as there have been many incidents during your employment here that have caused the partners to have serious concerns about your judgment and ability to work with others. We have therefore decided that your employment with the Firm should end, effective immediately.

Although our personnel policy does not require it, you will be paid through today as if you had not been absent for the past two weeks (other than April 10th, 11th and 12th, which you requested as vacation days). You also will receive any accrued vacation pay that may be due to you in accordance with the office manual. You will receive a letter regarding your COBRA rights. We will pack up your personal belongings in your office. You have a BlackBerry that belongs to the Firm. We ask that you contact Cindy about the logistics of picking up or delivering your personal property and the return of the BlackBerry. Our response to any inquires about your employment with us will be limited to confirming the dates of your employment and your position.

Your email refers to "reaching an amicable solution to this matter". That is one of the reasons we sought today's meeting. If it is something you wish to pursue, please let us know what you have in mind.

Very truly yours,

Mindy H. Stern

MHS/blw

EXHIBIT E TO VERIFIED COMPLAINT OF
RONIT D. APPEL DATED FEBRUARY 20, 2014

## PRIVILEGED AND CONFIDENTIAL

## INVESTIGATION REPORT

## COMPLAINT

I was asked to conduct an investigation into an incident that led one employee, Ronit Appel, to raise concerns of religious insensitivity by co-worker Susan "Susie" Casero. This allegation arose in the context of an email exchange between the two about weekend work for a document production project. In reviewing the emails in which this allegation was made, I saw that Susie raised her own concern about Ronit showing "hostile behavior" toward her. Therefore, I investigated this issue as well.

## WITNESSES INTERVIEWED

On Monday, June 18, 2012, I met with Susie and also with Cindy Nygaard at the Schoeman, Updike & Kaufman offices. The previous Friday, June 15, 2012, Ronit was informed that an investigation would be conducted. In an email following that notification, Ronit declined to participate in the investigation. Prior to the June 18 interviews, I met with Beth Kaufman and Charles Updike on May 18, 2012 to discuss conducting an investigation into this matter and was given some background information, including information about prior incidents involving Ronit and other attorneys.

## DOCUMENTS REVIEWED

I reviewed a series of email exchanges between Susie and Ronit, dated April 20, 2012, regarding their interactions in connection with a document production project. During my interview with Cindy, I was shown email exchanges between Ronit and a former employee, Deirdre Sheridan, regarding a CLE project, and was given additional emails written by Ronit informing the firm about taking time off for religious observances. I also reviewed email exchanges between Ronit and attorneys from the Reed Smith law firm relating to their work on an insurance matter. In addition, I reviewed the firm's written policy on Discrimination and Sexual Harassment.

## FACTUAL FINDINGS

Set forth below is a synopsis of my interviews with the two witnesses.

### Susan Casero:

Susie joined the firm on April 2, 2012 as a ninth year attorney. She had previously worked at two large law firms and joined Schoeman in order to have more of a work-family balance. Susie's

1

first introduction to Ronit was on March 29, 2012 when she attended a meeting on the deposition preparation aspect of the litigation matter that is the subject of this dispute. Susie was aware that Ronit had been working on the matter for quite awhile and she got a sense during that meeting that she needed to be careful with Ronit.

When she first started working on the case, Susie felt her role was unclear. At some point Beth asked her to manage the document production on the case. Prior to this, Ronit had responsibility for managing the document production, working with Alycia Levy, and had prepared a document review protocol memo.

Susie understood that Ronit had more knowledge about the case itself, but said that she has more experience managing document production, having done so on complex cases at her prior firms. She knows what is entailed in such productions. Susie was at a disadvantage because she came in to the case midstream and was not fully familiar with all the documents or how they had been handled in the past. She explained that it was important to be consistent in how the production responses were handled throughout the case. She needed to get clarification from Ronit on various issues, particularly because she was put in charge of supervising the contract attorneys working on the case and they had questions about the document review protocol, which they indicated was unclear.

Susie had no direct supervisory responsibility for Ronit. While she was assigned a management role for the document production aspect of the case, she did not otherwise have any responsibility for or input into Ronit's assessment, compensation, or any other term or condition of employment. She said that unlike the structure at larger law firms, there is no particular hierarchy at the firm among the general attorneys. However, she is senior in terms of experience: she is a ninth year Counsel, while Ronit is a second year Associate.

Susie had been at the firm for only three weeks before the April 20 incident. She said it is important to her to be liked and, since she was new to the firm, she was interested in developing good relationships. Her initial relationship with Ronit was fine; they were cordial with each other, although Susie also remarked that Ronit is stern and can be abrasive. Ronit was initially managing the production and Susie was pitching in to get things done. Within the first few days of her joining the firm, Susie got a call that her mother was in a near fatal car accident and flew home to be with her mother. Ronit expressed concern about her mother and was civil toward her.

Susie believes that her relationship with Ronit changed after Beth asked her to take over management of the document production. One of the first indications for Susie was when she sent an email to Ronit asking for help with the deposition preparation binders for two witnesses. In her mind, it made sense for Ronit to work on them since Ronit had done the binders to prepare the main witness and was more familiar with the documents that would be important for these witnesses. Ronit wrote back that she was happy to prepare them "instead of you." Susie said she thought it was an odd response. Thereafter, she sent another email to Ronit and David Black on April 18 asking about their availability to work on another batch of documents. Ronit sent back another email that Susie perceived as curt. Susie acknowledged, however, that Ronit was busy.

2

Susie also said she felt Ronit had been condescending toward her in a meeting with the contract attorneys where they discussed privilege issues. She said Ronit contradicted her in front of these attorneys, and she did not say anything because she was trying to get along and also because the work needed to get done.

On April 20, the contract attorneys told Susie they were unsure about what the protocol memo said about a particular kind of document and did not know how to proceed. Susie went to Ronit's office to discuss the situation. Ronit was speaking with Rachel, a paralegal, and did not want to be interrupted. They agreed that Susie would come back in ten minutes. When Susie returned, she asked Ronit about the production issues and Ronit responded in a manner that suggested to Susie that she was annoyed. Susie said to her, "is there a problem?" Ronit did not respond to the question; instead, she yelled at her, saying, "you can't talk to me like this," and asked Susie to get out of her office. Susie then closed the door and tried to have a conversation with Ronit about what was going on. Ronit would not speak with her and asked her to leave. Susie doesn't know if others heard what transpired.

Susie was very upset after having been spoken to in that manner. She decided to take some time to cool down and called her husband. She then wrote to Ronit saying that they needed to find a way to communicate with each other. Rather than responding directly to Susie, Ronit sent a response copying Beth, Cindy and Mindy Stern. In addition, she made accusations about Susie's conduct and also said it was inappropriate for Susie to have asked her to work on the Sabbath when, according to Ronit, Susie knew she was an Orthodox Jew.

Susie was furious after receiving that email and the subsequent one from Ronit. She said it was not okay that a comment was made alleging religious intolerance. That had never happened to her in her life. She also was concerned that, as a new attorney in the firm, Ronit was marring her reputation.

I asked Susie whether she ever had a conversation with Ronit about religion, particularly about her religious beliefs or practices. She had not. About 2-3 days before the blow-up, she spoke separately with David, Ronit and Stacy about their availability to work over the weekend, on Saturday and Sunday, since someone needed to be present when the contract attorneys were in. Both of the contract attorneys were available on Saturday, and only one on Sunday. David said that he was only available to work at night. Ronit said she couldn't come in on Sabbath, but might be able to work on the deposition prep from home on Sunday. Susie said okay.

Ronit may have mentioned at one time that she was Orthodox, but never mentioned anything about not working on Saturdays. Susie did not know that being Orthodox meant that one could not work on Saturday. Susie said that in her other firm, there was an Orthodox Jew who left early on Fridays. She recalls him working on a Saturday, and therefore did not know that Saturday work was prohibited. In any event, she said "okay" when Ronit said she could not work on Saturday. And, she said she did not make a comment about childcare for her son for that Saturday. She did, however, mention that her son's second birthday party was scheduled for that Sunday. Susie ended up coming in and worked for seven hours on Saturday. No one came in on Sunday since the work was completed on Saturday.

3

Subsequent to the interaction and email exchange, Susie spoke separately with Beth, Charlie and Cindy. She expressed concern that her reputation was being marred. She told them she would not work with Ronit and that Ronit cannot be managed.

Susie and Ronit are both still on the case, but have not had any interaction since that incident.[1] Ronit has never apologized and they have not spoken at all. Ronit completed the deposition prep binders and left them in a neutral territory. Susie has handled the document production on her own. I asked whether she had any idea why Ronit reacted the way she did. Susie believes that it had to do with losing management responsibility for the document production. Susie acknowledged that Ronit is stressed out; it looked to her like Ronit had a lot on her plate. This may have led to her perception that Ronit is "in over her head," as she wrote in the email to Beth.

Susie said she told Beth there were not two versions of events; there is no alternate explanation about what happened. She was furious about the email exchange and, even during our meeting, expressed frustration with having to relive it. She also said she believes Ronit is a liability to the firm. She thinks Ronit is too unpredictable and wouldn't put her in front of a client. I asked whether she had ever seen Ronit interact with clients. She recalls there being one meeting, a witness prep with Lisa that Ronit handled. She felt Ronit was robotic, cold.

I asked Susie whether anyone else in the firm ever told her they were having issues with Ronit. Prior to the April 20 incident, Alycia asked her how it was working with Ronit. After the incident, they spoke again and Susie told her about trying to get information and being thrown out of Ronit's office. Alycia said she had her own issues with Ronit having to do with managing and communicating with her. Susie is aware that another former attorney also had an issue with Ronit.

I asked Susie whether this incident and the inability to deal with Ronit were having an impact on her work on this case. She said she has some concerns about the impact on her preparation of two witnesses and the related documents. It would be preferable to be able to speak with Ronit about the documents, but she cannot. Susie does not trust that Ronit will not have another blowup and feels she cannot rely on her.

Susie described herself as being very friendly and said she has a good relationship with the other attorneys in the firm.

### Cindy Nygaard:

Cindy has been at the firm on and off since 1984. Her current position is as the Office Manager, with responsibility for back office, staff, insurance, office space and human resources, except with respect to the attorneys and paralegals. I asked Cindy about the nature of her relationships with Susie and Ronit. She described Susie as fantastic: she is bubbly, energetic, honest and open. When they first met, they hit it off and connected immediately. She described Ronit as sweet, generous with gifts, and thoughtful. She also found her to be structured and tightly wound. Ronit

---

[1] Susie said she and Ronit were scheduled to meet with Beth later in the day on the 18th to discuss the case. This would be their first interaction and she was concerned about it.

4

is respectful toward Cindy. She observed that Ronit keeps to herself and works behind closed doors.

Although Cindy's office is near Ronit's, she did not hear the discussion between Susie and Ronit on April 20. In addition, no one told her they heard any part of the conversation either. However, she saw Susie after the interaction and was copied on the emails sent by Ronit. When she received the initial email from Ronit responding to Susie's email and accusing her of religious insensitivity, she was surprised to see that Ronit copied her, Mindy and Beth. She also was surprised by the content of the email. She saw that Susie was upset that morning and called or emailed Beth saying that someone should speak with Susie. Cindy met with Susie and listened to her story, but did not offer any counsel in light of Ronit's charge relating to religion. She felt it was a serious charge and told Susie that one of the partners would speak with her.

I asked Cindy whether it was common knowledge to people in the firm that Ronit was an observant Jew and also, whether Ronit had asked for a religious accommodation. She said she did not know whether most people knew of Ronit's religious practices, but that many of the staff perceive the firm as being a Jewish firm, in light of the fact that there are no Christmas decorations at holiday season and many of the attorneys are Jewish. With respect to Ronit specifically, Cindy does not know whether she discusses her personal beliefs or religious practices. Ronit used to send email messages to the entire office noting when she would be out for religious holidays or leave early to observe the Sabbath. Cindy showed me several examples of such emails from 2010, including one dated November 18, 2010 stating, "Due to the short winter days and the fact that I am Sabbath-observant, beginning this Friday, I will be leaving on Fridays at 3:15." Other emails were sent informing the office that she would be out in celebration of Passover, Shavuot and other Jewish holidays.

Cindy said that Ronit would have asked Beth for an accommodation to leave early on Friday and never complained since she was permitted to take time off to practice her religion. Cindy does not know if Susie knew about Ronit's religious practices. Earlier this year Cindy had a conversation with Ronit, among others, and explained that it was not necessary to send a notice to the entire office about her time off, but only to her secretary and reception and any other specific individuals that needed to know her availability. In fact, when Ronit took time off in observance of Passover in April of this year, the notice did not get sent to the entire firm; it only went to specific individuals, which did not include Susie.

I asked Cindy whether she had any interactions with Ronit or Susie that were of a hostile or inappropriate nature and also, whether she was aware of other people in the firm having specific disagreements with either Ronit or Susie. Cindy herself has not had disagreements with either individual. She has a very good relationship with Susie and has found Ronit to be cordial and friendly with her and remarked that she also interacts well with her secretary.

As far as she knows, Susie has not had issues with others in the firm, but Ronit has. She opined that Ronit might have an inability to work with her peers. Specifically, she heard an argument between Ronit (a first year associate at the time, having joined the firm in September 2009) and Deirdre Sheridan (who was then a senior attorney, but has since left the firm) that occurred on May 25, 2010. In addition, Deirdre came to see Cindy following the incident to vent. Cindy

5

described an email "tirade" between the two having to do with preparation of materials for a CLE presentation that Beth and Deirdre were to deliver. I was shown a series of emails about the interaction, including one where Ronit accused Deirdre of plagiarism because she was going to use materials for the CLE program that Ronit drafted for an article to be published elsewhere by Beth and herself. Deirdre confronted Ronit saying words to the effect, "who do you think you are speaking to?" After that interaction, they did not speak to each other from that time until Deirdre left the firm earlier this year.

Cindy was aware of, but did not have personal knowledge about, another situation involving Ronit and Alycia, where Ronit accused her of stealing a case. She recalls that Beth and Charlie spoke with Ronit within the last year about that incident and gave Cindy a note to put into Ronit's file.

### Meeting with Beth Kaufman and Charles Updike:

I met with Beth and Charlie on May 18 at the firm's offices in order to discuss the investigation and to get some background information. During that meeting, I was given the emails between Ronit and Susie that are the subject of this investigation. In addition, I was told of another situation that occurred in January 2012, in which Ronit's communications with other lawyers became an issue. Charlie and Ronit were working with another law firm – Reed Smith – on a specific aspect of an insurance matter and Ronit reviewed a brief prepared by the Reed Smith attorneys. I subsequently reviewed a series of email exchanges in which Ronit told a senior partner from that firm that he was not authorized to file the brief without another review by her, despite a tight deadline and the fact that she had already given them feedback on an earlier draft. The partner then communicated with Charlie about their frustration in dealing with Ronit, in that she was creating more work for them and because she did not understand the legal arguments being made or the details of the insurance issues in which his firm had a particular expertise. Following that incident, Charlie spoke with Ronit and advised her that her emails had upset the attorneys and that both their tone and substance were inappropriate.

### CONCLUSIONS

As noted above, Ronit declined to participate in the investigation, leaving me to draw conclusions based solely on the interviews with Susie and Cindy and on the various documents shared with me. I conclude that Ronit's allegation of inappropriate conduct by Susie on the basis of her religion has no merit. In addition, I have noted some concerns about Ronit's communication style that may have contributed to Susie's perception of hostile behavior.

### Ronit's allegations against Susie based on her religious practices

Based on the evidence presented, the conduct that Ronit found objectionable was Susie's asking a question about her availability to work on Saturday. Ronit wrote, "your asking me yesterday if I can come in and work on Saturday was particularly inappropriate given that you know that I am an Orthodox Jew and that I do not work on Sabbath or Jewish holidays, as we have discussed this in the past." Ronit does not allege that she was forced to work on Saturday by Susie, who

6

was in charge of the discovery project, or that her refusal had any impact at all on her work on the case or her employment. Ronit made clear to Susie during their conversation that she was a Sabbath observer and could not work on Saturday, and Susie accepted that, effectively putting an end to the conversation.

Ronit's own email suggests that Susie should have known better than to even ask. There is no evidence to support this claim. The email in which Ronit announced her Sabbath observance to the firm was sent in 2010, two years before Susie joined the firm. When Ronit sent her emails on April 6 and 11, 2012 simply stating that she would be out of the office for Passover, Susie was not on the distribution list. In addition, Susie said that while she may have heard Ronit describe herself as Orthodox at some point, although she was not sure that she ever had a specific conversation with Ronit discussing her religious observance, even if she did, she did not understand being Orthodox to mean that one could not work on Saturday, based on her experience at a prior firm, as described above.

And, while Ronit believes that Susie's claimed lack of awareness is disingenuous, as was noted in her email, I was provided no evidence to corroborate her belief. Because I found Susie to be forthcoming and credible, I do not conclude that she feigned ignorance of Ronit's Sabbath observance. Rather, I find that she asked about weekend availability, particularly for Saturday because that is when the two contract attorneys were both available, and not because she intended to offend Ronit or interfere with her religious observance. At worst, this was an honest mistake by a new colleague, and one that was related to complying with a tight deadline. Her questioning was not based on a personal agenda, and had no impact on Ronit's employment, especially since Susie had no supervisory responsibility for Ronit.

Furthermore, because she did not agree to meet with me, I am not able to evaluate what Ronit meant when she wrote in her email to Susie and others, that Susie was "rude, condescending, and obnoxious" or that she asked Susie to leave her office because Susie had "no right to treat [her] in the manner" she did. It appears that she is referring to Susie's questions about the discovery process and not the conversation about Saturday work.

Susie's claims of alleged hostile behavior by Ronit

At the same time that Ronit charges that Susie's conduct made it difficult for her to get her work done, Susie also claims that Ronit's behavior was "unacceptable and hostile." However, unlike Ronit, who chose to copy Beth, Mindy and Cindy on her emails, Susie wrote about her problems with Ronit's behavior in an email addressed only to Beth. Susie explained to me that she went to Ronit's office to ask questions about the discovery so that she could direct the contract attorneys, who needed to move forward with the project. She acknowledged this was not the first time she went to Ronit with questions. When she sensed that Ronit was annoyed with her, she tried to have a discussion with Ronit about whether something was going on so that they could more effectively communicate about this subject. Rather than engaging with Susie, Ronit raised her voice, refused to discuss the situation, and threw her out of the office. Ronit's allegations of religious insensitivity and her statements that Susie evidenced "a total lack of sophistication and an immature approach to the work," offended Susie to the point that she determined she would not be able to work with Ronit any longer.

7

In reviewing some of Ronit's email exchanges with other attorneys, hearing about those interactions, and seeing her most recent email in which she stated her refusal to participate in this investigation, I can understand why others have raised concerns about her communication style. From what I observed, there is a harsh quality to her communications: she has accused one colleague of plagiarism; another of stealing a case; and Susie of lacking in sophistication and being immature and unproductive. And, with the Reed Smith attorneys, she told them their actions were unacceptable. In addition to the verbal exchange with Susie, Cindy told me about an argument between Ronit and Deirdre. Based on the above, by my calculation, Ronit has been involved in at least four "conflicts" in a two and a half year period.

Even assuming for the sake of argument that all of Ronit's complaints about others have some truth to them, in my opinion, her communication skills need improvement. For one of the more junior attorneys to be communicating in such an accusatory manner with more senior attorneys in her own firm, even where there is not a hierarchical structure, shows a lack of judgment. And, when her communications with partners in another firm led one of them to write to her, "Do not send me emails. Ever," this raises yet another cause for concern. What this suggests to me is that Ronit has not taken the time to consider, or shows no concern about, how the tone and substance of her communications will be received by others. These kinds of communications do not engender goodwill or foster the development of professional relationships. In fact, her accusations alienated at least two of her colleagues - Susie and Deirdre – to the point that they refused to work with her. And, perhaps even more telling is the fact that Cindy, who has had positive personal interactions with Ronit, also questioned Ronit's ability to work with her peers. I don't have enough information to conclude that Ronit's overall behavior is "hostile," but it does appear that her communications are impairing her ability to work effectively with others.

## RECOMMENDATIONS

As noted above, it is my understanding that Ronit has been spoken to on at least two occasions (once by Charlie individually, and another time by both Beth and Charlie) about her interactions with others. It should be noted that while Ronit has been described as curt and cold in her personal interactions, she has also been described as bright, hard working, and able to handle a heavy workload. I have no information as to whether this workload might be contributing to her approach. Her style, and by that I mean the tone and substance of her communications, may lead to questions about her ability to sustain productive working relationships. It is important in the firm environment, as in any workplace, to be able to get along with one's peers.

I have not had any direct, personal contact with Ronit, so I do not know whether she has an interest in learning how her communication style may be interfering with her professional relationships. However, a way of addressing this issue is to offer Ronit the opportunity to work with a coach in an attempt to help her develop more effective communication skills.

Laurie Zeligson, Esq.
The Zeligson Firm
June 26, 2012

8

FILED: NEW YORK COUNTY CLERK 02/20/2014

NYSCEF DOC. NO. 7

EXHIBIT F TO VERIFIED COMPLAINT OF
RONIT D. APPEL DATED FEBRUARY 20, 2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

MADISON 96TH ASSOCIATES, LLC,                                    **AFFIRMATION OF**
                                                                 **RONIT D. APPEL**
                         Plaintiff,

          -against-

17 EAST OWNERS CORP.,                                            Index No.: 601386/03

                         Defendant.

-----------------------------------------------------------------------X

17 EAST 96TH OWNERS CORP.,

                         Plaintiff,                             Index No.:  108695/04

          -against-

MADISON 96TH ASSOCIATES, LLC and 21 EAST 96TH
STREET CONDOMINIUM,

                         Defendants.
-----------------------------------------------------------------------X

MADISON 96TH ASSOCIATES, LLC,                                   Index No.:  591089/05

                    Defendant and Third-Party Plaintiff,

          -against-

MARSON CONTRACTING CO., INC.,

                         Third-Party Defendant.
-----------------------------------------------------------------------X

MADISON 96TH ASSOCIATES, LLC,                                   Index No.:  590585/07

                    Defendant and Third-Party Plaintiff,
          -against-

ILLINOIS UNION INSURANCE COMPANY,

                         Third-Party Defendant.

--------------------------------------------------------------------X
MADISON 96TH ASSOCIATES, LLC,

                Defendant and Fourth Third-Party Plaintiff,    Index No.: 590113/08

    -against-

QBE INSURANCE CORPORATION,

                Fourth Third-Party Defendant.
--------------------------------------------------------------------X

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF NEW YORK | ) |

      RONIT D. APPEL, an attorney duly admitted to practice law in the State of New York, affirms, under the penalties of perjury:

    1.    I am former counsel to Madison 96 Associates, LLC ("Madison 96") in the above-captioned actions. I was formerly employed by Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman"), counsel for Madison 96 in the above-captioned actions. I submit this affirmation because I have knowledge of certain insurance fraud committed in the above-referenced litigation by Schoeman and by Schoeman partner Charles B. Updike in their attempts to recover money on behalf of Madison 96 from QBE Insurance Corporation ("QBE").

    2.    I was counsel to Madison 96 in the above-captioned actions from 2009 until I was unlawfully terminated by Schoeman on April 24, 2013. The first instance of insurance fraud committed by Schoeman and Charles B. Updike, counsel for Madison 96, occurred shortly before my termination. One of the unlawful reasons for my termination listed by Schoeman in its April 24, 2013 termination letter to me was my "vigorous opposition" to "the content of a letter demanding payment of legal fees in full by an insurance carrier," and my "adamant refusal to cooperate in making the demand." The payment demand made by Schoeman that I refused to

2

cooperate with, which constituted fraud, consisted of the making of a demand by Schoeman to QBE that QBE pay $282,940.00 in attorneys' fees plus disbursements for the services of Reed Smith LLP, special insurance counsel to Madison 96, when Madison 96's engagement letter with Reed Smith, the terms of which QBE had no knowledge of at the time the demand was made by Schoeman, explicitly capped the fees that Reed Smith could recover from Madison 96 at $200,000.00 in attorneys' fees plus disbursements.

3.      After I sent an e-mail dated March 13, 2013 to Mr. Updike stating that, in light of the $200,000.00 attorneys' fees cap in the engagement letter, he should not make a demand that QBE pay more than $200,000.00 in attorneys' fees plus disbursements for Reed Smith's services, Mr. Updike responded by stating, *inter alia*, that the engagement letter between Madison 96 and Reed Smith "is none of QBE's concern" and that "[i]f they wanted to, Madison 96th and Reed Smith could revise their agreement to make it time at standard rates." A copy of Mr. Updike's e-mail documenting Mr. Updike's admission that he had no reservation about altering an engagement letter in order to recover from an insurance company on his client's behalf a higher amount of fees than his client is entitled to is attached hereto as **Exhibit A**. Later that day, Mr. Updike sent a letter dated March 13, 2013 to counsel for QBE seeking to recover on behalf of Madison 96 $282,940.00 in attorneys' fees plus disbursements for Reed Smith's services. A copy of Mr. Updike's letter to counsel for QBE is attached hereto as **Exhibit B**.

4.      Ultimately, when Mr. Updike made a motion to the Court asking the Court to, *inter alia*, direct entry of a judgment in favor of Madison 96 against QBE in the amount of $1,576,894.29, Mr. Updike notified the Court that in calculating Madison 96's costs of defense fees through December 31, 2013, Schoeman had excluded Reed Smith's fees.

3

5. Although Schoeman recently produced Madison 96's engagement letter with Reed Smith to QBE, it was clear to me on March 13, 2013, in light of Mr. Updike's e-mail stating that the engagement letter was "none of QBE's concern" and could be revised, that when Mr. Updike made the fraudulent payment demand to QBE on March 13, 2013, Mr. Updike's intention was that QBE would never be given a copy of the engagement letter between Madison 96 and Reed Smith that capped the fees that Madison 96 would owe Reed Smith at $200,000.00 plus disbursements and, in fact, it is my understanding that QBE did not receive a copy of the engagement letter until approximately half a year after the fraudulent payment demand was made. It was clear to me that Mr. Updike's intention at the time the fraudulent payment demand was made on March 13, 2013 was that the engagement letter would either be hidden by Schoeman from QBE or materially altered by Schoeman to remove the cap on attorneys' fees contained in the letter.

6. I have now become aware of additional insurance fraud being committed by Schoeman in its attempts to recover money on behalf of Madison 96 from QBE. In or about November of 2010, Schoeman and Madison 96 modified their fee arrangement. In the course of the discovery sought by QBE in preparation for a hearing to set the amount of attorneys' fees owed by QBE to Madison 96, Schoeman provided QBE with what it purports to be the November 7, 2010 fee modification agreement between Schoeman and Madison 96. However, the unsigned letter provided by Schoeman, attached as Exhibit J to QBE's proposed order to show cause dated October 8, 2013, and attached hereto as **Exhibit C**, which Schoeman is attempting to pass off as the fee modification agreement in effect between Schoeman and Madison 96, is not the actual signed fee modification agreement dated on or about November 7, 2010 that was executed by the parties.

4

7.    During the course of my employment at Schoeman, I read the actual signed fee modification agreement numerous times. The fee modification agreement that I read while employed at Schoeman, which was a PDF document saved on Schoeman's server, was signed and contains materially different terms than the terms contained in the unsigned letter provided by Schoeman to QBE attached as Exhibit J to QBE's October 8, 2013 motion papers and attached hereto as Exhibit C. For instance, the original signed fee modification agreement contained no provision regarding any obligation of Madison 96 to pay any "Additional Fees" as such term is defined in the letter attached as Exhibit J to QBE's motion papers and attached hereto as Exhibit C.

8.    I never saw either a signed or unsigned copy of the letter attached as Exhibit J to QBE's motion papers and attached hereto as Exhibit C while I was employed at Schoeman and to my knowledge, no such letter was ever drafted, executed, or in effect between Schoeman and Madison 96 while I was employed at Schoeman.

9.    I respectfully submit that in order to prevent QBE from becoming the victim of insurance fraud, Schoeman should be ordered to produce the PDF signed copy of the November 7, 2010 fee modification agreement that shows the date the document was last modified as well as an electronic copy of the unsigned letter Schoeman recently submitted to QBE, attached as Exhibit J to QBE's October 8, 2013 motion papers and attached hereto as Exhibit C, that shows when that document was last modified.

Dated: New York, New York
       October 10, 2013

_____

RONIT D. APPEL

5

# EXHIBIT A

## RE: Letter to Howard Altman

Charles Updike

**Sent:** Wednesday, March 13, 2013 12:27 PM

**To:** Ronit D. Appel

---

The arrangement between the client and Reed Smith is none of QBE's concern.    If they wanted to, Madison 96th and Reed Smith could revise their agreement to make it time at standard rates.   It is all subject to a "**reasonableness**" standard in any event.   Plus, we are almost certainly not going to get Reed Smith's fees at all.   In the end, we will be trading them away and paying Reed Smith out of client's share of our fees.



**Charles Updike |**
**Schoeman Updike Kaufman Stern & Ascher LLP**
551 Fifth Avenue, New York, NY 10176
(646) 723-1043 direct | (212) 661-5030 main | (212) 687-2123 fax
cupdike@schoeman.com | www.schoeman.com

The contents of this message may be privileged and confidential. If this message was received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this e-mail is not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Ronit D. Appel
**Sent:** Wednesday, March 13, 2013 11:51 AM
**To:** Charles Updike
**Subject:** Letter to Howard Altman

Charlie,

The engagement letter with ReedSmith caps the attorney fees ReedSmith can recover at $200,000 (plus disbursements). However, in the letter to Altman we ask for $282,940.00 plus disbursements for ReedSmith's fees. I think that we should change that number to $200,000 (plus disbursements) so that it is in accordance with the terms of the engagement letter.

Ronit

**Ronit D. Appel | Associate**
**Schoeman Updike Kaufman Stern & Ascher LLP**
551 Fifth Avenue, New York, NY 10176
(646) 723-1053 direct | (212) 661-5030 main | (212) 687-2123 fax
rappel@schoeman.com | www.schoeman.com

The contents of this message may be privileged and confidential. If this message was received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this e-mail is not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# EXHIBIT B

SCHOEMAN
UPDIKE
KAUFMAN
STERN &
ASCHER LLP

**Charles B. Updike**
646.723.1043 direct
cupdike@schoeman.com

March 13, 2013

BY U.S. MAIL AND E-MAIL

Howard B. Altman, Esq.
Newman Myers Kreines Gross Harris, P.C.
40 Wall Street, 26th Floor
New York, NY 10005

Re:    QBE's obligation to defend Madison 96th

Dear Howard:

Having heard nothing in response to our prior inquiry and in light of Judge Kornreich's recent decision and the judgment recently signed by her in the coverage action, we write to apprise QBE of the legal fees and interest payable through December 31, 2012 for the defense of Madison 96th and to inquire as to how QBE proposes to proceed going forward.

We have calculated our fees through December 31, 2012 in the following manner:

1)    We have excluded all charges of any kind prior to November 3, 2005.

2)    We have excluded charges for the coverage action against Illinois Union.

3)    We have excluded charges that, for one reason or another, were not incurred in defense of the action brought by 17 East 96th Owners Corp.

4)    We have included simple interest at the 9% statutory rate starting, in each instance, from the month after the bill in question was rendered.

551 Fifth Avenue | New York, New York 10176 | 212.661.5030 tel | 212.687.2123 fax | www.schoeman.com

Howard B. Altman, Esq.
March 13, 2013
Page 2 of 2

Total fees come to $1,134,146.95.  Interest on the fees is $312,533.61.

Total fees with interest is $1,446,680.56.

Total disbursements come to $102,720.15.  Interest on disbursements comes to $27,493.58.

Total disbursements with interest is $130,213.73.

The total due for work by Schoeman Updike Kaufman Stern & Ascher LLP is $1,576,894.29.  Please make the check payable to: "Schoeman Updike Kaufman Stern & Ascher LLP, as attorneys."

We believe the client is also entitled to be reimbursed for the fees incurred for Reed Smith's services in connection with the coverage action.  Reed Smith's fees through December 31, 2012 are $282,940.00.  The total disbursements of Reed Smith come to $9,849.63.  The payment of these charges may be made by check payable to "Reed Smith LLP, as attorneys."

Please let us know when we may expect payment of these charges.

Although there is presently a lull in activity in the underlying litigation, it may be reactivated at any time.  Accordingly, we also need to know how QBE plans to discharge its obligation to defend Madison 96th going forward.

We look forward to your prompt reply.

Very truly yours,

Charles B. Updike

CBU/blw

# EXHIBIT C

SCHOEMAN, UPDIKE & KAUFMAN, LLP

NEW YORK • CHICAGO

www.schoeman.com

CHARLES B. UPDIKE
cupdike@schoeman.com
TEL: (212) 661-5030

60 EAST 42nd STREET
NEW YORK, NY 10165
FAX (212) 687-5123

November 7, 2010

<u>VIA E-MAIL AND OVERNIGHT DELIVERY</u>

Mr. Stuart Boesky
Madison 96th Associates, LLC
c/o The Pembrook Group, LLC
767 Third Avenue, 18th Floor
New York, NY 10017

Mr. Jamison Weiner
Madison 96th Associates, LLC
c/o The Manhattes Group LLC
54 Thompson Street, 2nd Floor
New York, NY 10012

> Re:   *Madison 96th Associates, LLC v. 17 East Owners Corp. et al.,*
> Index No.: 601386/08; *17 East 96th Owners Corp. v.*
> *Madison 96th Associates, LLC et al.,* Index No.: 108695/04

Dear Stuart and Jamie:

As a follow up to our meeting last week, at your request we have set forth below a proposal for payment of the fees due our firm for the referenced matters. I had hoped to speak with you about this in person or by phone, but am preparing for a trial that begins tomorrow and have not had a chance to do so. I thought it best just to send the proposal.

We have tried to take into account the history of this matter, your circumstances and the length of time that our invoices have remained unpaid. This proposal is made in the spirit of accommodation and, as such, may not be used for any purpose other than our discussion regarding the payment of our fees. It is made without prejudice to our position that the full amount of the fees and disbursements is due and payable, in full, immediately. In the event the proposal is not accepted, we expressly reserve all rights we may have with respect to the

Mad 96_904

Mr. Stuart Boesky
Mr. Jamison Weiner
November 7, 2010
Page 2

payment of the debt to our firm.

Pursuant to our discussion on Wednesday, November 3, 2010, we have reviewed our outstanding invoices. As of September 30, 2010, the balance due us was $259,229.65. Of this amount, $35,802.88 represents disbursements advanced by us on your behalf. The time charges and disbursements go back to February, 2010. Except for $20,000.00 received in September, no payments have been made since March of this year.

We suggest the following arrangement going forward:

1. All outstanding disbursements ($35,802.88) and one-half of the outstanding fees ($111,713.38)--for a total of $147,516.26--shall be paid by November 12, 2010;

2. The balance remaining of the fees currently due our firm-- $111,713.39 (referred to hereinafter as the "Initial Deferred Amount") shall be payable as set forth below;

3. Going forward, all disbursements shown on our monthly statements to you shall be paid in full within thirty (30) days of the date of our invoice;

4. Going forward, 50% of our fees, as shown on our monthly statements to you, shall be paid within thirty (30) days of the date of our invoice (the remaining 50% that is deferred for payment on each invoice shall be added to the Initial Deferred Amount and the total of those is hereinafter referred to as the "Total Deferred Fees");

5. If the full amount of disbursements and 50% of the fees billed on any monthly invoice are not paid within 30 days of the date of our invoice, interest shall begin to run on the unpaid amount of that invoice at the New York pre-judgment statutory rate, beginning on the 31st day after the date of our invoice, until payment is received by us in full. All such unpaid fees, disbursements and accrued interest shall be added to and become a part of the Total Deferred Fees;

6. If a recovery is made (by settlement or otherwise) on behalf of Madison 96th on the claim originated by the Munroes and subsequently assigned (the "Munroe Claim"), the first dollars of any such recovery will be used to pay the Total Deferred Fees plus an

Mad 96_905

Mr. Stuart Boesky
Mr. Jamison Weiner
November 7, 2010
Page 3

additional 50% of those fees ("Additional Fees") and any unbilled fees and disbursements that may exist at the time of the receipt of the recovery on the Munroe Claim. Any balance of the recovery on the Munroe Claim remaining after payment in full of the Total Deferred Fees and Additional Fees, and unbilled fees and disbursements, shall belong to Madison 96th;

7.   If any recovery is made from either Illinois Union or QBE Insurance Corp. (or both) (the "Insurance Claims") (by settlement or otherwise), the first dollars of any such recovery shall be used to pay the Total Deferred Fees plus the Additional Fees and any unbilled fees and disbursements that may exist at the time of the receipt of the recovery on the Insurance Claims. Any balance of the recovery on the Insurance Claims remaining after payment in full of the Total Deferred Fees and Additional Fees and unbilled fees and disbursements, shall belong to Madison 96th;

8.   If any recovery is made (by settlement or otherwise) from Marson on the indemnification claim (the "Marson Claim"), the first dollars of any such recovery shall be used to pay the Total Deferred Fees plus the Additional Fees and any unbilled fees and disbursements that may exist at the time of the receipt of the recovery on the Marson Claim. Any balance of the recovery on the Marson Claim remaining after payment in full of the Total Deferred Fees and Additional Fees and any unbilled fees and disbursements, shall belong to Madison 96th;

9.   Any of the possible recoveries referred to above shall NOT be net of any amount due and owing from Madison 96th to Marson by way of set off or otherwise. That is, for purposes of calculating what is due our firm under this agreement, the amount of any recovery on any of the above claims shall not be reduced by any amount owed or paid by Madison 96th to Marson;

10. If the litigation is completely resolved in a settlement that involves no recovery pursuant to paragraphs 6, 7, or 8 above, or that involves an insufficient recovery to pay our firm the Total Deferred Fees and Additional Fees and any unbilled fees and disbursements as at that date in full, the unpaid amount of the Total Deferred Fees and Additional Fees and any such unbilled fees and disbursements, shall be paid to our firm. Said payment shall be made no later than thirty (30) days after agreement to any settlement that does not allow for the payment to our Firm in full of

Mad 96_906

Mr. Stuart Boesky
Mr. Jamison Weiner
November 7, 2010
Page 4

the Total Deferred Fees and Additional Fees, plus any fees and disbursements unbilled at that time.

11. Madison 96th shall have no obligation for fees or disbursements except as set forth above. Specifically, if there is no recovery pursuant to paragraphs 6, 7 and 8 and there is no settlement, Madison 96th shall have no obligation to pay the Total Deferred Fees or the Additional fees or unbilled fees and disbursements as provided for above.

12. All of Madison 96th's obligations under this agreement shall be personally guaranteed by both of you, jointly and severally.

13. You acknowledge that inherent in the fee arrangement set forth above is the potential for a conflict of interest on our part because our fees are dependent upon the outcome of the litigation. You expressly waive any such conflict.

14. This agreement expressly modifies the existing agreement between us which, as modified, remains in effect.

Sincerely yours,

Charles B. Updike

Enclosures

Agreed to:                              Agreed to and personally guaranteed by:

Madison 96th Associates, LLC            _____

                                        Jamison Weiner

By:_____              _____

                                        Stuart Boesky

Mad 96_907

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------X

MADISON 96TH ASSOCIATES, LLC,

               Plaintiff,

    -against-

17 EAST OWNERS CORP.,

              Defendant.

-------------------------------------------------------------------------X

Index No.: 601386/03

AND RELATED ACTIONS

## AFFIRMATION OF RONIT D. APPEL

Ronit D. Appel, Esq.
697 West End Avenue
New York, New York 10025
(347) 387-6100

EXHIBIT G TO VERIFIED COMPLAINT OF
RONIT D. APPEL DATED FEBRUARY 20, 2014

# Important - Notice of Litigation Hold

Ronit D. Appel

**Sent:** Tuesday, April 16, 2013 4:06 PM

**To:** Mindy H. Stern; Beth L. Kaufman; Charles Updike; Andrea D Ascher

**Cc:** DOMAIN NY; Cindy Nygaard

**Importance:** High

**Attachments:** 2013-4-15 Letter to Mindy...[...].pdf 590 KB

Mindy, Beth, Charlie, and Andrea

I will not endanger my health by coming into the office. It is unsafe to have people working in an office where there is ongoing construction and renovation and where the air may include asbestos and/or lead and other dangerous substances. Each of the at least four times I came onto the twelfth floor and was exposed to the construction dust and fumes, I became ill; once, a few weeks ago, when I stepped out of the elevator on the twelfth floor because Cindy wanted me to select an office, I immediately began coughing heavily and became nauseous and returned upstairs. I thereafter told Cindy that I would pick an office without seeing the new offices because I did not want to expose myself to the toxic construction dust and fumes; once, right before the move when Cindy showed me my new office and I became nauseous, and on April 8th and April 15th, when I came into the office and became very nauseous and began coughing. Your requiring me to come into an unsafe work environment and not permitting me to work from home constitutes blatant harassment in the workplace.

Since the firm will not provide a laptop for my use out of the office, I am willing to purchase a new computer today so that Joe can download the VPN software on it so that I can use it as a work computer and connect remotely to the server from my home. Mindy's mention of short-term disability coverage is highly inappropriate. I am not disabled now and I do not wish to become disabled by coming into the office and exposing myself to toxic fumes and dust.

The firm and everyone who works for the firm are hereby on notice that they are required to place an immediate litigation hold on any and all e-mails, documents, pleadings, whether in draft or final form, and any other documents sent from or to me, worked on by me, that mention me, or that relate to me in any manner at all, beginning from January 1, 2008 through the present. All members and employees of the firm must be informed by the firm of the litigation hold by e-mail today.

Please let me know immediately today whether the firm will permit me to work from home and not count the days I worked from home and will work from home as vacation days or as unpaid days. If I do not receive confirmation from you today that the firm will allow me to work from home and treat the days I worked and will work from home as fully-paid work days, I will immediately commence a lawsuit against the firm and individuals at the firm. As an employee of the firm, I am entitled to be paid my full salary and expect that the firm will continue to pay me my full salary.

The firm and each of Mindy, Beth, Charlie and Andrea, and perhaps others as well, will be held fully liable for any illnesses I may have contracted or will contract by breathing in the polluted air in the office. The firm and each of Mindy, Beth, Charlie, and Andrea, and perhaps as well, will further be held fully liable for any damages, including but not limited to physical illnesses, loss of pay, loss of vacation days, and mental anguish that I have incurred or may incur in the future as a result of your actions.

For the benefit of those copied on this e-mail who did not receive my letter to Mindy yesterday, I am attaching a copy of the letter I sent to Mindy yesterday.

Ronit

**From:** Mindy H. Stern
**Sent:** Tuesday, April 16, 2013 2:01 PM
**To:** Ronit D. Appel
**Cc:** Beth L. Kaufman; Charles Updike; Cindy Nygaard
**Subject:** RE: Your Letter Dated April 15 re Working Remotely and April 15 Request for a Laptop

Ronit - the firm does not have a policy allowing employees to work from home for extended periods on days when the office is open. In addition, we do not provide laptops for employees to use outside the office. The firm does have short-term disability coverage, and Cindy has been asked to provide the application forms for that to you.

As to the allocation of the 8th and 9th and any other days this month you were absent from the office, I refer you to our office manual with respect to our policies regarding sick days and vacation days.

Mindy

SCHOEMAN
UPDIKE
KAUFMAN
STERN
ASCHER

Mindy H. Stern | Partner
Schoeman Updike Kaufman Stern & Ascher LLP
551 Fifth Avenue, New York, NY 10176
(646) 723-1040 direct | (212) 661-5030 main | (212) 687-2123 fax
mstern@schoeman.com | www.schoeman.com

The contents of this message may be privileged and confidential. If this message was received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this e-mail is not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Ronit D. Appel
**Sent:** Monday, April 15, 2013 3:44 PM
**To:** Mindy H. Stern
**Cc:** Beth L. Kaufman; Charles Updike; Cindy Nygaard
**Subject:** Letter regarding working remotely due to unsafe work environment

Dear Mindy,

https://mail.schoeman.com/owa/?ae=Item&t=IPM.Note&id=RgAAAACI

~~~~~ of Litigation Hold

Please see the attached letter.

Thank you.

Ronit

SCHOEMAN
UPDIKE
KAUFMAN
STERN
ASCHER...

Ronit D. Appel | Associate

Schoeman Updike Kaufman Stern & Ascher LLP

551 Fifth Avenue, New York, NY  10176

(646) 723-1053 direct | (212) 661-5030 main | (212) 687-2123 fax

rappel@schoeman.com | www.schoeman.com

The contents of this message may be privileged and confidential. If this message was received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this e-mail is not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

https://mail.schoeman.com/owa/?ae=Item&t=IPM.Note&id=RpAAAACLa6aPRO4FO...

Ronit D. Appel
Schoeman Updike Kaufman Stern & Ascher LLP
551 Fifth Avenue
New York, New York 10176
(212) 661-5030
rappel@schoeman.com

April 15, 2013

Mindy H. Stern
Schoeman Updike Kaufman Stern & Ascher LLP
551 Fifth Avenue
New York, New York 10176

Re:    Working Remotely Due to Unsafe Work Environment

Dear Mindy:

Last Monday, April 8, 2013, upon entering the office, I began coughing heavily and got very nauseous due to the fumes and construction dust in the office. I spoke with Cindy and told her that I would be working from home on April 8th and April 9th. I also attempted to send an e-mail to Beth, Charlie, Paulette, Cindy, Veronica, and Reception 39 to that effect but the firm e-mail was not working. I told Cindy that I would send an e-mail later in the day, which I did. On both of those days I worked from home. From Wednesday, April 10th through Friday, April 12th, I was out on vacation, as I notified the firm I would be on April 3, 2013. Upon returning from my vacation today, I began to cough and get nauseous again from the dust from the construction. I opened my window to air out the office but my hands became blue from the cold and I could not continue to stay in my office. I spoke with Cindy and both she and Pam commented on how blue my hands were and Pam commented that I looked completely flushed. I told Cindy that I would work from home, whereupon she told me that upon instructions from Beth and Charlie, the days I worked from home last week would be counted as vacation days. I told her that that was very unfair. She said that I should speak with you regarding this matter because Beth and Charlie are traveling. She further mentioned that the renovation work would not be complete until the end of the month. I went to your office, but you were on the phone. While I waited, Dolores asked me if I was okay and I said that I was not because of all of the dust in the office. After waiting for a bit, I told Cindy that I would go home and would contact you later.

The work environment at our firm is currently unsafe and causes me to be sick. It is unreasonable and highly inappropriate for the firm to deduct vacation days because I choose to work from home rather than subject myself to a hazardous work environment. I do not consider Monday, April 8th and Tuesday, April 9th and any other days I will be working from home to be vacation days and I expect them to be counted as paid working days. I request that this be corrected immediately.

Mindy H. Stern
April 15, 2013
Page 2

Thank you for your prompt attention to this matter.

Very truly yours,

Ronit D. Appel

cc:    Beth L. Kaufman
       Charles B. Updike
       Cindy Nygaard

Ronit D. Appel
697 West End Avenue
New York, New York  10025
(347) 387-6100
RonitAppel@gmail.com

April 18, 2013

**BY E-MAIL (jfeil@feilorg.com)**
**AND REGULAR MAIL**

Mr. Jeffrey Feil
French Partners, LLC
c/o Jeffrey Mgmt.
370 7<sup>th</sup> Avenue
New York, New York  10001

**Re:    Unsafe Construction and Renovation Work at 551 Fifth Avenue**

Dear Mr. Feil:

I am writing to put you on notice that the construction and renovation work being performed on the twelfth floor of 551 Fifth Avenue poses a serious health risk to the employees of Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman"), whose office is located on the twelfth floor of 551 Fifth Avenue.  I am employed as an attorney at Schoeman and work on the twelfth floor of 551 Fifth Avenue.

As you may be aware, on the weekend of April 5<sup>th</sup>, Schoeman moved from its temporary location on the fourteenth floor of 551 Fifth Avenue to the twelfth floor of 551 Fifth Avenue, despite the fact that the construction and renovation work on the twelfth floor, which has been ongoing for months, is not yet complete.

Each of the at least four times I came onto the twelfth floor and was exposed to the toxic construction dust and fumes, I became ill.  I have not returned to my office due to the toxic construction dust and fumes on the twelfth floor and am presently working from home.

It is a serious hazard to the health of employees to expose us to construction dust and fumes that may contain lead, asbestos, carcinogens, or other harmful substances.  I will hold the ownership of 551 Fifth Avenue fully liable for any past, present, and future damages, including, but not limited to, physical illnesses, loss of pay, loss of employment, and mental anguish, that I have sustained or may sustain in the future as a result of my

Mr. Jeffrey Feil
April 18, 2013
Page 2

exposure to any asbestos, lead, dust, fumes, and any toxic, carcinogenic, or other unhealthy substances that I have been exposed to on the twelfth floor of 551 Fifth Avenue.

Very truly yours,

Ronit D. Appel

cc:   Mr. John Francis Borrelli, Architect (by e-mail and regular mail)
      Mindy H. Stern, Managing Partner of Schoeman Updike Kaufman Stern & Ascher
         LLP (by e-mail and regular mail)

Ronit D. Appel
697 West End Avenue
New York, New York  10025
(347) 387-6100
RonitAppel@gmail.com

April 18, 2013

BY E-MAIL (JFBARCHITECT@AOL.COM)
AND REGULAR MAIL

Mr. John Francis Borrelli
John Francis Borrelli Architect
9 East 38th Street
New York, New York  10016

Re:    Unsafe Construction and Renovation Work at 551 Fifth Avenue

Dear Mr. Borrelli:

I am writing to put you on notice that the construction and renovation work being performed on the twelfth floor of 551 Fifth Avenue poses a serious health risk to the employees of Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman"), whose office is located on the twelfth floor of 551 Fifth Avenue.  I am employed as an attorney at Schoeman and work on the twelfth floor of 551 Fifth Avenue.

As you may be aware, on the weekend of April 5th, Schoeman moved from its temporary location on the fourteenth floor of 551 Fifth Avenue to the twelfth floor of 551 Fifth Avenue, despite the fact that the construction and renovation work on the twelfth floor, which has been ongoing for months, is not yet complete.

Each of the at least four times I came onto the twelfth floor and was exposed to the toxic construction dust and fumes, I became ill.  I have not returned to my office due to the toxic construction dust and fumes on the twelfth floor and am presently working from home.

It is a serious hazard to the health of employees to expose us to construction dust and fumes that may contain lead, asbestos, carcinogens, or other harmful substances.  I will hold you and your company fully liable for any past, present, and future damages, including, but not limited to, physical illnesses, loss of pay, loss of employment, and mental anguish, that I have sustained or may sustain in the future as a result of my exposure to any

Mr. John Francis Borrelli
April 18, 2013
Page 2

asbestos, lead, dust, fumes, and any toxic, carcinogenic, or other unhealthy substances that I
have been exposed to on the twelfth floor of 551 Fifth Avenue.

Very truly yours,

Ronit D. Appel

cc:    Mr. Jeffrey Feil, Ownership (by e-mail and regular mail)
       Mindy H. Stern, Managing Partner of Schoeman Updike Kaufman Stern & Ascher
          LLP (by e-mail and regular mail)

Case 1:14-cv-02065-AJN   Document 2-4   Filed 03/25/14   Page 136 of 137

# EXHIBIT H TO VERIFIED COMPLAINT OF
# RONIT D. APPEL DATED FEBRUARY 20, 2014

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:   Ronit Appel
      697 West End Avenue
      New York, NY 10025

From:   New York District Office
        33 Whitehall Street
        5th Floor
        New York, NY 10004

[ ] On behalf of person(s) aggrieved whose identity is
    *CONFIDENTIAL (29 CFR §1601 7(a))*

| EEOC Charge No | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2014-00066 | Maritza  Rondon-Velazquez, Investigator | (212) 336-3678 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[ ]   More than 180 days have passed since the filing of this charge.

[X]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Kevin J. Berry,
District Director

12/9/13
*(Date Mailed)*

cc:   Director of Human Resources
      SCHOEMAN UPDIKE KAUFMAN STERN & ASCHER LLP
      551 Fifth Avenue
      New York, NY 10176