UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 6 2015

---

Ronit D. Appel,

                Plaintiff,

       —v—

Schoeman Updike Kaufman Stern & Ascher
L.L.P., *et al.*,

              Defendants.

14-cv-2065 (AJN)

MEMORANDUM AND
ORDER

---

ALISON J. NATHAN, District Judge:

On March 25, 2014, this action was removed to this Court from New York State Supreme

Court, New York County. Dkt. No. 2. On June 8, 2014, Plaintiff Ronit D. Appel filed an

Amended Complaint, which spans 1,271 pages (excluding exhibits), names 30 Defendants, and

alleges 224 Causes of Action (i.e., claims), across 2,467 paragraphs. Dkt. Nos. 106, 188.

Although Plaintiff is appearing *pro se*, as an attorney, she is held to the higher standards that are

expected of all attorneys appearing before this Court. *Corrado v. N.Y. State Unified Court Sys.*,

No. 12-CV-1748 (DLI)(MDG), 2014 U.S. Dist. LEXIS 97818, at *6-7 (E.D.N.Y. July 17, 2014).

Pending before the Court are ten motions to dismiss filed by ten different groups of

Defendants: (1) Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman"), Mindy H.

Stern, Beth L. Kaufman, Charles B. Updike, Andrea D. Ascher,[1] Susan S. Casero, Cindy

Nygaard, and Veronica Law (the "Schoeman Defendants"); (2) Nancy J. Mertzel; (3) Avant-

Garde Group, Inc. ("AGG") and Sergei Goloubenko (collectively, the "AGG Defendants"); (4)

Reed Smith LLP and Paul E. Breene (the "Reed Smith Defendants"); (5) Interior Construction

Corp. ("ICC") and Joseph Bruzzese (collectively, the "ICC Defendants"); (6) French Partners,

LLC, the Feil Organization, Inc., Jeffrey Management Corp., and Jeffrey Feil (the "Feil

Defendants"); (7) Creative Environment Solutions Corp., Michael J. Rattacasa, and Ivane

---

[1] Stern, Kaufman, Updike, and Ascher are referred to herein as the "Schoeman Partners."

Chikhladze (the "Creative Defendants"); (8) H&B Construction Services, Inc. ("H&B"); (9)

Madison 96 Associates, LLC ("Madison 96"), Stuart J. Boesky, and Jamison Weiner

(collectively, the "Madison 96 Defendants"); and (10) Laurie Zeligson and the Zeligson Firm

(the "Zeligson Defendants").   An eleventh group of Defendants—John Francis Borrelli

Architect, P.C. and John Francis Borrelli (the "Borrelli Defendants")—moved for summary

judgment.  The AGG Defendants also moved separately for sanctions under Federal Rule of

Civil Procedure 11, 18 U.S.C. § 1927, and this Court's inherent powers.  For the reasons stated

herein, the Defendants' motions are GRANTED in their entirety.[2]

## I.      BACKGROUND

Understanding the context for Plaintiff's 224 claims requires an extensive discussion of

the allegations in Plaintiff's Amended Complaint, which are presumed to be true for purposes of

the motions to dismiss.

### A.      Plaintiff's Employment History with Schoeman

Plaintiff was employed as an attorney at Schoeman from September 8, 2009 through

April 24, 2013, when she was terminated.  Am. Compl. ¶ 34.  She graduated from the Radzyner

School of Law at the Interdisciplinary Center Herzliya in Israel in the top 12% of her class and

then commenced an articled clerkship[3] at the Israeli firm of Meitar Liquornik Geva & Leshem

Brandwein ("Meitar").  Am. Compl. ¶¶ 47-48, 52.  After completing her articled clerkship,

Plaintiff commenced her employment at Schoeman, which, at the time, was located at 60 East

42nd Street, New York, New York.  Am. Compl. ¶ 54.

In September 2009, Marvin Artis, then a partner at Schoeman, sent an email to all

attorneys at Schoeman asking whether, "[i]n the last 5 years, has any individual in the firm or the

firm been involved in any criminal, civil or disciplinary proceeding, including bankruptcy."  Am.

Compl. ¶ 124.  Plaintiff responded that she had been involved in a civil proceeding in Israel in

November 2005.  Am. Compl. ¶ 125.  Artis then asked Plaintiff to tell him the general nature of

---

[2] Due to the large number of filings in this case, the Court refers to the parties' briefs by their ECF docket numbers.

[3] Plaintiff's Amended Complaint explains that an articled clerkship in Israel is the equivalent of a first-year associate in the United States.  Am. Compl. ¶ 53.

the proceeding, and, after Plaintiff asked him the purpose of the question, he indicated that it was for the firm's annual insurance questionnaire. Am. Compl. ¶¶ 126-130.  Plaintiff declined to provide him with details regarding the matter. Am. Compl. ¶ 130.

Also in 2009, Plaintiff co-authored an article with Kaufman that was intended for an outside publication. Am. Compl. ¶ 134.  In 2010, before the article was published, a senior attorney at the firm, Deirdre J. Sheridan, who was preparing a continuing legal education ("CLE") presentation, asked Plaintiff to send her a copy of the article. Am. Compl. ¶ 134. Plaintiff allegedly informed Sheridan that it had not been published and should not be annexed to her CLE materials. Am. Compl. ¶ 134.  But, according to Plaintiff, "Sheridan sent Ms. Kaufman a copy of her written CLE materials, which would be distributed at the CLE program and into which she incorporated a large portion of plaintiff's article without plaintiff's permission and without referencing plaintiff's name." Am. Compl. ¶ 134.  Plaintiff then sent Sheridan an email informing her that she had no permission to use the article without Plaintiff's consent. Am. Compl. ¶ 134.  Plaintiff alleges that the next day, "Sheridan stormed into plaintiff's office and began screaming at plaintiff," and, during that encounter, Plaintiff again accused Sheridan of plagiarizing her article and stated that she did not understand why Sheridan was asking Plaintiff to assist in her plagiarism. Am. Compl. ¶ 134.

In 2012, Plaintiff was working together with Schoeman's co-counsel, Reed Smith, on a summary judgment motion in an action involving the firms' shared client, Madison 96, against its insurance carrier. Am. Compl. ¶ 137.  Plaintiff allegedly identified a factually incorrect material statement that she brought to the attention of Jean M. Farrell, a Reed Smith attorney, after which Farrell became "antagonistic." Am. Compl. ¶ 137.  Before the summary judgment papers were filed, Plaintiff emailed the Reed Smith attorneys and demanded to see a final version of the papers, but Breene, the Reed Smith partner handling the case, refused, indicating that "we really do not have time for another go round." Am. Compl. ¶ 137.  On emails copying Updike, the Schoeman partner on the matter, Plaintiff persisted in demanding to see the final papers. Am. Compl. ¶¶ 137-143.  In the course of this exchange, Breene emailed Plaintiff to state "do

not send me e-mails. Ever." Am. Compl. ¶ 138. He also stated "[y]ou have seen them, commented on them, and made extra work for us enough. We have your comments. If this must go further, Charles should call me and we should speak to [the client] – together. You are wasting my time." Am. Compl. ¶ 142. "Ultimately," Plaintiff alleges, "the attorneys at Reed Smith gave in and sent plaintiff the final papers, which plaintiff reviewed to confirm that they did not contain the factual misrepresentation that plaintiff feared would be in the papers that Reed Smith planned to file." Am. Compl. ¶ 144.

In April 2012, Casero, who is of counsel at Schoeman, allegedly had a conversation with Plaintiff about Plaintiff being an Orthodox Jew and not working on the Sabbath or Jewish holidays. Am. Compl. ¶ 149. But shortly thereafter, on April 19, 2012, Casero asked Plaintiff if she could work on a Saturday. Am. Compl. ¶ 149. Plaintiff responded with an email to Casero stating "that in addition to [her] improper communications with plaintiff on April 20, 2012, which caused plaintiff to ask [her] to leave plaintiff's office on April 20, 2012, her asking plaintiff to work on Saturday on April 19, 2012 was inappropriate." Am. Compl. ¶ 149. The firm subsequently hired Zeligson, an outside employment lawyer, to conduct an investigation into Plaintiff's accusations of religious discrimination. Am. Compl. ¶ 150. Plaintiff informed Kaufman that she "did not consent to be interviewed by the attorney and would not consent to any discovery of the matter at that time and that if there needs to be discovery, it would be done under the supervision of a court of law." Am. Compl. ¶ 150. Zeligson interviewed Casero and others at the firm as part of her investigation and prepared a report that concluded no discrimination had occurred. Am. Compl. Ex. K.

In December 2012, Plaintiff was asked to assist with a matter involving the transfer of real estate in Israel. Am. Compl. ¶ 169. For tax purposes, the transaction had to be completed before year's end, but Plaintiff became convinced that it could not be completed by then and so she refused to work on the matter. Am. Compl. ¶ 169. Stern later informed Plaintiff that the transaction had in fact been completed in 2012. Am. Compl. ¶ 169.

In March 2013, after Madison 96 won its summary judgment motion against its insurance carrier, Updike prepared a claim for Madison 96 against the carrier for payment of Madison 96's legal fees. Am. Compl. ¶ 156. Plaintiff believed that the demand was in excess of what was warranted in light of the fact that Madison 96's engagement letter with Reed Smith capped fees that Reed Smith could recover from Madison 96 at $200,000. Am. Compl. ¶ 156. When Plaintiff informed Updike of her view, he told her to find a case with similar circumstances in which the court held that to make such a demand would be fraudulent. Am. Compl. ¶ 158. "Plaintiff told him that what he wanted to do was so blatantly and obviously fraudulent that no specific court case was needed to prove that it was fraudulent." Am. Compl. ¶ 158. After Plaintiff was terminated, she learned that Schoeman had allegedly made what she believed was a fraudulent demand for fees. Plaintiff subsequently submitted an affidavit to that effect to Justice Kornreich, the judge presiding over the Madison 96 proceedings in New York State Supreme Court, New York County. Am. Compl. ¶ 162.

## B.      Schoeman's Move to Its New Office Space

Much of Plaintiff's Second Amended Complaint, however, focuses on events surrounding Schoeman's move to its new office in 2013. In the fall of 2012, Schoeman entered into a new lease for office space on the twelfth floor of 551 Fifth Avenue, New York, New York, which was to undergo extensive renovation work before Schoeman could move in to the space. Am. Compl. ¶ 54. The space was not finished at the time that Schoeman's lease at 42nd Street ended, so the firm moved into a temporary space on the fourteenth floor of 551 Fifth Avenue. Am. Compl. ¶ 54. Schoeman contracted with Interior Construction Corp. for the renovation work, which Plaintiff alleges also included work on the "antique" entrance to the Schoeman suite ("Suite 1210"). Am. Compl. ¶ 55.

Prior to commencing the renovation work, AGG was retained by French Partners, LLC, Jeffrey Management Corp., and/or Schoeman in July 2012 to file an asbestos assessment report with the New York City Department of Environmental Protection. Am. Compl. ¶ 57. Plaintiff

alleges that the report "incorrectly" represented that no asbestos would be disturbed during construction. Am. Compl. ¶¶ 57-58.

Plaintiff further alleges that French Partners, The Feil Organization, Jeffrey Management Corp., Schoeman, and ICC, through the Borrelli Defendants, filed an inaccurate application with the New York City Department of Buildings indicating a false dollar value of the renovations and stating that asbestos abatement was not required under New York City Department of Environmental Protection regulations. Am. Compl. ¶ 61.

Although renovation work on the twelfth floor was not complete, over the weekend of April 5, 2013, Schoeman moved from its temporary location on the fourteenth floor to its permanent location on the twelfth floor of 551 Fifth Avenue. Am. Compl. ¶ 62. Before the move, Plaintiff alleges that on each of the two times that she entered the twelfth floor, she was afflicted with fits of coughing and nausea, which she attributed to the "toxic" air quality on the floor. Am. Compl. ¶ 63. Plaintiff alleges that Nygaard, Schoeman's Office Manager, and Ascher, a partner at the firm, pressured her to go to the twelfth floor to select her new office and assured her that it was safe to visit the floor. Am. Compl. ¶ 63. Upon arriving at work on Monday, April 8, 2013, Plaintiff alleges that she again became nauseated and began to cough as a result of her exposure to the construction fumes and dust. Am. Compl. ¶ 64.

On April 15, 2013, Plaintiff contacted the Occupational Safety and Health Administration ("OSHA") to report an unsafe work environment. Am. Compl. ¶ 70. Plaintiff alleges that during this time she attempted to work from home, but lost vacation days as a result and had difficulty accessing the firm's remote-desktop service from her own personal computer. Am. Compl. ¶¶ 69, 71. She complained to Kaufman, Updike, and Nygaard, apparently seeking the ability to work from home and to use a firm-issued laptop to do so; both requests were denied. Am. Compl. ¶ 73-75. On April 16, 2013, Plaintiff received an email from Stern informing her that the firm does not have a policy allowing employees to work from home for extended periods of time and does not provide laptops for use outside the office. Am. Compl. ¶ 75. In that same email, Stern informed Plaintiff that the firm has short-term disability coverage and directed Plaintiff to

refer to the office manual regarding allocation of days absent from the office. Am. Compl. ¶ 75. In an email that copied the entire firm, Plaintiff responded by putting the firm on notice that she was prepared to commence a lawsuit against them and that they should treat her email as notice of a litigation hold on any and all documents that she worked on, that mention her, or relate to her. Am. Compl. ¶ 77. Stern then responded on April 17, 2013 with a firm-wide email indicating that the firm had no reason to believe that there were any safety or health concerns with the ongoing renovation work on the twelfth floor, but that the firm had received an inquiry from OSHA regarding an anonymous complaint and that the firm would post the inquiry notice in the lunch room. Am. Compl. ¶ 79. Stern followed up with an additional email indicating that the firm's landlord had hired a consultant to test the air quality in the office and elevator lobby. Am. Compl. ¶ 81. The consultant was Creative Environment Solutions Corp. Am. Compl. ¶ 91. Updike sent Plaintiff an additional email asking her to refrain from emailing the entire firm regarding these issues and to instead direct her communications to him. Am. Compl. ¶ 82. Updike further noted that the firm would be willing to accommodate her health issues if she could provide a doctor's note documenting the condition and the accommodation she sought. Am. Compl. ¶ 82. Plaintiff then submitted a discrimination complaint to OSHA on April 17, 2013. Am. Compl. ¶ 85.

Plaintiff alleges that Ivane Chikhladze, a New York State Department of Labor Licensed Asbestos Project Monitor employed by Creative Environment Solutions Corp., took five air samples at Schoeman. Am. Compl. ¶ 92. But, according to Plaintiff, Chikhladze did not take an air sample from the "antique" entrance area even though Stern's e-mail indicated that air samples would be taken from the elevator lobby, and he did not test for any hazardous substance other than asbestos. Am. Compl. ¶ 95.

### C.    Plaintiff's Termination

On April 22, 2013, Stern sent an email to the firm's staff letting them know that the renovation work had been completed with the exception of a few items, such as the installation of certain light fixtures. Am. Compl. ¶ 105. Plaintiff then sent an email to Stern asking Stern to

7

inform her when renovation work would be completed in the conference room next to her office, when the carpet installation would be completed, and what "punch list" items remained. Am. Compl. ¶ 106. Stern responded on April 23, 2013 with an email indicating that the renovation work had been finished with the exception of some lighting fixtures, punch list items (for which a list had not yet been prepared), and decorations. Am. Compl. ¶ 107. Stern further indicated that the air quality findings were satisfactory and that Plaintiff was expected to come to the office the following day. Am. Compl. ¶ 107. Plaintiff alleges that when she arrived the next day, she immediately began coughing heavily, became very nauseated from the residual construction dust, and was advised by her father, a physician, to leave. Am. Compl. ¶ 108. Plaintiff alleges that she then learned that the firm still had possession of the fourteenth floor[4] for a few more days, so she asked Stern if she could work there, to which Stern replied that she and Updike would like to speak to Plaintiff at 4:00 p.m. that day. Am. Compl. ¶¶ 109-110. Plaintiff refused to attend the meeting and instead insisted on discussing the matter with them via email. Am. Compl. ¶ 111. That same day, Plaintiff received a letter from OSHA indicating that the work safety case that was opened on April 15, 2013 could be closed on the grounds that the hazardous conditions at Schoeman had been corrected or no longer existed. Am. Compl. ¶ 113. Later that day, Plaintiff received a Letter of Termination from Stern. Am. Compl. ¶ 114.

Plaintiff alleges that in its Letter of Termination, Schoeman presented a distorted and non-factual description of the events that occurred at Schoeman involving Plaintiff dating back to 2009. Am. Compl. ¶ 116. The Letter of Termination noted that "[a]fter consideration over a period of time, we have come to the conclusion that we do not have confidence in your judgment or your ability to work effectively with your colleagues." Am. Compl. ¶ 117. The Letter also stated that, "[a]lthough you are an employee at will under New York law, and may therefore be terminated at any time for any reason or no reason, we believe it is both fair to you and otherwise useful to spell out the considerations that led to our decision and have done so below." Am.

---

[4] Plaintiff alleges that the firm still had possession of the sixteenth floor, but earlier alleges that the firm's temporary office space was on the fourteenth floor. *Compare* Am. Compl. ¶ 54 *with* Am. Compl. ¶ 109.

Compl. ¶ 117. The Letter then listed a number of incidents that led to its decision, including: (1) Plaintiff's refusal to answer the insurance questionnaire; (2) Plaintiff's refusal to share material prepared at the firm's request and on the firm's time with Sheridan and Plaintiff's accusations of plagiarism; (3) Plaintiff's heated exchange with colleagues at Reed Smith; (4) Plaintiff's reaction to Casero's asking whether she could work on a Saturday and her refusal to participate in the investigation that the firm felt obligated to conduct because of Plaintiff's complaint of religious discrimination; (5) Plaintiff's adamant refusal to cooperate in making a demand for legal fees in the Madison 96 proceeding and unresponsiveness to the suggestion that Plaintiff research the issue; (6) Plaintiff's persistence in raising "specious" questions about the Israeli real estate transaction and Plaintiff's refusal to continue working on the matter; (7) Plaintiff's communications regarding the office relocation, including her "belligerent and adversarial communications with [the firm's] architect and landlord"; (8) and Plaintiff's refusal to come to work despite the air quality testing showing there was no problem with the air in the firm's offices. Am. Compl. ¶ 117. Plaintiff's Amended Complaint contends that this Letter of Termination defamed her, and she provides a point-by-point discussion of her view of all the statements contained in the Letter. Am. Compl. ¶¶ 120-180.

Plaintiff also alleges that throughout her employment at Schoeman, she was subjected to religious discrimination. Am. Compl. ¶¶ 187-234. For example, in addition to the incident with Casero described above, Plaintiff alleges that the firm routinely failed to have kosher food at firm events. Am. Compl. ¶¶ 192-198.

Plaintiff also alleges that she was subjected to age discrimination at Schoeman based on her young age as an associate at the firm because she believes that she was treated less favorably than attorneys with comparable levels of seniority, but who were older than she. Am. Compl. ¶¶ 235-261. For instance, Plaintiff complains that on numerous occasions, members of the firm would limit her interaction with clients and others outside of Schoeman because she was a "young attorney." Am. Compl. ¶ 244. She further complains that her secretary, Law, would

often ignore her requests because of her age, Am. Compl. ¶ 250, and that the firm did not post a photo of her on its website because of her age, Am. Compl. ¶ 252.

## II.   LEGAL STANDARD FOR THE MOTIONS TO DISMISS

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party. *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Factual allegations are therefore afforded a presumption of truth, but a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

"In its review, the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Grant v. Cnty. of Erie*, 542 F. App'x 21, 23 (2d Cir. 2013) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

## III.   THE SCHOEMAN DEFENDANTS

At base, this lawsuit is an employment dispute between Plaintiff and the Schoeman partnership. Inexplicably, Plaintiff, a member of the bar, has also dragged in every additional

individual or company that is tangentially related to the several incidents that Schoeman lists in its Letter of Termination as its basis for terminating Plaintiff, an at-will employee: from her former client, to her former secretary, to the asbestos investigation company that performed the preliminary asbestos assessment report on Schoeman's new office space, and many others in between. As compensation, Plaintiff seeks no less than $1 billion per claim—often more—for a total sum that appears to exceed $224 billion. The bulk of Plaintiff's claims are asserted against the various Schoeman Defendants, so the Court addresses their motion to dismiss first, but much of the analysis contained therein applies with equal force to the other Defendants, as discussed below. As will become clear in the discussion that follows, Plaintiff's claims range from the meritless to the frivolous.

### A.    Defamation

Plaintiff's 1st through 12th Claims are all forms of defamation[5] allegedly committed by Schoeman and the Schoeman Partners; her 13th Claim is for defamation, libel, and slander based on the report that Zeligson prepared.

"'Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name.'" *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 839 (N.Y. App. Div.), *aff'd* 444 N.E.2d 1002 (1982)). And, "[g]enerally, spoken defamatory words are slander; written defamatory words are libel." *Id.* (citing *Matherson v. Marhello*, 473 N.Y.S.2d 998, 1003 (App. Div. 1984)). Under New York law, "'[t]he elements [of defamation] are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se.'" *Frechtman v. Gutterman*, 979 N.Y.S.2d 58, 61 (App. Div. 2014) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1998)). A defamatory statement is "one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion,

---

[5] Specifically, Plaintiff asserts claims for libel, libel by implication, libel per se, libel per se by implication, defamation, defamation by implication, defamation per se, defamation per se by implication, slander, slander by implication, slander per se, and slander per se by implication.

ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Kimmerle v. N.Y. Evening Journal*, 186 N.E. 217, 218 (N.Y. 1933)). And, "[f]or the purposes of determin[ing] whether a statement can be defamatory, there is no determinative difference between the various types of defamation alleged." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC)*, No. 10 Civ. 5405 (GBD), 2011 U.S. Dist. LEXIS 76076, at *6 n.1 (S.D.N.Y. July 8, 2011) ("*WPHMC*") (citing *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 375 (S.D.N.Y. 2006)).

The Court must first "decide as a matter of law whether the challenged statement is opinion." *Celle*, 209 F.3d at 178 (2d Cir. 2000) (citing *Rinaldi v. Holt, Rinehart & Winston*, 366 N.E.2d 1299, 1306 (N.Y. 1977)). To determine whether a challenged statement is fact or opinion, courts consider:

> (1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read is likely to be opinion, not fact.

*WPHMC*, 2011 U.S. Dist. LEXIS 76076, at *7 (quoting *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993)). Statements of "pure opinion" are not actionable as a matter of law. *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be 'pure opinion' if it does not imply that it is based upon undisclosed fact." *Id.* Whether a statement is fact or opinion is a question of law for the court to decide and "must be answered on the basis of what the average person hearing or reading the communication would take it to mean." *Id.* at 553.

### 1.   Statements in the Letter of Termination

The Letter of Termination does not contain any actionable statements. Rather, it merely provides Schoeman's opinion that "[a]fter consideration over a period of time, we have come to

the conclusion that we do not have confidence in your judgment or your ability to work
effectively with your colleagues." Am. Compl. ¶ 177; Ex. J.  The Letter then provides a number
of incidents that led the firm to arrive at this opinion of Plaintiff.  Am. Compl. ¶ 177; Ex. J.
Plaintiff contends that the incidents underlying Schoeman's opinion are actionable defamation,
and she systematically marches through her version of the facts of each incident to argue that the
description of the incident as contained in the Letter is false.  But

> courts must consider the content of the communication as a whole, as well as its
> tone and apparent purpose.  Rather than sifting through a communication for the
> purpose of isolating and identifying assertions of fact, the court should look to the
> over-all context in which the assertions were made and determine on that basis
> "whether the reasonable reader would have believed that the challenged
> statements were conveying facts about the libel plaintiff."

*Brian v. Richardson*, 660 N.E.2d 1126, 1129-1130 (N.Y. 1995) (quoting *Immuno AG v. Moor-*
*Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991)).  Considering the Letter of Termination as a
whole, it is clear that the firm was conveying its opinion of Plaintiff's job performance based on
its view of how she had poorly handled a number of situations in the past.  Plaintiff may disagree
with her employer's view of these situations, but that is not enough to state a claim for
defamation.  *Parks v. Steinbrenner*, 520 N.Y.S.2d 374, 378 (App. Div. 1987).  In context, and
taken as a whole, it is clear that a reasonable reader would have understood the statements as
conveying the firm's opinion about Plaintiff.

Moreover, this conclusion is supported by the fact that "[u]nder New York law, the
evaluation of an employee's performance, even an unsatisfactory evaluation, is a matter of
opinion that cannot be objectively categorized as true or false and cannot be actionable."  *Brattis*
*v. Rainbow Advertising Holdings, L.L.C.*, No. 99 Civ. 10144 (NRB), 2000 U.S. Dist. LEXIS
7345, at *10-11 (S.D.N.Y. May 31, 2000) (citing *McDowell v. Dart*, 607 N.Y.S.2d 755 (App.
Div. 1994) (noting that "statements made by an employer regarding an employee's work
performance are opinion and are thus not actionable")); *see also Reilly v. NatWest Mkts. Grp.*
*Inc.*, 181 F.3d 253, 271 (2d Cir. 1999) (finding superior's statement that employee's performance
was unsatisfactory non-actionable opinion); *Williams v. Varig Brazilian Airlines*, 564 N.Y.S.2d

328, 331 (App. Div. 1991) (finding statements concerning employee's work and attitude non-actionable opinion); *Ott v. Automatic Connector*, 598 N.Y.S.2d 10, 11 (App. Div. 1993) (noting that "the unfavorable assessment of [plaintiff's] work performance in the letter amounted to a nonactionable expression of opinion"). In *WPHMC*, for example, an employer's termination letter stated the employee-plaintiff "demonstrate[d] a lack of nursing knowledge and clinical judgment identified by the following: Unable to identify rhythms on the cardiac monitor; . . .; Unfamiliar with proper IV abbreviations;" etc. 2011 U.S. Dist. LEXIS 76076, at *3. Judge Daniels noted that "[t]hough some of the statements . . . are objective statements that could be proven true or false, courts are to avoid 'hypertechnical parsing' of written and spoken words for the purpose of identifying 'possible facts' that might form the basis of a sustainable libel action.'" *Id.* at *8-9 (quoting *Dworin v. Deutsch*, 06 Civ. 13265 (PKC), 2008 U.S. Dist. LEXIS 13655, at *12 (S.D.N.Y. Feb. 22, 2008)).

Plaintiff also takes issue with the Letter of Termination's statement that "[o]ur response to any inquiries about your employment with us will be limited to confirming the dates of your employment and your position." Am. Compl. ¶ 177; Ex. J. Plaintiff indicates that the firm's refusal to say anything good about her is, in the legal world, the equivalent of saying she was a poor employee and therefore constitutes defamation by implication. Although Plaintiff draws a distinction between the affirmative statements contained in the Letter of Termination and the implicit statement in the firm's neutral reference policy, this implicit statement is also a non-actionable assessment of her job performance. Plaintiff's theory would have required Schoeman to give her a positive recommendation merely to avoid the possibility of a defamation suit. The law does not require employers to provide positive references merely to avoid exposing themselves to tort liability. *Cf. Ott*, 598 N.Y.S.2d at 11 ("An employer has the right to assess an employee's performance on the job without judicial interference.").

Although the Court finds substantial merit to the Schoeman Defendants' remaining arguments relating to Plaintiff's 1st through 12th Claims, the Court need not address these

arguments because it concludes that the statements contained in the Letter of Termination are non-actionable opinion. Therefore, Plaintiff fails to state a claim on her 1st through 12th Claims.

## 2. Statements in Zeligson's Report

With respect to Plaintiff's 13th Claim for defamation, libel, and slander relating to Zeligson's report, Am. Compl. Ex. K, the Court first notes that any Claim based on the statements contained in the report is time barred because the report is dated June 26, 2012. *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003) (noting that the statute of limitations for libel in New York is one year (citing N.Y. C.P.L.R. § 215(3))). Any allegedly defamatory statements made by any Defendant and contained in Zeligson's report would have been made prior to that date, which was more than one year before Plaintiff's February 2014 commencement of this lawsuit. Regardless, the numerous statements contained in the Report to which Plaintiff objects are all statements of opinion. *See* Am. Compl. ¶¶ 204-228. Therefore, Plaintiff fails to state a claim against the Schoeman Defendants on her 13th Claim.

## B. Tortious Interference Claims

Plaintiff's 14th through 91st Claims allege tortious interference with contractual and business relations and tortious interference with prospective contracts against Schoeman and the Schoeman Partners. Her 106th Claim alleges tortious interference with business relations against Casero.

"To state a contract-interference claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 124-25 (2d Cir. 2008) (citing *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (1996)).

Plaintiff's 14th Claim is asserted against Schoeman and the Schoeman Partners for their alleged tortious interference with her contractual relations with Schoeman itself, which cannot lie as a matter of law because Schoeman and the Schoeman Partners are the same entity and cannot

interfere with their own contractual relations. *Maumud v. Kaufman*, 607 F. Supp. 2d 541, 561

(S.D.N.Y. 2009) ("'[A] plaintiff cannot maintain a tortious interference [claim] against her

employer . . . . An employer cannot be liable for interfering with its own relationship with its

employee.'" (quoting *Malec v. Metro Life Ins. Co.*, No. 03-CV-969A, 2007 U.S. Dist. LEXIS

23777 (W.D.N.Y. Mar. 30, 2007))). Similarly, "a tortious interference claim may not lie against

agents of the employer absent a showing that they acted outside the scope of their authority," *id.*,

and Plaintiff does not allege that the Schoeman Partners acted outside the scope of their authority

when they fired Plaintiff, an at-will employee, from their law firm. Likewise, Plaintiff fails to

allege that Casero acted outside the scope of her authority when she spoke to Zeligson about

Plaintiff as part of Zeligson's investigation, which was requested by Casero's employer.

To state a claim for tortious interference with *prospective* business relations, "four

conditions must be met: (1) the plaintiff had business relations with a third party; (2) the

defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose

or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the

relationship." *Catskill*, 547 F.3d at 132 (citing *Lombard v. Booz-Allen & Hamilton, Inc.*, 280

F.3d 209, 214 (2d Cir. 2002); *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir.

1997)). "Plaintiff must also show that she 'would have entered into an economic relationship but

for the defendant's wrongful conduct.'" *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d

334, 349 (S.D.N.Y. Oct. 27, 2009) (citing *Knight-McConnell v. Cummins*, No. 03 Civ.

5035(NRB), 2004 U.S. Dist. LEXIS 14746, at *13 (S.D.N.Y. July 29, 2004)). In addition, "the

wrongful conduct that is relevant [is] that which was directed not at the plaintiff, but at the third

party with whom plaintiff has or seeks to have a relationship." *Id.* (citing *Carvel Corp. v.

Noonan*, 818 N.E.2d 1100, 1104-05 (N.Y. 2004)); *see also Plasticware, LLC v. Flint Hills Res.,

LP*, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (collecting cases).

To begin with, and putting Plaintiff's conclusory allegations aside, Plaintiff does not

allege that the Schoeman Defendants did anything other than write the Letter of Termination to

Plaintiff. She does not allege that they directed any conduct toward third-party prospective

16

employers, nor does she allege in anything other than conclusory terms that they acted for a wrongful purpose or used dishonest, unfair, or improper means. She notes, for example, that during her interview with Meitar, apparently the only employer with which she secured an interview, she was asked "if Schoeman would say good things about her if Meitar [contacted] Schoeman," but "[b]ecause of what Schoeman wrote in its letter of termination, plaintiff was forced to inform [Meitar] that Schoeman would not say good things about her if contacted by Meitar." Am. Compl. ¶ 965. Moreover, Plaintiff does not allege any non-conclusory facts to support an allegation that, but for the Schoeman Defendants' actions, she would have secured employment with all 78 employers that she applied to following her termination from Schoeman. Again, under Plaintiff's theory, all employers would be required to give positive recommendations to former employees to avoid liability for this tort. Because the law imposes no such requirement, Plaintiff fails to state a claim on her 15th through 91st and 106th Claims.

## C.    New York Judiciary Law § 487

Plaintiff's 92nd through 94th Claims allege that Schoeman, Reed Smith, Updike, Breene, and Mertzel violated Section 487 of the New York Judiciary Law. "Section 487 [] permits a civil action to be maintained by any *party* who is *injured* by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation, and it provides for treble damages." *Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008) (citing *Fields v. Turner*, 147 N.Y.S.2d 542, 543-44 (Sup. Ct. 1955)) (emphasis added).

First, Plaintiff has no standing to bring a claim under Section 487 because she was not a party to the proceedings in which the alleged deceit occurred, which were between Madison 96—a Schoeman client—and its insurance carrier. *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 629 F. Supp. 2d 259, 265 (S.D.N.Y. 2007) (citing *Gelmin v. Quicke*, 638 N.Y.S.2d 132, 134 (App. Div. 1996) (stating that the "party" referred to in § 487 is "clearly a party to an action pending in a court in reference to which the deceit is practiced, and not a person outside, not connected with the same at the time or with the court")), *aff'd* 351 F. App'x 472 (2d Cir. 2009); *see also Trepel v. Dippold*, No. 04 Civ. 8310 (DLC), 2005 U.S. Dist. LEXIS

8541, at *15 (S.D.N.Y. May 9, 2005) (noting that courts have "held that even a non-party could raise a Section 487 claim provided that he alleged a fiduciary relationship" (citing *Olshansky v. Sutton*, No. 00 Civ. 3539 (LAP), 2001 U.S. Dist. LEXIS 945, at *12-13 (S.D.N.Y. Feb. 6, 2001)). Moreover, even assuming Plaintiff could maintain an action as Madison 96's fiduciary, she makes no allegation that she was *injured* by the alleged deceit.

Second, recent court opinions have held that "a party's remedy for a violation of Section 487 stemming from an attorney's actions in a litigation lies exclusively in that lawsuit itself, not a second plenary action." *Alliance Network, LLC v. Sidley Austin LLP*, 987 N.Y.S.2d 794, 802 (Sup. Ct. 2014) (citing *Yalkowsky v. Century Apartments Assocs.*, 626 N.Y.S.2d 181, 215 (App. Div. 1995)). In an unpublished opinion, the Second Circuit noted this rule and indicated that it would appear to apply at least where the party became aware of the deceit prior to the entry of judgment, unless the deceit was part of a fraudulent scheme extending beyond the prior lawsuit. *Seldon v. Bernstein*, 503 F. App'x 32, 33 (2d Cir. 2012) (summary order). Plaintiff alleges that she was aware of the alleged deceit during the course of the Madison 96 proceedings and does not otherwise allege a fraudulent scheme extending beyond the prior lawsuit. Therefore, Plaintiff's 92nd through 94th Claims are dismissed.

### D. RICO

Plaintiff's 95th through 102nd Claims assert claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against the Schoeman Partners.

> To establish a civil RICO claim, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity," as well as "injury to business or property as a result of the RICO violation." The pattern of racketeering activity must consist of two or more predicate acts of racketeering.

*Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (quoting *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)). And in order to have standing to bring a civil RICO claim, "a plaintiff must show: (1) a violation of Section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v.*

*Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990); *see also Kimm v. Chang Hoon Lee*, 196 F. App'x 14, 16 (2d Cir. 2006) (summary order).

Plaintiff alleges a number of RICO predicate acts and alleges that she "suffered injury to her business and property . . . including, but not limited to, plaintiff's termination, severe economic injury, including but not limited to lost past and future wages, severe injury to plaintiff's reputation, and the loss of plaintiff's home." Am. Compl. ¶ 1546.  These allegations are insufficient to establish Plaintiff's standing to bring a civil RICO claim for the simple reason that she does not allege any cognizable civil RICO injuries.  Plaintiff's purported injury can be boiled down to her loss of employment.  Although Plaintiff also asserts that she lost her home, Am. Compl. ¶ 262, there is nothing in her Amended Complaint to suggest that this was due to anything but the loss of her job.

"The Second Circuit has held for more than a quarter century that loss of employment for reporting or refusing to participate in an enterprise engaging in a pattern of racketeering activity is not an injury sufficient to confer RICO standing." *Hoatson v. N.Y. Archdiocese*, No. 05 Civ. 10467 (PAC), 2007 U.S. Dist. LEXIS 9406, at *22 (S.D.N.Y. Feb. 8, 2007) (relying on *Hecht v. Comm. Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) and *Burdick v. Am. Express Co.*, 865 F.2d 527, 529 (2d Cir. 1989)).  Similarly, Plaintiff's "generalized reputational harms alleged . . . are too speculative to constitute an injury to business or property." *Kimm*, 196 F. App'x at 16. Therefore, because Plaintiff lacks standing to assert a civil RICO claim against any Defendant, her 95th through 98th Claims are dismissed.

Because Plaintiff fails to state a civil RICO claim against any Defendant, her 99th through 102nd claims for civil RICO conspiracy are also dismissed. *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("[B]ecause Plaintiffs did not adequately allege a substantive violation of RICO . . ., the District Court properly dismissed [counts alleging] a RICO conspiracy in violation of 18 U.S.C. § 1962(d)." (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999))).

### E.    Intentional Infliction of Emotional Distress

Plaintiff's 103rd Claim alleges intentional infliction of emotional distress against Schoeman and the Schoeman Partners, and her 107th Claim alleges intentional infliction of emotional distress against Casero. "Under New York law, a claim for intentional infliction of emotional distress requires: '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). It is well recognized that "the standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'" *Id.* (citing *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). The purpose of this rigorous standard "is to filter out trivial complaints and assure that the claim of severe emotional distress is genuine." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (citing *Howell*, 612 N.E.2d at 703). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Conboy*, 241 F.3d at 258 (quoting *Stuto*, 164 F.3d at 827). "A court may determine, as a matter of law, that the alleged behavior is not sufficiently outrageous to warrant the imposition of liability." *Medcalf*, 938 F. Supp. 2d at 488 (citing *Howell*, 612 N.E.2d at 702). Finally, it is worth noting that "[c]laims of intentional infliction of emotional distress in the context of employment disputes or firings are rarely found to meet these standards." *Slue v. N.Y. Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 371 (S.D.N.Y. 2006).

To support her claim, Plaintiff repeats many of the allegations described above revolving around her termination, including, *inter alia*, that Schoeman and the Schoeman Partners refused to allow Plaintiff to work from home during the renovations, terminated Plaintiff nine days after she filed an OSHA complaint, and listed in the Letter of Termination all the reasons why they lacked confidence in her judgment and performance. Am. Compl ¶¶ 1681-1697. She also contends that Schoeman submitted false information for the purpose of obtaining an inaccurate

asbestos report. Am. Compl. ¶ 1695. With respect to her 107th Claim against Casero, Plaintiff

contends that Casero subjected her to religious discrimination and then lied about it. Am.

Compl. ¶ 1718.

There is nothing in any of these allegations that rises to the level of conduct that is "'so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Conboy*,

241 F.3d at 258 (quoting *Stuto*, 164 F.3d at 827). Moreover, as noted, courts routinely reject

claims for intentional infliction of emotional distress that are based on discriminatory or

retaliatory terminations. *See, e.g., Zhengfang Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184,

213-14 (E.D.N.Y. 2012) (rejecting claim for intentional infliction of emotional distress where

plaintiff alleges that "defendants criticized her, placed her under surveillance, and terminated her

in retaliation for her complaints") (footnote omitted); *see also Spence v. Md. Cas. Co.*, 995 F.2d

1147, 1158 (2d Cir. 1993) ("Defendants' criticisms of [plaintiff's] job performance and their

conditional threats of termination . . . fall far short of the 'extreme' and 'outrageous' conduct that

is actionable as an intentional infliction of emotional distress."); *Martin v. Citibank, N.A.*, 762

F.2d 212, 220 (2d Cir. 1985) (holding that allegations of being polygraphed on the basis of race

is not outrageous per se "despite the unacceptability of racial discrimination in civilized

society"). Because Plaintiff fails to allege conduct that would satisfy the "rigorous, and difficult"

standard for stating a claim of emotional distress, *Howell*, 612 N.E.2d at 702, she has not stated a

claim on her 103rd and 107th Claim.

Similarly, the Court has reviewed all of Plaintiff's many allegations of intentional

infliction of emotional distress concerning the other Defendants and finds them equally without

merit because she fails to allege conduct concerning any Defendant that is sufficiently

outrageous to satisfy the stringent requirements of the tort. *See, e.g.,* Am. Compl. ¶¶ 2382-2383,

2389, 2399. Therefore, Plaintiff's 105th, 195th, 197th,[6] 208th, and 209th Claims are dismissed.

---

[6] Plaintiff's claim against the Reed Smith Defendants fails for the additional reason that New York courts
have held that "defamatory remarks impugning plaintiff's competence as an attorney" are not sufficiently

### F.     Religious Discrimination

Plaintiff asserts numerous permutations of claims for religious discrimination under federal, state, and municipal law against the Schoeman Defendants, collectively or individually, in her 136th through 140th and 142nd through 159th Claims.  These Claims can be grouped into claims relating to: (1) disparate treatment/discriminatory termination, (2) failure to accommodate, (3) retaliation, and (4) aiding and abetting discrimination.  However, Plaintiff asserts in her opposition brief that she did not intend to assert a failure to accommodate claim, Dkt. No. 198 at 67.  Claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and New York State's Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, are analyzed together.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 27 (2d Cir. 2012) (citing *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.")).  Claims under New York City's Human Rights Law ("NYCHRL"), N.Y. City Admin Code § 8-101 *et seq.*, are analyzed independently and more broadly than their federal and state counterparts.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

Claims for employment discrimination are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires a plaintiff to first establish a *prima facie* case of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).  However, "[t]he Supreme Court has held . . . that 'the requirements for establishing a prima facie case under *McDonnell Douglas* [do not] apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.'"  *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006) (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)).  Nonetheless, "the elements of the *prima facie* case [still] 'provide an outline of what is necessary to render a plaintiff's . . . claims for relief plausible,'" so "courts 'consider these elements in determining whether there is sufficient factual matter in the complaint which, if true,

---

outrageous to state a claim for intentional infliction of emotional distress.  *LoPresti v. Florio*, 899 N.Y.S.2d 10, 11 (App. Div. 2010).

gives Defendant a fair notice of Plaintiff's claim and the grounds on which it rests.'" *Cruz v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 13 Civ. 1335 (AJN), 2014 U.S. Dist. LEXIS 77428, at *5-6 (S.D.N.Y. June 4, 2014) (quoting *Henry v. NYC Health & Hosp. Corp.*, No. 13 Civ. 6909 (PAE), 2014 U.S. Dist. LEXIS 32821, at *9-10 (S.D.N.Y. Mar 10, 2014)).

To state a claim for disparate treatment, Plaintiff must first establish a *prima facie* case of discrimination, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Ruiz*, 609 F.3d at 492. Plaintiff focuses on allegations relating to the April 2012 incident in which Casero allegedly asked Plaintiff to work on a Saturday, despite allegedly knowing that Plaintiff was an Orthodox Jew who does not work on Saturdays, and that she was once asked to work on a time-sensitive matter on a Friday afternoon. These allegations do not raise an inference of discrimination. Working on weekends and time-sensitive matters on Friday afternoons is common in law firms; indeed, it is common in many workplaces. The fact that on *one* occasion a superior *asked* Plaintiff if she was available to work on a Saturday, even if she knew that Plaintiff is an Orthodox Jew, does not raise an inference of discrimination. As further indication of the lack of discrimination, Plaintiff does not allege an adverse employment action related to these allegations other than her termination more than a year later. To the contrary, Plaintiff's own Amended Complaint indicates that she was permitted to and routinely did leave early on Fridays and did not work on Saturdays. Moreover, Plaintiff alleges that Schoeman and its partners took Plaintiff's accusations of religious discrimination seriously and hired outside counsel to conduct an investigation to determine if Plaintiff had been treated in a discriminatory fashion. Plaintiff refused to participate in that investigation—indicating that she would only participate in "discovery" under the supervision of a court of law. Am. Compl. ¶ 189. In short, Plaintiff does not allege facts that would raise an inference of discrimination.

Turning to Plaintiff's termination, she similarly states no facts that would support an inference of discrimination. Combining the two allegations noted in the preceding paragraph

with Plaintiff's other allegations that Schoeman (1) routinely failed to have kosher food at firm events and (2) only ordered a kosher birthday cake for one of the twelve monthly birthday parties that the firm hosted each year (the kosher cake being served for the month of Plaintiff's birthday), there is nothing in Plaintiff's Amended Complaint that suggests she was subjected to discrimination, much less that her termination had anything to do with her religion.  Plaintiff also points to the statements in the Letter of Termination regarding Plaintiff's behavior surrounding her accusations of religious discrimination against Casero.  Am. Compl. ¶ 117.  But nothing in the Letter suggests that the firm's decision to terminate Plaintiff was on account of her religion, rather than her behavior surrounding her accusations of religious discrimination, including her failure to cooperate in the firm's investigation.  Even after "construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible,'" *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of N.Y.*, 947 N.E.2d 135, 137-38 (N.Y. 2011)), Plaintiff has not put forth any factual allegations under which her claims for disparate treatment and discriminatory termination on religious grounds are plausible under federal, state, or municipal law.

"In order to present a prima facie case of retaliation under Title VII . . ., a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find (1) that [s]he engaged in protected participation or opposition under Title VII . . ., (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).  As noted, Title VII and NYSHRL claims are analyzed together.  But liability under the NYCHRL is "broader" than its state and federal counterparts because, under the NYCHRL, "retaliation 'in any manner' is prohibited, and '[t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment.'" *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d

712, 723 (2d Cir. 2010) (quoting N.Y.C. Admin. Code § 8-107(7)). "However, a plaintiff claiming retaliation under the NYCHRL must still show that her employer was aware she engaged in a protected activity, and that there was a causal connection between the protected activity and the employer's subsequent action." *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 592 (S.D.N.Y. 2012) (citing *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009)).

Plaintiff contends that she was terminated in April 2013 in retaliation for her complaints of religious discrimination that were made in April 2012. A one-year gap between the protected activity and the alleged retaliation is generally considered too great a timespan to provide circumstantial evidence of a causal connection for a retaliation claim. *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (finding claim of retaliation under 42 U.S.C. § 1983 not stated where more than one year passed between protected activity and adverse employment action); *see also Chukweze v. N.Y. City Emps. Ret. Sys.*, 891 F. Supp. 2d 443, 457-58 (S.D.N.Y. 2012) (collecting cases finding that causal connection is lacking where there is a substantial gap of three, six, eight, or more months between the protected activity and the alleged retaliation). Moreover, there is nothing else in Plaintiff's Amended Complaint to suggest that she was terminated in April 2013 *because of* the accusations she made in April 2012. Lacking any factual allegations that would support a finding of causation, Plaintiff's retaliation claims under federal, state, and municipal law must be dismissed.

And because Plaintiff fails to state a claim for religious discrimination of any kind, her 142nd through 144th, 153rd, and 155th Claims for aiding and abetting religious discrimination under Title VII, the NYSHRL, and the NYCHRL are also dismissed.[7]

---

[7] This Court has jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331, federal question jurisdiction, on the basis of Plaintiff's civil RICO claims and her Title VII claims. The Court has jurisdiction over the remainder of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, supplemental jurisdiction. "[T]he district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction [so long as] there is first a proper basis for original federal jurisdiction." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) (citations omitted).

### G.    Age Discrimination

Plaintiff's 108th through 135th Claims allege numerous permutations of age discrimination and aiding and abetting age discrimination under the NYSHRL and NYCHRL against various Schoeman Defendants.  Like religious discrimination, age discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework described above. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009).  Thus, "[t]o establish a prima facie case of age discrimination . . . a plaintiff must demonstrate the following:  (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 498 (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003)).  As noted, the NYCHRL is interpreted more broadly and "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8.  That being said, the NYCHRL "still requires a showing of some evidence from which discrimination can be inferred." *Ben-Levy v. Bloomberg*, 518 F. App'x 17, 20 (2d Cir. 2013) (summary order).

Plaintiff alleges that, based on her young age, she was treated poorly by her superiors and some support personnel at the firm.  *See* Am. Compl. ¶¶ 241-255.  For example:  Updike would sometimes tell Plaintiff and others that she was a first- or second-year associate when she in fact had more years of experience, Am. Compl. ¶ 241; Kaufman would treat her like a "paralegal with a strictly administrative role" in front of clients and other attorneys, Am. Compl. ¶ 243; Kaufman would often not announce Plaintiff's presence on conference calls, Am. Compl. ¶ 243; at a court appearance, Kaufman failed to introduce Plaintiff to other attorneys working on the case, Am. Compl. ¶ 243; Kaufman would limit Plaintiff's interactions with clients, Am. Compl. ¶¶ 244, 247; Kaufman, Nygaard, and Law would sometimes ignore Plaintiff's emails or requests, Am. Compl. ¶¶ 246, 249-50; Updike once asked Plaintiff to carry a "heavy load of documents," Am. Compl. ¶ 255; and Schoeman did not put a photo of Plaintiff on its website even though it put the photos of other, older attorneys with comparable levels of experience on its website, Am.

Compl. ¶ 252.  Nothing about these allegations plausibly suggests that Plaintiff was
discriminated against on the basis of age; rather, these are allegations that she was treated like a
junior attorney in a law firm.  *Cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)
("Because age and years of service are analytically distinct, an employer can take account of one
while ignoring the other, and thus it is incorrect to say that a decision based on years of service is
necessarily 'age based.'").

    Like Plaintiff's claims for retaliation relating to her complaints of religious
discrimination, her retaliation claims relating to her complaints of age discrimination require a
*prima facie* showing "(1) that [s]he engaged in protected [activity] . . ., (2) that the employer was
aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that
a causal connection exists between the protected activity and the adverse action, i.e., that a
retaliatory motive played a part in the adverse employment action.'"  *Kessler*, 461 F.3d at 205-06
(quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).  "The elements of a
retaliation claim under the NYCHRL are identical, 'except that the plaintiff need not prove any
'adverse' employment action; instead, he must prove that something happened that would be
reasonably likely to deter a person from engaging in protected activity.'"  *Olorode v.
Streamingedge, Inc.*, No. 11 Civ. 6934 (GBD) (AJP), 2014 U.S. Dist. LEXIS 59421, at *66
(S.D.N.Y. Apr. 29, 2014) (quoting *Jeune v. City of New York*, No. 11 Civ. 7424 (JMF), 2014
U.S. Dist. LEXIS 2574, at *18 (S.D.N.Y. Jan. 9, 2014)).

    Plaintiff only conclusorily states that she complained about her perceived age
discrimination, but she does not allege to whom she complained or when these complaints were
made.  Such conclusory allegations do not suffice to show that Plaintiff engaged in protected
activity.  *Accord Herling v. N.Y. City Dep't of Educ.*, No. 13-cv-5287, 2014 U.S. Dist. LEXIS
56442, at *24 (E.D.N.Y. Apr. 23, 2014) (finding an allegation that plaintiff "regularly
complained of unlawful discrimination and retaliation . . . too vague and conclusory to constitute
protected activity as [plaintiff] fails to specify when he lodged these complaints, who he
complained to, and whether [his direct supervisor] knew about these complaints").  Relatedly,

Plaintiff fails to allege a causal connection between these vague complaints and any action on the part of her employer that would be reasonably likely to deter a person from engaging in protected activity. Thus, even under the broader and more liberal reading required by the NYCHRL, Plaintiff fails to state a claim for retaliation based on her alleged complaints of age discrimination under either state or municipal law.

And because Plaintiff fails to state a claim for age discrimination of any kind, her 117th through 122nd and 134th Claims for aiding and abetting age discrimination under the NYSHRL and NYCHRL are also dismissed.

### H.    Breach of Fiduciary Duty

Plaintiff's 160th and 212th Claims allege that Schoeman and the Schoeman Partners breached a fiduciary duty that they owed to her, and her 161st through 164th and 213th through 216th Claims allege that the Schoeman Partners aided and abetted (presumably their own or Schoeman's) breach of fiduciary duty. Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Communs., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (App. Div. 2009)). "A fiduciary relationship arises 'between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 980 (N.Y. 2009) (quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)). "Put differently, '[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.'" *Id.* (quoting *AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 896 N.E.2d 61, 67 (N.Y. 2008)).

Plaintiff merely alleges in a conclusory fashion that she "reposed trust and confidence in the integrity and fidelity of Schoeman and the [Schoeman Partners] who thereby gained a resulting superiority and influence over plaintiff, and who had control and responsibility over plaintiff." Am. Compl. ¶ 2010. But she alleges no facts to support the existence of a fiduciary

relationship other than the fact of her employment relationship with Schoeman.  Plaintiff's "mere assertions of 'trust and confidence' are insufficient to support a claim of a fiduciary relationship." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (citing *Freedman v. Pearlman*, 706 N.Y.S.2d 405, 409 (App. Div. 2000)).  Moreover, "[t]he law . . . enunciated in every reported [New York] appellate-division-level case[] is that employment relationships do not create fiduciary relationships." *Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 125 (App. Div. 2009) (collecting cases); *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 878 N.Y.S.2d 717, 719 (App. Div. 2009) ("His breach of fiduciary duty claim fails because an employer owes no fiduciary duty to an at-will employee" (citing *Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*, 568 N.YS.2d 84, 85 (App. Div. 1991))).  Therefore, because the Schoeman Defendants and Schoeman Partners, as Plaintiff's employer, did not owe Plaintiff a fiduciary duty, her 160th through 164th and 212th through 216th Claims are dismissed.

And because Schoeman and the Schoeman Partners did not owe Plaintiff a fiduciary duty, there was no breach of fiduciary duty for any of the other Defendants to aid and abet.  Therefore, Plaintiffs 161st through 164th, 166th, 168th, and 221st through 224th claims for aiding and abetting breach of fiduciary duty are dismissed.

## I.     New York Labor Law § 241

Plaintiff's 171st Claim arises under New York Labor Law § 241(6) and her 193rd Claim arises under New York Labor Law § 241(10), both against Schoeman.

New York courts have explained that Section 241(6) "guarantees a reasonably safe work environment for employees and those 'lawfully frequenting such places.'" *Blandon v. Advance Constr. Co.*, 695 N.Y.S.2d 36, 38 (App. Div. 1999).  But "[t]he statute is limited to affording protection for those actually employed to work on a construction site, i.e., 'a plaintiff must demonstrate that he was both permitted or suffered to work on a building or structure and that he was hired by someone, be it owner, contractor or their agent', for that purpose." *Id.* (quoting *Mordkofsky v. V.C.V. Dev. Corp.*, 536 N.E.2d 263, 265 (N.Y. 1990)).  Contrary to Plaintiff's suggestion, "[n]ot every employee lawfully on the property is necessarily affiliated with the

construction work, or is otherwise frequenting the premises within the meaning of Labor Law

§ 241(6)." *Id.* (internal citations and quotation marks omitted). Rather, Section 241(6) is limited

to those actually engaged in "construction" or "excavation" work. *Jock v. Fien*, 605 N.E.2d 365,

367 (N.Y. 1992); *see also Kuffour v. Whitestone Constr. Corp.*, 941 N.Y.S.2d 653, 655 (App.

Div. 2012) (holding that security guard employed at school undergoing construction "was not a

person entitled to the protections" of New York Labor Law §§ 200, 240, or 241(6) despite being

allegedly injured by the defendant construction company's bricks stored in or near his security

booth); *Blandon*, 695 N.Y.S.2d at 38 (holding that a maintenance foreman and security guard

who was working the night shift at a building undergoing renovation was not among the class of

workers entitled to protection under Section 241(6) despite the fact that he was injured when he

fell through an opening where construction workers had earlier removed a staircase as part of the

construction work).

The Appellate Division, First Department's decision in *Spadola v. 260/261 Madison

Equities Corp.*, 798 N.Y.S.2d 38 (App. Div. 2005), is particularly instructive on this point. In

that case, the plaintiff was employed as a computer technician by a third party, United Staffing

Systems ("USS"), whose office space was being renovated by the defendants. "As USS prepared

to move into its new offices, plaintiff became involved in the planning for the new computer

system in the premises, causing him to visit the new space regularly." *Spadola*, 798 N.Y.S.2d at

40. On one of these visits, he slipped and fell on adhesive glue on the floor of the new space.

*Id.* The First Department affirmed the lower court's dismissal of plaintiff's claim under Section

241(6) "on the ground that he was not within the class of persons entitled to invoke the

protection of the statute." *Id.* (citing *Mordkofsky*, 563 N.E.2d at 265). The First Department

explained that

> [a]lthough an individual need not actually be engaged in physical labor, such as
> masonry, carpentry, electrical work, welding and plumbing, to be entitled to
> coverage under the Labor Law, the fact remains that plaintiff did not perform
> work integral or necessary to the completion of the construction project, nor was
> he a member of a team that undertook an enumerated activity under a construction
> contract or employed by a company engaged under a contract to carry out an
> enumerated activity. Instead of working for a company that had been engaged to

30

> carry out a specific part of the construction project, plaintiff was a computer technician employed by the entity on whose behalf the renovation work was being performed, and his duties had nothing to do with the construction taking place.

*Id.* at 40-41 (citations and internal quotation marks omitted). This analysis and holding are directly on point. Plaintiff was similarly employed by the entity on whose behalf the renovation work was being performed, and her duties as an attorney for that entity had nothing to do with the construction taking place. Therefore, Plaintiff cannot state a claim under New York Labor Law § 241(6) against any Defendant, so her 171st, 173rd, 176th, 179th, 182nd, 185th, 188th, and 191st Claims are all dismissed as against all Defendants.

Turning to Plaintiff's 193rd Claim arising under Section 241(10) of New York's Labor Law, the Court concludes that the above analysis with respect to the class of persons covered by Section 241(6) applies equally to Section 241(10) in light of the fact that both fall under the same general Section 241 covering "[c]onstruction, excavation and demolition work." In any event, Plaintiff's Amended Complaint fails to state any plausible claim under this subsection, which provides:

> Prior to advertising for bids or contracting for or commencing work on any demolition work on buildings covered under this section . . . all owners and their agents, . . . *shall conduct or cause to be conducted a survey* to determine whether or not the building to be demolished contains asbestos or asbestos material as defined in section nine hundred of this chapter.

N.Y. Labor Law § 241(10) (Consol. 2014) (emphasis added). Plaintiff alleges that

> [u]pon information and belief, despite the fact that asbestos [is] located on the twelfth floor of 551 Fifth Avenue and despite the fact that the asbestos [was] disturbed during the construction and renovation work, *no survey was conducted* pursuant to Section 241(10) of the Labor Law which stated that asbestos would be disturbed during the construction and renovation work and no asbestos remediation contract performed by a licensed asbestos contractor was ever completed.

Am. Compl. ¶ 2286 (emphasis added). But Plaintiff elsewhere alleges that such a survey *was* conducted by the AGG Defendants, Am. Compl. ¶ 57, and in fact attaches the report that the AGG Defendants prepared following that survey, Am. Compl. Ex. C. Therefore, even assuming Plaintiff's claim is not barred outright because she is not a member of the class of persons the statute was intended to protect, her own allegations belie any contention that there was a

violation of the subsection in the first place. Therefore, she cannot state a claim for a violation of

Section 241(10), so her 193rd Claim is dismissed as against all Defendants.

### J.    New York Labor Law § 740

Plaintiff's 169th Claim asserts a claim against Schoeman for violation of Section 740 of

New York's Labor Law. Section 740 provides, in relevant part:

> An employer shall not take any retaliatory personnel action against an employee
> because such employee does any of the following:  (a) discloses, or threatens to
> disclose to a supervisor or to a public body an activity, policy or practice of the
> employer that is in violation of law, rule or regulation which violation creates and
> presents a substantial and specific danger to the public health or safety, *or which
> constitutes health care fraud*; (b) provides information to, or testifies before, any
> public body conducting an investigation, hearing or inquiry into any such
> violation of a law, rule or regulation by such employer; or (c) objects to, or
> refuses to participate in any such activity, policy or practice in violation of a law,
> rule or regulation.

N.Y. Labor Law § 740 (Consol. 2014) (emphasis in original). New York courts interpreting this

statute have held that "'not every disclosure, or threat of disclosure, by an employee of a practice

in violation of a law, rule or regulation is protected by Labor Law § 740.'" *Connolly v. Harry*

*Macklowe Real Estate Co.*, 555 N.Y.S.2d 790, 792 (App. Div. 1990) (quoting *Remba v. Fed'n*

*Emp't and Guidance Serv.*, 545 N.Y.S.2d 140, 142 (App. Div. 1989)).   Rather,

> in order to maintain a claim pursuant to Labor Law [§] 740, a party must establish
> a violation of a law, rule or regulation, which violation must be actual and not
> merely possible, and that the lack of compliance presents a substantial and
> specific danger to the public health or safety.

*Id.* (citations omitted). The New York Court of Appeals has explicitly rejected attempts by

plaintiffs to extend Section 740's protections to "employees who make statements upon a

reasonable belief that a law, rule or regulation affecting public health and safety has been

violated." *Bordell v. Gen. Elec. Co.*, 88 N.Y.2d 869, 871 (N.Y. 1996).

Plaintiff cannot state a claim under Section 740 because she fails to allege an actual

violation of a law, rule, or regulation. To support her claim, Plaintiff makes the conclusory

allegation that Schoeman violated Sections 200(1) and 241 of New York's Labor Law and

Section 23-1.5(a) of the Industrial Code. Beyond being conclusory and speculative, Plaintiff

points to nothing more than her own personal belief that any violation of any law, rule, or regulation occurred. In *Nadkarni v. North Shore-Long Island Jewish Health System*, the plaintiff similarly alleged that the defendants retaliated against her when she complained that the hospital's plan to use volunteers to assist with the service and retrieval of patients' meal trays violated a certain health care financing administration regulation. 799 N.Y.S.2d 574, 574-75 (App. Div. 2005). The Appellate Division, Second Department affirmed dismissal of her claim because "plaintiff's contention that utilizing volunteers could adversely affect patient health and cause a substantial and specific danger to the public health or safety was no more than speculation." *Id.* at 575. Similarly, Plaintiff's "concerns were solely her belief" and are therefore insufficient to allege an *actual* violation of any law, rule, or regulation as required under the statute. *Id.*

### K. New York Labor Law § 200

Plaintiff's 170th Claim asserts a claim under New York Labor Law § 200 against Schoeman. Section 200 provides that: "All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places." "Section 200 of the New York Labor Law codifies the common law duty 'to protect the health and safety of employees.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 06-cv-1520, 2014 U.S. Dist. LEXIS 160212, at *97-98 (S.D.N.Y. Nov. 13, 2014) (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1052-53 (S.D.N.Y. 1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124 (2d Cir. 1995)). It "applies to owners, contractors, or their agents who exercise control or supervision over the work, or either created the allegedly dangerous condition or had actual or constructive notice of it." *Kim v. Herbert Const. Co., Inc.*, 713 N.Y.S.2d 190, 193-94 (App. Div. 2000) (citations omitted). And "[i]n order for a party to have a duty under section 200, it must 'have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 06-cv-1520, 2014 U.S. Dist. LEXIS

160212, at *93-94 (S.D.N.Y. Nov. 13, 2014) (quoting *Russin v. Louis N. Picciano & Son*, 429 N.E.2d 805, 807 (N.Y. 1981)).

As a preliminary matter, the Court doubts whether Plaintiff is within the class of persons Section 200 was intended to cover. The Court of Appeals has expressly held that "[t]he primary purpose of the Labor Law was the protection of workers," and, therefore, the Labor Law does not extend the protections of Sections 200 or 241 to members of the general public. *Mordkofsky*, 563 N.E.2d at 265. Analyzing cases applying the "persons lawfully frequenting" portion of Section 200(1), on which Plaintiff principally relies, the Court of Appeals noted that in nearly all those cases "the *injured* plaintiff was either a worker at the premises or a person seeking employment at the jobsite." *Id.* (emphasis added). The court in *Mordkofsky* further held that "the contract-vendee of a home being custom built . . . who was injured when the deck of the house gave way while he was inspecting the progress of the work" was not within the class of persons protected by Section 200:

> Because he was not an "employee" or "employed" at this site, was not a "mechanic, workingman or laborer working for another for hire" (Labor Law § 2(5)) nor one "permitted or suffered to work" (Labor Law § 2(7)) at the place of the occurrence he cannot be considered to have been within the class of persons "employed therein or lawfully frequenting" the premises entitled to the protection afforded by the "flat and unvarying duty" imposed by the Labor Law.

*Id.* at 264-66. Since Plaintiff had no involvement with the renovation work and was only briefly present in an area where renovations were being undertaken, she is not protected by Section 200.

But even if she were, Plaintiff does not actually allege any plausible injury to her health or safety, aside from fits of coughing and nausea, nor is she seeking recovery for any injury to her health or safety. Her claims under this statute against the various Defendants named in her Amended Complaint are based on some variation of the following causal sequence: Plaintiff suffered from a fit of coughing and nausea due to the "toxic" substances in the air caused by the renovation of the twelfth floor of 551 Fifth Avenue; as a result, Plaintiff complained to OSHA and refused to come to work; because she complained to OSHA and because she refused to come to work, among other reasons, Plaintiff was terminated. The Court is not aware of any case

34

applying Section 200 in which the plaintiff was able to recover for something other than personal injury, such as economic damages caused by termination from employment, nor does Plaintiff cite any cases supporting application of this statute outside the realm of personal injury. The Court, therefore, declines Plaintiff's invitation to expand liability under Section 200, whose "principal objective and purpose . . . was to provide for the health and safety of employees," *id.* at 265, to Plaintiff's remote and speculative economic harm, particularly where she fails to allege or seek recovery for any injury to her health or safety.

Regardless, Plaintiff's numerous claims under New York Labor Law § 200 are duplicative of her numerous claims for common law negligence. Because the Court also concludes that Plaintiff fails to state a claim for negligence against any Defendant, as described below, she also fails to state a claim under Section 200. *Cf. Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 455 n.15 (S.D.N.Y. 2005) ("Because § 200 is a codification of the common law of negligence, courts generally analyze claims brought under both § 200 and the common law simultaneously." (collecting cases)). Therefore, Plaintiff fails to state a claim under Section 200 and her 170th, 172nd, 175th, 178th, 181st, 184th, 187th, and 190th Claims are dismissed as against all Defendants.

### L.     Common Law Negligence

Plaintiff's 198th Claim asserts a claim sounding in common law negligence against Schoeman and the Schoeman Partners. But the New York Workers' Compensation Law "provides an exclusive remedy for negligence actions by an employee against his/her employer." *Duran v. Jam. Hosp.*, 216 F. Supp. 2d 63, 66 (E.D.N.Y. 2002); *see also* N.Y. Work. Comp. § 11 (McKinney 2014) ("The liability of an employer prescribed by [the NYWCL] shall be exclusive and in place of any other liability whatsoever, to such employee . . ., at common law or otherwise, on account of such injury or death or liability arising therefrom . . . ."). "[C]ourts have consistently interpreted this provision to bar negligence claims brought in federal court by an employee against an employer." *Id.* (citing *Walker v. Weight*, 961 F. Supp. 32, 35 (E.D.N.Y.

1997); *Chrzanowski v. Lichtman*, 884 F. Supp. 751, 756 (W.D.N.Y. 1995)).  Therefore,

Plaintiff's 198th Claim for negligence is dismissed.

## IV.   NANCY J. MERTZEL

Defendant Nancy J. Mertzel, a partner at Schoeman, was added in Plaintiff's Amended

Complaint and separately filed a motion to dismiss Plaintiff's sole claim asserted against her—

Plaintiff's 94th Claim for an alleged violation of Section 487 of New York's Judiciary Law.

Dkt. No. 170.  Mertzel argues that Plaintiff's claim against her should be dismissed because

Plaintiff failed to comply with Federal Rule of Civil Procedure 21 and because Plaintiff fails to

state a claim on which relief can be granted.  The Court need not decide the procedural issue

because it concludes, as noted in Part III.C. *supra*, that Plaintiff lacks standing to bring a claim

against anyone for a violation of Section 487.

## V.   THE AGG DEFENDANTS

The AGG Defendants filed a motion to dismiss Plaintiff's 210th Claim for negligence,

220th Claim for breach of fiduciary duty, and 224th Claim for aiding and abetting a breach of

fiduciary duty.  Plaintiff alleges that AGG was hired by Schoeman's landlord at 551 Fifth

Avenue to conduct a pre-construction asbestos assessment of certain areas in the space that was

to be renovated for Schoeman's new offices.  Am. Compl. ¶¶ 57, 2394.  She attached to her

Amended Complaint the asbestos assessment report dated August 4, 2012 that the AGG

Defendants authored and filed with the New York City Department of Environmental Protection.

Am. Compl. Ex. C.  Plaintiff alleges that the report is inaccurate because it

> incorrectly states the scope of work performed and omits from the scope of work
> certain areas where heavy renovation and construction work was performed and
> where asbestos are present in large quantities.  Moreover, the report incorrectly
> indicates that no asbestos would be disturbed during the construction and
> renovation work when asbestos was in fact disturbed.

Am. Compl. ¶ 58.  Plaintiff further alleges that construction activities were performed in the

antique entrance area and that asbestos was present in these areas and was disturbed by the

construction.  Am. Compl. ¶ 59-60.

## A.     Common Law Negligence

To state a claim of negligence under New York law, Plaintiff must allege "(1) a duty on the part of the defendant; (2) a breach of that duty by conduct involving an unreasonable risk of harm; (3) damages suffered by the plaintiff; and (4) causation, both in fact and proximate, between the breach and the plaintiff's harm." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 117 (2d Cir. 2013) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997)). "Although a jury determines whether and to what extent a particular duty was breached, it is for the court first to determine whether any duty exists, taking into consideration the reasonable expectations of the parties and society generally. The scope of any such duty of care varies with the foreseeability of the possible harm." *Tagle v. Jakob*, 763 N.E.2d 107, 109 (N.Y. 2001). It is well established that "[w]hen the harm which in fact results is caused by the intervention of factors or forces which form no part of the recognizable risk involved in the actor's conduct, the actor is ordinarily not liable." Restatement (Second) of Torts § 281 *cmt. f.* (1965). In addition, there are only "three circumstances in which a duty of care to noncontracting third parties may arise out of . . . contractual obligation[s] or the performance thereof." *Fernandez v. Otis Elevator Co.*, 772 N.Y.S.2d 14, 17 (App. Div. 2004) (citing *Espinal v. Melville Snow Contrs.*, 773 N.E.2d 485 (N.Y. 2002)). These circumstances include:

> (1) where the contracting party, in failing to exercise reasonable care in the execution of the contract, creates an unreasonable risk of harm to others, or exacerbates that risk; (2) where a plaintiff detrimentally relies on the defendant's continued performance of a contractual obligation; and (3) where the contracting party comprehensively agrees to assume and displace the promisee's safety-related obligations.

*Id.*

First, as a non-contracting third party, Plaintiff was owed no duty of care and she fails to allege any exceptions to that rule. Specifically, Plaintiff fails to allege that (1) the AGG Defendants created an unreasonable risk of harm to her and others in their failure to exercise reasonable care in the execution of their contract to conduct an asbestos assessment and report of that assessment; (2) she detrimentally relied on the AGG Defendants' continued performance of their contractual obligation, which was limited to a pre-construction asbestos assessment of

37

specific areas of the twelfth floor; or (3) that the AGG Defendants comprehensively agreed to assume and displace Schoeman's or Schoeman's landlord's safety-related obligations. *Fernandez*, 772 N.Y.S.2d at 17.

Moreover, and assuming that the rule stated in *Espinal* does not apply, Plaintiff still fails to plausibly allege that the AGG Defendants owed her a duty of care under general principles of common law negligence because the harm that befell her—the loss of her job—formed no part of the recognizable risk involved in their conduct. Plaintiff is not suing the AGG Defendants to recover for personal injury caused by their alleged negligence in conducting the asbestos assessment or in preparing the AGG Report. Instead, she is suing to recover for the loss of her job, which she alleges was due, in part, to dust created by the ICC Defendants' renovation work, which caused her to cough and become nauseated, which caused her to file an OSHA complaint and to work from home, which ultimately, among other reasons, led her employer to fire her. As described in greater detail below, Plaintiff fails to properly allege that the loss of her job was even factually caused by the AGG Defendants' actions, much less that the loss of her job was within the recognizable risk of their conduct. Therefore, "taking into consideration the reasonable expectations of the parties and society generally," and, particularly, the "foreseeability of the possible harm," *Tagle*, 763 N.E.2d at 109, the Court concludes that the AGG Defendants did not owe Plaintiff a duty of care because the harm she alleges forms no part of the recognizable risk involved in the AGG Defendants' conduct.

Second, and assuming for the sake of argument that the AGG Defendants owed a duty to Plaintiff, she does not properly allege a breach of that duty. AGG's report clearly identifies the area that the AGG Defendants were hired to investigate: "12th floor, suite 1210: interior renovation. Antique entrance and east of the entrance part *are excluded*." Am. Compl. Ex. C. ¶ 7 (emphasis added). The AGG Report goes on to assume that "asbestos is present and will not be disturbed during construction activity" in the "[a]ntique part entrance area and east of entrance area," which were the very areas excluded from the scope of work. Am. Compl. Ex. C. ¶ 8. Plaintiff alleges that the antique area and checkered floor did in fact undergo construction

work.  But even if that is the case, this fact has no plausible bearing on any breach by the AGG

Defendants because they were not hired to investigate those locations and had no control over

whether construction would be undertaken in those locations.  Furthermore, the report assumes

that those locations contain asbestos, so Plaintiff cannot allege that the AGG Defendants

breached any duty owed to her by failing to identify the presence of asbestos in the antique

entrance area.  In sum, Plaintiff does not in any way allege that the AGG Defendants failed to

properly investigate the areas of the twelfth floor that they were hired to investigate, so she fails

to allege a breach of any duty that the AGG Defendants may have owed to her.

Third, and assuming for the sake of argument that the AGG Defendants owed a duty to

Plaintiff that they breached, she fails to adequately plead causation because she does not allege

that she was injured by any breach that can be attributed to the AGG Defendants; i.e., she does

not allege that she was injured by asbestos that the AGG Defendants failed to identify.  It is well

established that

> [c]ausation incorporates at least two separate but related concepts: cause-in-fact
> and proximate cause.  Cause-in-fact refers to those antecedent events, acts or
> omissions which have so far contributed to the result that without them it would
> not have occurred. . . .  Proximate cause serves to limit, for legal or policy
> reasons, the responsibility of an actor for the consequences of his conduct.

*Aegis Ins. Servs. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (quoting *Monahan*

*v. Weichert*, 442 N.Y.S.2d 295, 298 (App. Div. 1981)).  The parties focused on Plaintiff's failure

to plead proximate causation, which is usually a jury question, but the Court need not reach this

issue because Plaintiff fails "to establish, beyond the point of speculation and conjecture, a

factual, causal connection between [her] losses and [the AGG Defendants'] actions."  *Id.* at 179.

Plaintiff's argument can be boiled down to the following causal sequence:  renovation

work on the twelfth floor released "toxic" substances into the air and renovation on the antique

entrance area released asbestos into the air; Plaintiff suffered a fit of coughing and nausea duty to

the "toxic" air; as a result, she complained about the air and refused to come to work; because

she complained about the air and refused to come to work, among other reasons, she was fired.

The causal problem with this scenario is that Plaintiff fails to connect her harm to any alleged

breach that can be attributed to the AGG Defendants. The AGG Defendants were hired to conduct an asbestos assessment of specified areas, not a general assessment of toxic substances much less an assessment of the entire floor. Plaintiff only vaguely alleges that she became ill "from the air," but does not allege that she became ill due to asbestos that was disturbed in areas that the AGG Defendants were hired to investigate and failed to identify. In sum, and even assuming that the AGG Defendants owed Plaintiff a duty of care that was breached, Plaintiff does not allege that she became ill from the asbestos that they failed to identify. *Cf. Taylor v. Botnick Motor Corp.*, 539 N.Y.S.2d 141, 143 (App. Div. 1989) ("While defendant's conduct in improperly registering the Chevette enabled the vehicle to be on the roadway, that dereliction was not a cause in fact of Taylor's injuries."). Therefore, Plaintiff cannot state a claim for negligence against the AGG Defendants.

Similarly, the Court has reviewed all of Plaintiff's many allegations of negligence concerning the non-Schoeman and non-Borrelli Defendants, *see, e.g.,* Am. Compl. ¶¶ 87, 2219, 2224-25, 2341-42, and finds them equally without merit for substantially the same reasons noted above. As with the AGG Defendants, the ICC Defendants did not owe Plaintiff a duty of care, because, as a non-contracting third party, Plaintiff was owed no duty of care and she fails to allege any exceptions to that rule. Moreover, under general principles of common law negligence, the Defendants could not have foreseen that the dust that their construction work produced would have led to Plaintiff's termination, and thus they did not owe Plaintiff a duty of care to prevent her termination. In short, even assuming the non-contracting third party rule of *Espinal* did not apply, none of the Defendants owed Plaintiff a duty of care because the harm she alleges forms no part of the recognizable risk involved in their conduct. Therefore, Plaintiff's 174th, 177th, 180th, 183rd, 186th, 199th, 201st through 203rd Claims are dismissed.[8]

---

[8] Plaintiff's negligence claims against the Creative Defendants fail for the additional reason that, according to Plaintiff's own allegations, Schoeman fired her because of the OSHA complaint, which was filed before the Creative Defendants conducted the air quality tests. Even assuming they owed Plaintiff a duty of care and that they were negligent in their air quality testing, the Creative Defendants' negligence did not contribute to Schoeman's decision to fire Plaintiff because, as she alleges, Schoeman chose to fire her based on her *filing* of the OSHA complaint, not based on the Creative Defendants' air quality tests.

### B.    Breach of Fiduciary Duty

As noted above, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Communs., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (App. Div. 2009)). "A fiduciary relationship arises 'between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation'" or, "[p]ut differently, '[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.'" *Eurycleia Partners, LP*, 910 N.E.2d at 980.  But "[m]ere reposal of one's trust or confidence in a party . . . does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well." *Qube Films Ltd. v. Padell*, No. 13-cv-8405, 2014 U.S. Dist. LEXIS 111595, at *14 (S.D.N.Y. 2014) (quoting *Thermal Imaging, Inc. v. Sandgrain Secs., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001)).  Finally, courts have also noted that "[w]ith respect to a fiduciary duty created by one party's trust and confidence in another party, 'the requisite high degree of dominance and reliance must have existed prior to the transaction giving rise to the alleged wrong, and not as a result of it[.]'" *Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 U.S. Dist. LEXIS 104829, at *10 (S.D.N.Y. Nov. 10, 2009) (quoting *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd.*, 674 N.Y.S.2d 648, 649 (App. Div. 1998)).

> Plaintiff alleges that
>
> [a]s the defendants retained to perform an asbestos investigation and prepare an as[b]estos assessment report for the office space where plaintiff would be employed and would be working for countless hours each week, said defendants had a relationship with plaintiff wherein plaintiff reposed trust and confidence in the integrity and fidelity of said defendants to ensure that the work environment at Schoeman was safe, who thereby gained a resulting superiority and influence over plaintiff, and who had control and responsibility over plaintiff.

Am. Compl. ¶ 2453.  Plaintiff does not state what resulting superiority or influence the AGG Defendants obtained over her.  Nor does she allege that the requisite high degree of dominance and reliance pre-dated the transaction giving rise to her alleged wrong.  And to the extent she

reposed trust in the AGG Defendants to do anything more than what they were hired to do,
Plaintiff does not allege that the AGG Defendants accepted such reposal of trust. Moreover, and
as extensively discussed above, even assuming that the AGG Defendants owed Plaintiff a
fiduciary duty, she fails to allege that they breached that duty or that she was damaged thereby
because she does not allege that they failed to investigate the areas of the floor that they were
hired to investigate. For these many reasons, Plaintiff fails to state a claim for breach of
fiduciary duty against the AGG Defendants.

Similarly, the Court has reviewed all of Plaintiff's many allegations of breach of
fiduciary duty concerning the non-Schoeman and non-Madison 96 Defendants, *see, e.g.,* Am.
Compl. ¶¶ 2038, 2441, 2449, and finds them equally without merit for substantially the same
reasons noted above with respect to the AGG Defendants. As noted, mere allegations that
Plaintiff reposed trust and confidence in the Defendants are insufficient to establish a fiduciary
duty. Moreover, there is nothing in Plaintiff's allegations to suggest that any of the Defendants
gained a resulting superiority over Plaintiff, or that the required high degree of dominance and
reliance she alleges existed prior to the transaction giving rise to the alleged wrong and not as a
result of it. Therefore, Plaintiff's 167th,[9] 217th, and 219th[10] Claims are dismissed.

---

[9] Plaintiff's breach of fiduciary duty claim against the Reed Smith Defendants fails for the additional
reason that co-counsel generally do not owe each other a fiduciary duty. *See Beck v. Wecht*, 48 P.3d 417, 423 (Cal.
2002) (creating a "bright-line rule refusing to recognize" a fiduciary duty between co-counsel); *Scheffler v. Adams &
Reese, LLP*, 950 So. 2d 641, 652-53 (La. 2007) ("Based on the foregoing precepts and precedent, we conclude that it
is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his or her client. This
duty should not be diluted by a fiduciary duty owed to some other person, such as co-counsel, to protect that
person's interest in a prospective fee."); *see also Blondell v. Littlepage*, 968 A.2d 678, 688-92 (Md. Ct. Spec. App.
2009); *Mazon v. Krafchick*, 144 P.3d 1168, 1171-73 (Wash. 2006). Plaintiff is correct that most of these cases
involve fee disputes between co-counsel, but the opinions are driven by a concern that recognizing a fiduciary duty
in such circumstances might impinge on the undivided loyalty that co-counsel owe to their shared client. *See
Scheffler*, 950 So. 2d at 652-53. This concern is not diminished in the context of Plaintiff's alleged reputational
harms.

[10] Plaintiff's breach of fiduciary duty claim against the Creative Defendants fails for the additional reason
that it is entirely duplicative of her breach of contract claim and can be dismissed on that ground alone. *Hildene
Capital Mgmt., LLC v. Friedman, Billings, Ramsey Group, Inc.*, No. 11 Civ. 5832 (AJN), 2012 U.S. Dist. LEXIS
115942, at *24-25 (S.D.N.Y. Aug. 15, 2012) (citing *Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011)).

## VI.    THE REED SMITH DEFENDANTS

The Reed Smith Defendants filed a motion to dismiss Plaintiff's 13th, 92nd, 93rd, 94th, 167th, 168th, 196th, and 197th Claims insofar as these Claims concern Reed Smith and Breene. The discussion below is limited to Plaintiff's claims that have not already been addressed above.

### A.    Defamation

Plaintiff bases her 13th Claim for defamation against the Reed Smith Defendants largely on allegations revolving around the Madison 96 proceedings discussed above, and, specifically, an email from Breene to Updike discussing Plaintiff that was included in Zeligson's report. As discussed above, prior to filing the summary judgment briefs, Plaintiff and Breene exchanged a number of emails, on which Updike was apparently copied, in which Breene expressed his belief that Plaintiff's comments were not needed and Plaintiff nonetheless insisted on reviewing the final papers. Am. Compl. ¶¶ 137-143. Updike eventually stepped in and informed Breene to "[g]o ahead and file." Am. Compl. ¶ 144. Breene subsequently emailed Updike, stating:

> We will need to discuss future filings. While we need and want input from you and Ronit on the facts and procedural history of this case, Jean and I have won a dozen of these motions – one last week – and it has not been productive for Ronit to insist that we make changes in legal argument that (i) she does not understand, and (ii) relate to insurance issues in which we have developed an expertise. Ronit's input on these has vastly increased the cost to us of making this motion. Your firm is being paid, we are on a contingency and unnecessary work has made this an unprofitable proposition. I don't believe I have ever sent harsher e-mails to anyone than those I sent to Ronit today, but, frankly, the frustration level of dealing with Ronit on this matter has really boiled over for both Jean and myself.

Am. Compl. ¶ 145. Plaintiff's defamation claim against the Reed Smith Defendants fails for many of the same reasons discussed above with respect to the Schoeman Defendants.

First, Plaintiff's Claim is time barred. Plaintiff alleges that the Breene email was sent in January 2012, Am. Compl. ¶ 137, which was more than two years before Plaintiff filed her complaint. As noted above, defamation claims are subject to a one-year statute of limitations, which begins to run on the date that the defamatory statement is "published." *Van Buskirk*, 325 F.3d at 88. Plaintiff attempts to circumvent this limitation by alleging that the email was republished in June 2013 when Schoeman sent Zeligson's report, which allegedly contained the

43

email, to OSHA. The Court of Appeals recently stated that New York's "republication liability standard has been consistent for more than one hundred years," and provides that "'one who utters a slander, or prints and publishes a libel, is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control.'" *Geraci v. Probst*, 938 N.E.2d 917, 921 (N.Y. 2010) (quoting *Schoepflin v. Coffey*, 56 N.E. 502, 504 (1900)). Plaintiff states that "the republication of [Zeligson's report] was done with the consent of . . . Paul E. Breene," Am. Compl. ¶ 955, but she provides no factual basis for this conclusory allegation and does not allege any facts to suggest that the Reed Smith Defendants in any way requested the republication or authorized it.

Second, and even assuming that Breene's email rises to the level of a defamatory statement, which is doubtful, it contains non-actionable statements of opinion. Applying the legal authority discussed in Part III.A. *supra*, it is clear from the context of Breene's email that he merely provided his opinion that Plaintiff's contributions were not productive and that it was frustrating to work with her.

### B.   Tortious Interference with Business Relations

Plaintiff's 196th Claim alleges tortious interference with business relations against the Reed Smith Defendants. In general, to state a claim for tortious interference with business relations, "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). As the Second Circuit noted in *Catskill*, "[t]he wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Id.* (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449-50 (N.Y. 1980)). Moreover, "a plaintiff must 'demonstrate *both* wrongful means *and* that the wrongful acts were the proximate cause' of the

alleged injury." *Id.* at 133 (citing *State St. Bank & Trust. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171-72 (2d Cir. 2004)).

As an at-will employee, Plaintiff cannot state a claim for tortious interference with her relationship with Schoeman. The New York Court of Appeals has held that "there is no Claim in tort for abusive or wrongful discharge of an at-will employee, [and it] has declined to allow a plaintiff 'to evade the employment at-will rule and relationship by recasting his Claim in the garb of a tortious interference with his employment.'" *Thawley v. Turtell*, 736 N.Y.S.2d 2, 3 (App. Div. 2001) (quoting *Ingle v. Glamore Motor Sales, Inc.*, 535 N.E.2d 1311, 1313-14 (N.Y. 1989)). Twenty years later, the Court of Appeals reiterated that "New York law is clear that absent 'a constitutionally impermissible purpose, a statutory prescription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired.'" *Smalley v. Dreyfus Corp.*, 882 N.E.2d 882, 884 (N.Y. 2008) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (1983)). To further drive home the point, the Court of Appeals continued:

> Thus, either the employer or the employee generally may terminate the at-will employment for any reason, or for no reason. In the decades since *Murphy*, we have repeatedly refused to recognize exceptions to, or pathways around, these principles.

*Id.* (citing *Horn v. N.Y. Times*, 790 N.E.2d 753 (N.Y. 2003); *Ingle*, 535 N.E.2d 1311, *Sabetay v. Sterling Drug*, 506 N.E.2d 919 (N.Y. 1987); *Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441 (N.Y. 1982)). This clear directive from New York's highest court, reiterating and citing the rule stated in *Ingle*, could not be clearer. On this basis alone, the Court concludes that Plaintiff cannot state a claim against any Defendant for tortiously interfering with her at-will employment relationship with Schoeman.

Despite these consistent and clear holdings from the New York Court of Appeals, however, a number of courts have allowed plaintiffs to state claims of tortious interference with at-will employment relationships under certain "limited situations." *See, e.g., Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (citing *Mansour v. Abrams*, 502 N.Y.S.2d 877, 878 (App. Div.

1986)). According to these opinions, the "limited situations" require the plaintiff to "establish that a 'third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.'" *Id.* (citing *Cohen v.* Davis, 926 F. Supp. 399, 403 (S.D.N.Y. 1996)); *see also McHenry v. Lawrence*, 886 N.Y.S.2d 492, 494 (App. Div. 2009) (discussing *Smalley*, but then stating that "an at-will employee may assert a Claim alleging tortious interference" by showing: "(1) the existence of a business relationship between the plaintiff and a third party; (2) the defendants' interference with that business relationship; (3) that the defendants acted with the sole purpose of harming plaintiff *or* used dishonest, unfair, improper or illegal means that amounted to a crime or an independent tort; and (4) that such acts resulted in the injury to the plaintiff's relationship with the third party." (quoting *Schorr v. Guardian Life Ins. Co. of Am.*, 843 N.Y.S.2d 24, 28 (App. Div. 2007))). The Court notes that these "limited situations" do not fall within the very narrow confines of "constitutionally impermissible purpose, a statutory prescription, or an express limitation in the individual contract of employment" recognized in *Smalley*. Moreover, they appear to be duplicative of the third element that must be satisfied for *any* tortious interference with business relations claim: "the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means." *Catskill*, 547 F.3d at 124-25. For the avoidance of doubt, however, the Court notes that even under this more permissive framework, Plaintiff's claim for tortious interference with her business relationship with Schoeman fails because her allegations do not satisfy the sole purpose or wrongful means prong of this test.

Similarly, the Court has reviewed all of Plaintiff's many allegations of tortious interference with business relations concerning the other Defendants in this case and finds them equally without merit. *See, e.g.,* Am. Compl. ¶¶ 2293, 2364-66, 2370-71, 2376-77. As noted above, the Court doubts whether Plaintiff can state a claim against any Defendant for tortiously interfering with her at-will employment relationship with Schoeman, but, even under the more permissive approach that some courts have followed in the at-will context for such tortious

interference claims, she still fails to allege that any of the Defendants (1) acted with the sole purpose of harming Plaintiff or (2) used dishonest, unfair, improper, or illegal means that amounted to a crime or an independent tort. Indeed, she generally fails to allege any volitional conduct on the part of the Defendants that could be construed as intending to interfere in any way with her relationship with Schoeman. Therefore, Plaintiff's 104th, 194th,[11] 205th, 206th, 207th Claims are dismissed.

## VII.    THE ICC DEFENDANTS

The ICC Defendants filed a motion to dismiss Plaintiff's 184th through 189th, 193rd, 206th, 208th, and 211th Claims insofar as these claims are asserted against the ICC Defendants. The ICC Defendants were allegedly hired by Defendant Jeffrey Management Corp. to act as the general contractor on the renovation of the Schoeman offices at 551 Fifth Avenue. The discussion below is limited to Plaintiff's claims that have not already been addressed above.

Plaintiff's 211th Claim alleges breach of contract against the ICC Defendants.[12] Plaintiff bases her breach of contract claim on the contract entered into between ICC and Jeffrey Management Corp. for the performance of construction and renovation work on the twelfth floor of 551 Fifth Avenue. Am. Compl. ¶ 2406. Acknowledging that she was not a party to that contract, Plaintiff argues that she is entitled to bring suit as an "express" third-party beneficiary of the contract. Am. Compl. ¶ 2408. Although Plaintiff selectively quotes from the contract, she does not point to any language in the contract expressly acknowledging the existence of third-party beneficiaries, much less that Plaintiff herself was a third-party beneficiary of the contract.

---

[11] Although Plaintiff does allege a fraud concerning the Madison 96 Defendants, the fraud she alleges was directed at Madison 96's adversary, QBE, not Schoeman. Moreover, Plaintiff does not properly allege that the Madison 96 Defendants acted with the *sole* purpose of harming Plaintiff. *Protic v. Dengler*, 46 F. Supp. 2d 277, 279 (S.D.N.Y. 1999) (noting that "the presence of any other motive, even coupled with an intention to inflict harm, is fatal to a claim such as this" (citing *S.O. Textiles Co. v. A & E Prods. Grp.*, 18 F. Supp. 2d 232, 240 (E.D.N.Y. 1998)). Indeed, she alleges that the purpose of Madison 96's conduct was to commit a fraud on QBE, and she fails to allege, other than in conclusory terms, that they in any way acted with a purpose of harming Plaintiff.

[12] The ICC Defendants did not argue that Plaintiff's breach of contract claim against them should be dismissed in their opening brief, but did argue that this claim should be dismissed in their reply. Regardless, he Court concludes that the claim is meritless and dismisses the claim *sua sponte*.

Under New York law, "[a] party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" *Cal. Pub. Emps. Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 469 (N.Y. 1983)). In addition, "[t]o create a third party right to enforce a contract, 'the language of the contract' must '*clearly* evidence[] an intent to permit enforcement by the third party[.]'" *Consol. Edison, Inc. v. Ne. Util.*, 426 F.3d 524, 528 (2d Cir. 2005) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)). Not only do Plaintiff's own allegations suggest that she was an incidental, rather than intended, beneficiary of any contract entered into between ICC and Jeffrey Management Corp., she fails to properly allege that the language of the contract *clearly* evidences an intent to permit her enforcement of the contract. Therefore, Plaintiff cannot state a claim for breach of this contract.

## VIII.   THE FEIL DEFENDANTS

Plaintiff's 172nd through 183rd, 193rd, 199th, 205th, 208th, 217th, and 221st Claims assert claims against the Feil Defendants. The Feil Defendants are the owners or managers of 551 Fifth Avenue. In sum and substance, Plaintiff alleges that the Feil Defendants improperly permitted Schoeman to occupy space on the twelfth floor of 551 Fifth Avenue while renovation work continued. She also alleges that they failed to determine if asbestos or other hazardous substances were present on the twelfth floor and, in particular, in Plaintiff's personal office. She further alleges that had the Feil Defendants not allowed Schoeman to occupy the space while renovations were ongoing, she would not have had to complain or work from home, and, therefore, would not have been fired. All of the claims against the Feil Defendants are addressed in the analysis above.

48

## IX.    THE CREATIVE DEFENDANTS

Plaintiff's 201st through 204th, 207th, 209th, 219th, and 223rd Claims assert claims against the Creative Defendants.  The Creative Defendants were allegedly retained by H&B Construction Services to conduct air quality tests on the twelfth floor of 551 Fifth Avenue following Plaintiff's complaint to OSHA.  Am. Compl. Ex. F.  The discussion below is limited to Plaintiff's claims that have not already been addressed above.

Plaintiff's 204th Claim asserts a claim for breach of contract against the Creative Defendants.  To support her claim, Plaintiff alleges that Creative Environment Solutions Corp. and/or H & B Construction Services, Inc. entered into a contract with French Partners, LLC and/or The Feil Organization and/or Jeffrey Management Corp. to have the air quality in Schoeman's office space on the twelfth floor tested in response to Plaintiff's OSHA complaint. Am. Compl. ¶ 2358.  She then alleges that "Creative Environment Solutions Corp. and/or H & B Construction Services, Inc. are guilty of a breach of contract in failing to properly ascertain the quality of the air at Schoeman and in issuing a report that concluded that the air at Schoeman was safe when it was not and when the report did not test the air in plaintiff's personal office at Schoeman or of the air quality in any of the Schoeman attorneys' personal offices or of the air in the antique entrance area to Suite 1210." Am. Compl. ¶ 2360.  But Plaintiff nowhere alleges that these acts or omissions actually breached the contract's terms. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) ("Stating in a conclusory manner that an agreement was breached does not sustain a claim for breach of contract." (collecting cases)).  Moreover, Plaintiff fails to allege facts that would support her ability to enforce the contract as a third-party beneficiary. *See* Part VII *supra*.

## X.    THE H&B DEFENDANTS

The H&B Defendants moved to dismiss Plaintiff's 200th, 204th, 207th, 209th, 218th, and 222nd Claims asserted against them.  Plaintiff alleges that H&B Construction Services, Inc. retained Creative Environment Solutions Corp. to test the quality of the air on the twelfth floor. Am. Compl. ¶ 91.  But Plaintiff fails to adequately distinguish between the acts of H&B

Construction Services, Inc. and Creative Environment Solutions Corp., and it appears that her claims against H&B Construction Services, Inc. are duplicative of her claims against the Creative Defendants (presumably based on her contention that H&B Construction Services, Inc. retained Creative Environment Solutions Corp to test the quality of the air at Schoeman's offices). Furthermore, she provides only conclusory allegations and no specific facts regarding the H&B Defendants to support her claims. Finally, Plaintiff fails to state a claim for breach of contract against the H&B Defendants because she fails to allege that she was an intended third-party beneficiary of the contract that she alleges was breached. *See* Part VII *supra*. Therefore, the Court concludes that she fails to state a claim against the H&B Defendants.

## XI.   THE MADISON 96 DEFENDANTS

The Madison 96 Defendants filed a motion to dismiss Plaintiff's 165th, 166th, 194th, and 195th Claims.[13] In March 2013, Madison 96 allegedly engaged Schoeman and Reed Smith to represent them in a dispute with Madison 96's insurance carrier, QBE Insurance Corp. ("QBE"). Boesky and Weiner are members of Madison 96. Am. Compl. ¶¶ 16-17. The discussion below is limited to Plaintiff's claims that have not already been addressed above.

Perhaps the most outlandish claim asserted in Plaintiff's sprawling Amended Complaint is her contention that her former client, Madison 96, breached its fiduciary duty *to her*. Specifically, Plaintiff contends that she "reposed trust and confidence in her client, the Madison 96 Defendants, not to conspire with Charles B. Updike, the Schoeman partner representing them, and plaintiff's co-counsel, Reed Smith and Breene, behind plaintiff's back, to commit insurance fraud." Dkt. No. 206 at 8. Under New York law—indeed the Court presumes that it is black-letter law in every jurisdiction in this country—"an attorney stands in a fiduciary relation to the client" and not the other way around. *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 653 N.E.2d 1179, 1182 (N.Y. 1995) (citing *In re Kelly v. Greason*, 244 N.E.2d 456, 460 (N.Y.

---

[13] Defendant Jamison Weiner submitted an affidavit indicating that he was never properly served in this action. Although Weiner's affidavit raises serious questions regarding whether he was in fact served, because the Court concludes that Plaintiff fails to state a claim against any of the Madison 96 Defendants, including Weiner, the Court need not resolve this procedural issue.

1968)). The fiduciary relationship between lawyer and client is a one-way street because the law "superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and *honoring the clients' interests over the lawyer's*." *In re Cooperman*, 83 N.Y.2d 465, 472 (1994) (citing *In re Kelly*, 244 N.E.2d at 460-61) (emphasis added). A lawyer may have any of a number of other claims that it can assert against a client, such as breach of contract for failure to pay legal fees, but it is utterly meritless for an attorney to assert a breach of fiduciary duty claim against her own client for conduct arising out of the attorney's representation of that client. Therefore, because a client cannot breach a non-existent fiduciary duty to her own attorney, Plaintiff fails to state a claim for breach of fiduciary duty against the Madison 96 Defendants.

## XII. THE ZELIGSON DEFENDANTS

The Zeligson Defendants filed a motion to dismiss Plaintiff's 13th, 104th, 105th, 116th, and 141st Claims. As noted above, Zeligson was allegedly hired by Schoeman to investigate Plaintiff's accusations of religious discrimination, and she subsequently prepared a report of her investigation. The discussion below is limited to Plaintiff's claims that have not already been addressed above.

Plaintiff's 13th Claim asserts various forms of defamation against the Zeligson Defendants based on the content of Zeligson's report. Plaintiff alleges that Schoeman hired Zeligson in June 2012 to conduct an investigation following Plaintiff's allegations of religious discrimination, Am. Compl. ¶ 150, and that Zeligson prepared a report following her investigation, Am. Compl. Ex. K. The report is dated June 26, 2012. Am. Compl. Ex. K. The Letter of Termination dated April 24, 2013 mentions Zeligson's report, which was allegedly sent to OSHA. Am. Compl. ¶ 152.

Even assuming that the report contains defamatory statements, Plaintiff's claim against the Zeligson Defendants is time barred because the report is dated June 26, 2012, and Plaintiff did not commence her present Claim until 2014. *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 89

(2d Cir. 2003) (noting that the statute of limitations for libel in New York is one year (citing

N.Y. C.P.L.R. § 215(3))).  As with the Reed Smith Defendants, Plaintiff cannot circumvent this

time bar based on her allegations that the report was re-published because she does not allege in

anything other than conclusory terms that the Zeligson Defendants gave Schoeman the authority

to republish the report or that they requested that Schoeman republish the report.  *Geraci*, 938

N.E.2d at 921.  Nor can Plaintiff circumvent this time bar by asserting in her opposition briefing

that "although the report is dated June 26, 2012, there is a question of fact as to whether it was in

fact *published* to Schoeman on that date or whether it was sent to Schoeman, at Schoeman's

request, shortly prior to plaintiff's April 24, 2013 termination, when Schoeman had a need for

it." Dkt. No. 202 at 16.  Even assuming this farfetched scenario were true, Plaintiff bears the

burden of alleging facts *in her complaint*, not her opposition briefings, that are sufficient to state

a claim.  *See Thai v. Cayre Group. Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) ("A

defamation claim 'is only sufficient if it adequately identifies 'the purported communication, and

an indication of who made the communication, when it was made, and to whom it was

communicated.'" (quoting *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 849 (S.D.N.Y.

2000)).  Therefore, Plaintiff's claims against the Zeligson Defendants are dismissed.

## XIII.   THE BORRELLI DEFENDANTS

The Borrelli Defendants moved for summary judgment as to Plaintiff's 190th through

193rd, 205th, and 208th claims insofar as these claims were asserted against the Borrelli

Defendants.  Schoeman retained the Borrelli Defendants pursuant to an Interior Design Services

Proposal under which the Borrelli Defendants provided architectural services for the renovations

of Schoeman's new offices; in other words, the Borrelli Defendants designed Schoeman's new

office space.  The discussion below is limited to Plaintiff's claims that have not already been

addressed above.

### A.      Standard of Review on Motions for Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment, a court views all evidence in the light most favorable to the non-movant, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  Finally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  In other words, "nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citations and quotation marks omitted).

### B.    Common Law Negligence

As noted above, to state a claim of negligence under New York law, Plaintiff must allege "(1) a duty on the part of the defendant; (2) a breach of that duty by conduct involving an unreasonable risk of harm; (3) damages suffered by the plaintiff; and (4) causation, both in fact and proximate, between the breach and the plaintiff's harm." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 117 (2d Cir. 2013) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997)).

New York courts have consistently held that where an architect does not direct or control construction work, a plaintiff injured as a result of construction work undertaken pursuant to the architect's designs cannot state a claim for negligence. *See Fernadez v. CMB Contr.*, 487 F. Supp. 2d 281, 288 (E.D.N.Y. 2007) (collecting cases recognizing that architects who do not direct or control the work are excluded from liability under common law negligence and New York Labor Law §§ 200, 240, and 241); *see also Jaroszewicz v. Facilities Dev. Corp.*, 495

N.Y.S.2d 498, 500 (App. Div. 1985) ("The record further establishes that defendant architects had neither the duty nor the right to control the manner in which the construction was performed. Nor is there any proof that defendant architects engaged in any active malfeasance which caused or contributed to the accident. In these circumstances, an architect or engineer is not liable for injuries to third persons."). The Borrelli Defendants submitted the Declaration of John F. Borrelli attesting to the fact that "JFBPC had no authority to direct or control the construction or renovation work, nor did JFBPC actually direct or control the work. JFBPC was not responsible for maintenance, control or safety at the premises where the plaintiff was employee." *See* Borrelli Decl. ¶ 5. Plaintiff takes issue with the authenticity of the contract the Borrelli Defendants submitted with their motion for summary judgment, but aside from the conclusory allegations in her Amended Complaint and the argument in her briefing, Plaintiff points to no admissible evidence that would contradict Borrelli's sworn statement.

Rather, Plaintiff attempts to circumvent the rule with respect to architects by pointing to inapposite cases. For example, she cites *Minorczyk v. Dormitory Auth. of the State of N.Y.*, which stated that "it was not necessary to show that [the construction company or City of New York] exercised supervisory control over the manner of performance of the injury-production work" if the defendants "had notice of the condition." 904 N.Y.S.2d 383, 384 (App. Div. 2010). But this case did not concern an architect who merely prepared the designs on which the construction work was based. And even if this case were on point, Plaintiff fails to point to any evidence that would suggest (a) any injury-producing work or (b) that the Borrelli Defendants had notice of such injury-producing work. She also argues that "an architect who does not exercise supervision and control over the work performed will still be liable for its negligent preparation or planning of design work," Dkt. No. 214 at 8, but she fails to allege much less point to any evidence of negligent preparation or planning of design work. Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts, and [she] may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554

(internal citations and quotation marks omitted).  Because she fails to do so, the Borrelli Defendants are entitled to summary judgment on Plaintiff's negligence claim.

And even if this rule pertaining to architects did not bar Plaintiff's claims, she would still fail to state a claim because, as noted in Part V.A. *supra*, the loss of her job was well outside the bounds of any recognizable risk involved in the Borrelli Defendants' conduct and so they could not have owed her a duty of care.

Therefore, for the several reasons described above, the Borrelli Defendants are entitled to summary judgment on Plaintiff's Claims asserted against them.[14]

## XIV.  MOTION FOR SANCTIONS

The AGG Defendants also moved separately for sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and this Court's inherent powers.  Dkt. No. 262.  The AGG Defendants contend that Plaintiff "appears to treat this litigation like some game or contest and, apparently out of anger or spite or both, seems to have divested herself of the ethical compass by which lawyers, even *pro se* ones, must be guided."  Dkt. No. 265 at 1.  The Court agrees.

### A.    Background

As noted, Plaintiff is a member of the bar of the State of New York who was employed by a New York law firm from 2009 until 2013.  Plaintiff's initial complaint in this action was roughly 500 pages long and asserted 102 separate claims against 27 Defendants.  Following the first round of motions to dismiss, Plaintiff filed her Amended Complaint, which grew to more than 1,200 pages and asserted 224 separate claims against 30 Defendants.  Plaintiff added the AGG Defendants in her Amended Complaint and asserted three claims against them, including claims for (1) negligence, (2) breach of fiduciary duty, and (3) aiding and abetting Schoeman's breach of fiduciary duty to Plaintiff.  Plaintiff's Amended Complaint seeks $3.2 billion for her negligence claim, $3.2 billion for her breach of fiduciary duty claim, and $2.8 billion for her

---

[14] Following briefing on the Borrelli Defendants' motion for summary judgment, Plaintiff filed a letter motion requesting that the Court hold John Francis Borrelli in criminal and civil contempt of court for felony perjury and also requested that the Court refer the matter to the U.S. Attorney for the Southern District of New York for criminal prosecution.  Dkt. No. 252.  Because Plaintiff did not seek the Court's permission to file that request, which was, in essence, a sur-reply memorandum of law, the Court did not consider it.

aiding and abetting breach of fiduciary duty claim, for a total sum of $9.2 billion against the AGG Defendants. As described in detail in Part V *supra*, these claims are frivolous.

AGG is a small, family-owned business. Sergei Goloubenko Decl. ¶ 2. Sergei Goloubenko, his wife, and his daughter are its shareholders. Goloubenko Decl. ¶ 2. Most of AGG's business is derived from Goloubenko's work as a New York City Certified Asbestos Investigator, and he typically charges only a few hundred dollars for each inspection he performs. Goloubenko Decl. ¶¶ 5-6. As of December 15, 2014, the AGG Defendants have incurred $24,953.00 in legal costs to defend against Plaintiff's frivolous claims. Goloubenko Decl. ¶ 4. The AGG Defendants have an insurance policy that covers claims alleging errors or omissions in Goloubenko's work as an asbestos investigator, but that policy has a deductible of $25,000 and so the AGG Defendants' have had to pay their defense costs out of their own pocket. Goloubenko Decl. ¶ 4.

On August 14, 2014, the AGG Defendants filed a motion to dismiss Plaintiff's claims against them in her Amended Complaint. Dkt. No. 192. On August 18, 2014, the AGG Defendants' counsel sent Plaintiff a letter demanding that she withdraw her frivolous claims against the AGG Defendants and also provided a detailed explanation of why the claims were frivolous. Kennell Decl. ¶ 2; Ex. A. Instead of withdrawing her claims, Plaintiff filed an opposition to the AGG Defendants' motion to dismiss on September 29, 2014. Dkt. No. 210. In accordance with Federal Rule of Civil Procedure 11(c)(2), the AGG Defendants served their Rule 11 motion on Plaintiff on October 30, 2014, but did not file the motion until December 12, 2014. *See* Dkt. No. 258-4. Plaintiff failed to withdraw her frivolous claims within the 21-day safe harbor.

### B.   Discussion

As noted, although Plaintiff is appearing *pro se*, as an attorney, she is held to the higher standards that are expected of all attorneys appearing before this Court. *Corrado v. N.Y. State Unified Court Sys.*, No. 12-CV-1748 (DLI)(MDG), 2014 U.S. Dist. LEXIS 97818, at *6-7

(E.D.N.Y. July 17, 2014).  With this caveat in mind, and as discussed below, the Court concludes

that sanctions are warranted under Rule 11.

### 1.    Rule 11 Sanctions

Under Rule 11(b),

> [b]y presenting to the court a pleading, written motion, or other paper—whether
> by signing, filing, submitting, or later advocating it—an attorney or unrepresented
> party certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances:

> (1)    it is not being presented for any improper purpose, such as to harass, cause
> unnecessary delay, or needlessly increase the cost of litigation; [and]

> (2)    the claims, defenses, and other legal contentions are warranted by existing
> law or by a nonfrivolous argument for extending, modifying, or reversing
> existing law or for establishing new law. . . .

"An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an

objective standard of reasonableness, it is clear . . . that there is no chance of success and no

reasonable argument to extend, modify or reverse the law as it stands." *Caisse Nationale de

Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994) (citations and internal

quotation marks omitted).

As discussed in detail in Part V *supra*, Plaintiff's claims against the AGG Defendants are

frivolous.  Beginning with her negligence claim, Plaintiff failed to allege that the AGG

Defendants owed her a duty of care because she did not properly allege any of the *Espinal*

exceptions to the rule that noncontracting third parties are generally not owed a duty of care.

Nor did she allege a duty of care under general principles of common law negligence because the

loss of her job was well outside the bounds of any recognizable risk involved in the AGG

Defendants' conduct.  She also failed to allege that they breached any duty they owed to her

because she did not allege that they failed to identify any toxic substance that they were hired to

identify.  Finally, Plaintiff failed to allege that the AGG Defendants' actions could have been the

factual cause of her termination.  All but recognizing this shortcoming, Plaintiff argues that

"*regardless of whether the defendants' actions caused plaintiff bodily harm*, the AGG

Defendants are liable for the severe economic, reputational, and other damage, including severe

emotional distress, they caused" her. Dkt. No. 266 at 15 (emphasis added). Unsurprisingly, she

provides no factual or legal authority to support this contention.

Plaintiff's second claim against the AGG Defendants is equally frivolous. Plaintiff

alleged in conclusory terms that she reposed trust and confidence in the AGG Defendants, but

failed to allege that the AGG Defendants accepted this reposal of trust and confidence or that

they acquired any resulting superiority or dominance over her due to her unilateral reposal of

trust. It was also clear from Plaintiff's Amended Complaint that this alleged fiduciary

relationship did not pre-date the conduct giving rise to her claim, which courts have held to be a

fatal shortcoming in alleging the existence of a fiduciary relationship. Finally, and similar to

Plaintiff's claim for negligence against the AGG Defendants, Plaintiff failed to properly allege

that the AGG Defendants breached any supposed duty they owed to her or that she was

proximately injured thereby.

Also frivolous was Plaintiff's claim against the AGG Defendants that they aided and

abetted Schoeman's breach of fiduciary duty. As discussed in Part III.H. *supra*, Schoeman, as

Plaintiff's employer, did not—indeed, could not—owe her a fiduciary duty. Nor did Plaintiff

allege any facts that could have created such a fiduciary duty. There was, therefore, no possible

breach of fiduciary duty for the AGG Defendants to aid and abet. Moreover, Plaintiff provides

no factual allegations that could be construed as the type of knowledge or purposeful conduct

necessary to aid and abet Schoeman to do *anything*, much less breach a non-existent fiduciary

duty to Plaintiff.

Finally, as noted above, Plaintiff sought a total of $9.2 *billion* in damages against the

AGG Defendants. In her opposition to the AGG Defendants' sanction motion, Plaintiff argues

that there is a basis to support her damages claim because she

> is a highly-intelligent and extraordinarily talented attorney with a unique set of
> skills and legal experience that are unmatched. Plaintiff, who is currently 28
> years old, is fully bilingual in English and Hebrew, with outstanding written and
> oral communication skills in both languages. She is admitted to practice law in
> New York and Israel and is a skilled litigator who can litigate in both New York
> and Israeli courts.

Dkt. No. 266 at 9.  Rather than retreat from her claim to $9.2 billion in damages, Plaintiff

> believes that any amount less than the amount of damages sought in the complaint
> will not adequately compensate her for the horrific injuries she suffered as a result
> of the actions of the [AGG] defendants in this action, which destroyed her life,
> career, livelihood, and reputation, among other severe damage.  Plaintiff further
> seeks significant punitive damages to punish the [AGG] defendants for their
> unconscionable actions and to deter them from even considering such heinous
> actions again in the future.

Dkt. No. 266 at 10-11. There can be no legal or factual basis to support such an outrageous claim

for compensatory or punitive damages against *anyone* for the loss of Plaintiff's job, much less

against Defendants who were so far removed from Schoeman's decision to terminate her.

### 2.    Sanction Amount

Although it is clear that Rule 11 sanctions are warranted on the facts here, a much more

difficult proposition concerns the amount of such sanctions.  On this point, the Second Circuit

has cautioned that "the principal objective of the imposition of Rule 11 sanctions is not

compensation of the victimized party but rather the deterrence of baseless filings and the curbing

of abuses." *Caisse Nationale de Credit Agricole-CNCA*, 28 F.3d at 266.  In addition,

> [i]n fashioning a sanctions order, the Advisory Committee notes suggest the
> following considerations: (1) whether the improper conduct was willful or
> negligent; (2) whether it was part of a pattern of activity, or an isolated event; (3)
> whether it infected the entire pleading, or only one particular count or defense; (4)
> whether the person has engaged in similar conduct in other litigation; (5) whether
> it was intended to injure; (6) what effect it had on the litigation process in either
> time or expense; (7) whether the responsible person is trained in law; (8) what
> amount, given the financial resources of the responsible person, is needed to deter
> that person from repetition in the same case; and (9) what amount is needed to
> deter similar activity by other litigants.

*Zlotnick v. Hubbard*, 572 F. Supp. 2d 258, 272 (N.D.N.Y. 2008) (citing Rule 11(c) Advisory

Comm. Notes (1993)).

Applying these considerations, the Court concludes that a monetary sanction in the

amount of $5,000 is warranted.  There can be no doubt that Plaintiff's decision to name the AGG

Defendants in her Amended Complaint and to assert three frivolous claims against them was

willful.  Plaintiff's sanctionable conduct infected all the claims against the AGG Defendants;

indeed, it infected her entire Amended Complaint.  The Court can discern no purpose for

Plaintiff's frivolous claims against the AGG Defendants other than to exact as much pain and, most likely, extort as much money from as many people as possible following her termination, regardless of their role—or lack thereof—in that decision. By asserting claims against the AGG Defendants, Plaintiff unnecessarily increased the litigation costs involved for all parties who had to sift through her voluminous Amended Complaint to discern whether there were any non-conclusory factual allegations contained therein. The AGG Defendants, who had no role to play in her termination, have already expended more than $24,000 to defend against her frivolous claims. By adding so many frivolous claims against so many additional defendants, Plaintiff also slowed down the entire litigation process due to the amount of time needed for the Court to sift through Plaintiff's hundreds of claims that resulted in eleven motions to dismiss or for summary judgment. As a member of the bar and practicing attorney, Plaintiff is trained in the law. With respect to Plaintiff's financial resources, she states that Schoeman paid her at least $120,000 per year from September 2009 until April 2013. Am. Compl. ¶ 35. However, she alleges that she has been unable to find work with any other law firms or legal entities since her termination in April 2013. Plaintiff also alleges that she lost her home. That being said, Plaintiff is a licensed attorney and it is unclear whether she continues to work as a solo practitioner.

Finally, the Court must consider what amount is needed to deter similar activity by other litigants, and on this point it is important to emphasize the fact that Plaintiff is no ordinary *pro se* litigant—she is a member of the bar, who, until very recently, was actively practicing with a law firm in New York City. Through their understanding of both procedural and substantive law, members of the bar are endowed with an incredible power that, when left unchecked, can be used in menacing ways. When named in a lawsuit, particularly one brought by a trained lawyer seeking billions of dollars in damages, an individual must respond to the complaint or risk a default judgment. To ably respond to such a complaint, most individuals will need to hire an attorney. The attorney will need to expend many hours reviewing the complaint and researching the law implicated in the complaint before drafting and filing a response to the complaint. Even for a reasonably priced attorney, the cost of answering a frivolous complaint may be in the

thousands, if not tens of thousands, of dollars.  No matter how frivolous the claims, many defendants would be tempted to settle a lawsuit for some fraction of the cost of litigating the lawsuit.  Knowing this, a *pro se* attorney could use a lawsuit merely to extort money from those wishing to be rid of the matter and to avoid mounting legal fees.  That is at least one reason why Rule 11 forbids unrepresented parties and attorneys from making frivolous claims and also requires that any factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation.  On the facts here, not only was there no legal basis for *any* of Plaintiff's claims against the AGG Defendants, the facts known to her provide no support *whatsoever* for any of Plaintiff's claims against the AGG Defendants.  In short, the Court can discern no basis for Plaintiff's decision to name the AGG Defendants, who were so far removed from her termination, other than for improper purposes—either to inflict as much pain on as many people as she could following what she believed to be a wrongful termination or to extort money in the form of settlement from anyone she could think of to offset the loss of her law firm job.  Deterring such behavior on the part of *pro se* attorneys requires a strong sanction.

The Court, therefore, concludes that a monetary sanction in the amount of $5,000 is appropriate in light of Plaintiff's status as a member of the bar, the utter frivolousness of Plaintiff's claims, the amount of damage she has caused to the AGG Defendants, her litigation behavior, her employment and salary history, and the need to deter similar *pro se* attorneys from using litigation as a tool for revenge or extortion.  The Court is awarding these sanctions pursuant to Rule 11(c)(4), which authorizes the Court, "if imposed on motion and warranted for effective deterrence," to issue "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Although the Court is strongly inclined to award the AGG Defendants the full amount of their reasonable attorneys' fees, based on Plaintiff's statements about her financial situation following her

termination, the Court will exercise its discretion to impose a significantly reduced sanction in the amount of $5,000.[15]

## XV.   CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, they are either moot or without merit. Therefore, for the reasons stated herein, the Defendants' motions are GRANTED in their entirety. This resolves Dkt. Nos. 119, 137, 141, 145, 149, 152, 155, 158, 170, 174, 176, 184, 192, and 262. (Dkt. Nos. 43, 56, 62, 66, 72, 75, 82, and 86 were superseded by subsequent motions to dismiss or for summary judgment per Dkt. No. 92.). In addition, it is hereby ORDERED that Plaintiff is to pay the AGG Defendants $5,000 pursuant to Rule 11. The Court also finds pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: March __26__, 2015
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

---

[15] The AGG Defendants also moved for sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent powers. Although the Court believes there is a strong basis to find sanctions pursuant to these powers and a court may award such sanctions in addition to Rule 11 sanctions, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991), because the Court concludes that the AGG Defendants are entitled to Rule 11 sanctions, the Court declines to decide whether Plaintiff should also be sanctioned under § 1927 or this Court's inherent powers.